No. 22-14237

# United States Court of Appeals for the Eleventh Circuit

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JUSTIN W. KEENER
D/B/A JMJ FINANCIAL,

*Defendant-Appellant.*

———————————————

On Appeal from the
United States District Court for the Southern District of Florida,
Case No. 1:20-cv-21254-BB

## BRIEF FOR DEFENDANT-APPELLANT JUSTIN W. KEENER

CHRISTOPHER F. REGAN
ORRICK, HERRINGTON
    & SUTCLIFFE LLP
2001 M Street NW, Suite 500
Washington, D.C. 20036
(202) 349-8000

HELGI C. WALKER
BRIAN A. RICHMAN
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
HWalker@gibsondunn.com

BARRY GOLDSMITH
M. JONATHAN SEIBALD
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y. 10166-0193
(212) 351-4000

*Counsel for Defendant-Appellant Justin W. Keener*

May 31, 2023

*SEC v. Justin W. Keener*, No. 22-14237

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Defendant-Appellant Justin W. Keener states that the following individuals, law firms, and entities have an interest in the outcome of this appeal:

1. Augustini, Hope Hall

2. Bloom, Beth F., U.S. District Judge

3. Braunstein, Joshua E.

4. Buckley LLP

5. Conley, Michael A.

6. Dwyer, Jared E.

7. Folena, Jan

8. Freda, Dominick V.

9. Gibson, Dunn & Crutcher LLP

10. Goldsmith, Barry

11. Greenberg, Benjamin G.

12. Greenberg Traurig, P.A.

13. Keener, Justin W. d/b/a JMJ Financial

*SEC v. Justin W. Keener*, No. 22-14237

14.    Lisitza, David D.

15.    Louis, Lauren Fleischer, U.S. Magistrate Judge

16.    Miller, Adam

17.    Orrick, Herrington & Sutcliffe LLP

18.    Petrilla, Antony R.

19.    Quinn, Brian O.

20.    Ramkumar, Archith

21.    Raskin, Jane S.

22.    Raskin & Raskin

23.    Regan, Christopher F.

24.    Richman, Brian A.

25.    Seibald, Jonathan M.

26.    Securities and Exchange Commission

27.    Viswanatha, Veena

28.    Walker, Helgi C.

29.    Welshhans, Carolyn M.

*SEC v. Justin W. Keener*, No. 22-14237

Pursuant to the district court's order, Defendant-Appellant Justin W. Keener has surrendered his remaining shares of stock and his remaining conversion rights.    Accordingly, Defendant-Appellant Justin W. Keener certifies that, pursuant to Eleventh Circuit Rule 26.1-3(b), there is no publicly traded company or corporation that has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Justin W. Keener respectfully requests oral argument. This appeal implicates a statutory question of enormous importance for the nation's financial markets—the meaning of the word "dealer" in the Securities Exchange Act of 1934. As the current Chairman of the House Financial Services Committee's Oversight Subcommittee recently warned, the Commission's theory in this and another recent case also pending before this Court (No. 21-13755) represents a "drastic, market-changing interpretation[] of securities law[]," with potentially significant legal implications for hedge funds, investment companies, and investment advisers. *Oversight of the SEC's Division of Enforcement: Hearing Before the Subcomm. on Investor Protection, Entrepreneurship and Capital Markets of the H. Comm. on Fin. Servs.*, 117th Cong. at 23:33 (2022) (statement of Rep. Huizenga), https://bit.ly/3MBCGad. The case also raises important constitutional questions about fair notice, and whether agencies can reverse course and seek life-altering sanctions for conduct that the agency had specifically stated was "not unlawful." Oral argument would substantially assist the Court in resolving these and other important issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF CONTENTS ............................................................... ii

TABLE OF CITATIONS ............................................................... v

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION ................................................. 3

STATEMENT OF ISSUES .......................................................... 3

STATEMENT OF THE CASE ...................................................... 4

    A.   In 1934, Brokers And Dealers Effectuate Customer Orders. ................................................................. 4

    B.   For The Next Nine Decades, "Dealer" Is Read In The Context Of Customer-Order Facilitation. ........................... 8

    C.   The Commission Claims To Discover A New Meaning. ....... 10

    D.   Over Multiple Dissents, The Commission Selectively Applies Its New Theory To Convertible Lenders. ............... 13

    E.   The District Court Adopts The Commission's New Theory. ................................................................... 18

STANDARD OF REVIEW........................................................... 19

SUMMARY OF ARGUMENT ...................................................... 19

ARGUMENT ......................................................................... 21

I.    The Commission's New "Dealer" Theory Is Contrary To Law. ......21

      A.    Brokers And Dealers Effectuate Orders For Customers......21

            1.    The '34 Act Uses Well-Known, Widely Used
                  Terms That Refer To The Methods Of
                  Effectuating Customer Orders. ...................................22

            2.    The Context Reinforces The Customer-Order-
                  Facilitation Interpretation. .........................................28

            3.    The Act's Structure Confirms The Customer-
                  Order-Facilitation Interpretation. ..............................31

      B.    The Commission's Contrary Position Is Untenable. ............34

            1.    The Commission Ignores Context And History...........34

            2.    The Commission Would Destroy Regulatory
                  Safeguards...................................................................35

            3.    The Commission Flouts Precedent. .............................36

            4.    The Commission's Theory Is Absurd. .........................39

            5.    The Commission Is Unable To Tell Anyone What
                  A "Dealer" Is Or Isn't...................................................45

            6.    The Commission Calls Into Question Decades Of
                  Regulatory Activity......................................................47

            7.    The Commission Makes A Mess Of Other
                  Statutory Language......................................................53

II.   The Retroactive Application Of The Commission's New
      "Dealer" Theory Violates Fundamental Principles Of Fair
      Notice. .........................................................................................56

III.  The Sanctions The District Court Ordered Are Unlawful. ...........60

A.    The Sanctions Violate Principles Of Equal Protection. ....... 61

B.    Disgorgement Is Unwarranted. ............................................. 63

C.    The Obey-The-Law Injunction Is Invalid. ........................... 68

CONCLUSION ......................................................................................... 70

ADDENDUM OF PERTINENT STATUTORY AND
CONSTITUTIONAL PROVISIONS ....................................................... 1a

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021)........................................................ 35

\* *Alvarez v. United States*,
862 F.3d 1297 (11th Cir. 2017). ...............................65, 66, 67

*In re Appling*,
848 F.3d 953 (11th Cir. 2017)............................................. 45

*Atchison, Topeka & Santa Fe Ry. Co. v. Vosburg*,
238 U.S. 56 (1915)............................................................. 63

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ................................................. 59

*Bankamerica Corp. v. United States*,
462 U.S. 122 (1983)........................................................... 48

*Bittner v. United States*,
143 S. Ct. 713 (2023)..............................................41, 59, 60

*Bond v. United States*,
572 U.S. 844 (2014)........................................................... 28

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981)........................................... 38

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020)..................................................63, 64

*Bullock v. BankChampaign, N.A.*,
569 U.S. 267 (2013)........................................................... 33

\* *CFTC v. S. Tr. Metals, Inc.*,
    894 F.3d 1313 (11th Cir. 2018)...............................................65, 66, 67

\* *CFTC v. Sidoti*,
    178 F.3d 1132 (11th Cir. 1999)..........................................................63, 64

*Chamber of Com. v. U.S. Dep't of Labor*,
    885 F.3d 360 (5th Cir. 2018)...................................................................43

\* *Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)..........................................................................58, 59

*Clark v. Martinez*,
    543 U.S. 371 (2005)...................................................................................45

*Cox v. Louisiana*,
    379 U.S. 559 (1965)...................................................................................58

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
    138 S. Ct. 1061 (2018)................................................................................6

*Diamond Roofing Co. v. Occupational Safety & Health Rev.*
    *Comm'n*,
    528 F.2d 645 (5th Cir. 1976)..................................................................60

*Donander Co. v. Comm'r*,
    29 B.T.A. 312 (1933)................................................................................30

*Eastside Church of Christ v. Nat'l Plan, Inc.*,
    391 F.2d 357 (5th Cir. 1968)..................................................................38

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)...................................................................................56

*Fed. Power Comm'n v. Panhandle E. Pipe Line Co.*,
    337 U.S. 498 (1949)...................................................................................48

*Freeman v. Quicken Loans, Inc.*,
    566 U.S. 624 (2012)...................................................................................33

*FTC v. Univ. Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991)............................................................. 38

*Glasser v. Hilton Grand Vacations Co.*,
    948 F.3d 1301 (11th Cir. 2020).............................................................. 27

*Goldstein v. SEC*,
    451 F.3d 873 (D.C. Cir. 2006).......................................................... 48, 49

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009)............................................................................ 39

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)............................................................................ 24

*Harriman Nat'l Bank v. Comm'r*,
    43 F.2d 950 (2d Cir. 1930).................................................................. 30

*Inv. Tr. of Mut. Inv. Co. v. Comm'r*,
    27 B.T.A. 1322 (1933)........................................................................ 27

*Johnson v. United States*,
    576 U.S. 591 (2015)............................................................................ 45

*Johnson v. Winslow*,
    279 N.Y.S. 147 (N.Y. Sup. Ct. 1935) .............................................. 4, 31

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010)............................................................................ 33

*Keene Corp. v. United States*,
    508 U.S. 200 (1993)............................................................................ 54

*Kokesh v. SEC*,
    581 U.S. 455 (2017)............................................................................ 68

*Lake Bldg. Prods., Inc. v. Sec'y of Labor*,
    958 F.3d 501 (6th Cir. 2020)............................................................... 53

\* *Liu v. SEC,*
   140 S. Ct. 1936 (2020)..........................................................55, 65, 67

*Lyes v. City of Riviera Beach,*
   126 F.3d 1380 (11th Cir. 1997)...................................................... 62

*M.L.B. v. S.L.J.,*
   519 U.S. 102 (1996)........................................................................ 61

*Maslenjak v. United States,*
   582 U.S. 335 (2017)........................................................................ 55

*McBoyle v. United States,*
   283 U.S. 25 (1931).......................................................................... 60

*Murphy v. NCAA,*
   138 S. Ct. 1461 (2018).................................................................... 27

*Nat'l Parks Conservation Ass'n v. Norton,*
   324 F.3d 1229 (11th Cir. 2003)...................................................... 61

*Neder v. United States,*
   527 U.S. 1 (1999)............................................................................ 30

*New Prime Inc. v. Oliveira,*
   139 S. Ct. 532 (2019)...................................................................... 22

*Niz-Chavez v. Garland,*
   141 S. Ct. 1474 (2021).................................................................... 43

*PHH Corp. v. CFPB,*
   839 F.3d 1 (D.C. Cir. 2016)......................................................56, 57

*Pinares v. United Techs. Corp.,*
   973 F.3d 1254 (11th Cir. 2020)...................................................... 42

*Reeves v. Astrue,*
   526 F.3d 732 (11th Cir. 2008)........................................................ 39

*Roberts v. Sea-Land Servs., Inc.*,
    566 U.S. 93 (2012)................................................................. 32

*Romero v. Sec'y of Homeland Sec.*,
    20 F.4th 1374 (11th Cir. 2021) ........................................... 47

*Roth v. SEC*,
    22 F.3d 1108 (D.C. Cir. 1994) ............................................ 37

\*  *Sackett v. EPA*,
    598 U.S. ___, 2023 WL 3632751 (2023)............................... 47

*SEC v. Almagarby*,
    479 F. Supp. 3d 1266 (S.D. Fla. 2020)............................ 12, 17, 18, 41

*SEC v. AMX, Int'l, Inc.*,
    7 F.3d 71 (5th Cir. 1993)..................................................... 19

*SEC v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2015)......................................... 18, 38

*SEC v. Crown Bridge Partners, LLC*,
    No. 1:22-cv-06537 (S.D.N.Y. filed Aug. 8, 2022)................ 17

*SEC v. Diversified Corp. Consulting Grp.*,
    378 F.3d 1219 (11th Cir. 2004)........................................... 19

*SEC v. First City Fin. Corp.*,
    890 F.2d 1215 (D.C. Cir. 1989)........................................... 63

*SEC v. Goble*,
    682 F.3d 934 (11th Cir. 2012)............................................ 69

*SEC v. Graham*,
    823 F.3d 1357 (11th Cir. 2016)........................................... 68

*SEC v. Keener*,
    No. 1:20-cv-21254 (S.D. Fla. filed Mar. 24, 2020).............. 17

*SEC v. Levin*,
    849 F.3d 995 (11th Cir. 2017).............................................................. 19

*SEC v. Nat'l Presto Indus., Inc.*,
    486 F.3d 305 (7th Cir. 2007)................................................................ 37

*SEC v. Ridenour*,
    913 F.2d 515 (8th Cir. 1990)............................................................... 37

*Shivangi v. Dean Witter Reynolds, Inc.*,
    825 F.2d 885 (5th Cir. 1987)........................................................... 9, 10

*Skilling v. United States*,
    561 U.S. 358 (2010)...................................................................... 29, 30

*State v. San Patricio Canning Co.*,
    17 S.W.2d 160 (Tex. Civ. App. 1929)............................................. 54, 55

*State v. Yearby*,
    82 N.C. 561 (1880)........................................................................... 54

*Stokeling v. United States*,
    139 S. Ct. 544 (2019)........................................................................ 23

*Stoller v. CFTC*,
    834 F.2d 262 (2d Cir. 1987) ............................................................... 58

*SuVicMon Dev., Inc. v. Morrison*,
    991 F.3d 1213 (11th Cir. 2021)........................................................... 24

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979)............................................................................ 9

*United States v. Feldman*,
    936 F.3d 1288 (11th Cir. 2019)........................................................... 64

*United States v. Giles*,
    640 F.2d 621 (5th Cir. Unit A Mar. 1981)........................................... 62

x

*United States v. Jackson*,
  995 F.3d 1308 (11th Cir. 2021)..........................................34

*United States v. Pa. Indus. Chem. Corp.*,
  411 U.S. 655 (1973).......................................................58

*United States v. Pugh*,
  99 U.S. 265 (1878).........................................................26

*Universal Health Servs., Inc. v. United States*,
  579 U.S. 176 (2016).......................................................30

*Upton v. SEC*,
  75 F.3d 92 (2d Cir. 1996) ..............................................58

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)..................................................39, 40

\* *Van Buren v. United States*,
  141 S. Ct. 1648 (2021).........................................31, 32, 42

*Weisbrod v. Lowitz*,
  282 Ill. App. 252 (1935).............................................5, 31

\* *West Virginia v. EPA*,
  142 S. Ct. 2587 (2022)..............................................45, 53

*Whatley v. Zatecky*,
  833 F.3d 762 (7th Cir. 2016)..........................................46

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001).......................................................44

*Wilbur v. Corr. Servs. Corp.*,
  393 F.3d 1192 (11th Cir. 2004).....................................38

*Wis. Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018)..................................................22

*XY Planning Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020) ................................................................. 21

*Yates v. United States*,
  574 U.S. 528 (2015) ............................................................................... 47

**Constitutional Provisions**

\*    U.S. Const. amend. V ............................................................. 3, 20, 61, 62

**Statutes**

15 U.S.C.
  § 77b(a)(12) ............................................................................................ 38
  § 77e(a) .................................................................................................. 15
  § 78aaa .................................................................................................... 9
  § 78c(a)(4) .............................................................................................. 23
\*    § 78c(a)(4)(A) ............................................................................. 7, 19, 31
  § 78c(a)(5) .............................................................................................. 23
\*    § 78c(a)(5)(A) .............................. 7, 12, 20, 29, 31, 39, 41, 42, 43, 44, 68
  § 78c(a)(5)(B) ....................................................................... 41, 42, 43, 68
  § 78ff(a) .................................................................................................. 47
  § 78fff-4(c) ............................................................................................. 34
  § 78g(c)(1) ............................................................................................... 7
  § 78h(a) ................................................................................................... 7
  § 78h(b) ................................................................................................... 7
  § 78k(d) ................................................................................................... 7
  § 78n(b)(1) ............................................................................................... 7
  § 78o(a) ................................................................................................... 8
  § 78o(a)(1) ............................................................................................. 68
  § 78o(c)(3)(A) ........................................................................................ 34
  § 78o(e) .................................................................................................. 34
  § 78o(h)(2) ............................................................................................... 9
  § 78u(d) ................................................................................................... 3
  § 78u(d)(3)(A) ....................................................................................... 67

28 U.S.C.
  § 1291 ...................................................................................................... 3

Act of Apr. 5, 1938,
 ch. 72, 52 Stat. 198..................................................................56

Act of June 25, 1938,
 ch. 677, 52 Stat. 1070.............................................................28

Act of May 27, 1936,
 ch. 462, 49 Stat. 1375...............................................................8

Investment Advisers Act of 1940,
 ch. 686, 54 Stat. 847...............................................................28

Investment Company Act of 1940,
 ch. 686, 54 Stat. 789...............................................................28

National Defense Authorization Act for Fiscal Year 2021,
 Pub. L. No. 116-283, 134 Stat. 3388......................................67

Securities Act of 1933,
 ch. 38, 48 Stat. 74.............................................................6, 42

Securities Enforcement Remedies and Penny Stock Reform
 Act of 1990, Pub. L. No. 101-429, 104 Stat. 931 ....................9

\* Securities Exchange Act of 1934,
 ch. 404, 48 Stat. 881..................2, 6, 7, 8, 23, 24, 28, 32, 33, 35, 43, 55

Securities Investor Protection Act of 1970,
 Pub. L. No. 91-598, 84 Stat. 1636...........................................9

**Rules**

11th Cir. R. 27-1(g) ...................................................................11

Fed. R. App. P. 4(a)(1)(B) ...........................................................3

**Regulations**

17 C.F.R.
§ 230.144 ................................................................... 15
§ 240.15c3-3(a)(1) ..................................................... 35
§ 240.15c3-3(b)(1) ..................................................... 36
§ 249.501(a) ............................................................... 33

FINRA Rule 160(b)(4) ....................................................... 36

FINRA Rule 5310 .............................................................. 36

**SEC Materials**

1 H.R. Doc. No. 88-95 (1963) ........................................... 8

2 H.R. Doc. No. 76-279 (1939) ................................... 27, 29

*Acqua Wellington N. Am. Equities Fund*, SEC No-Action
Letter, 2001 WL 1230266 (Oct. 11, 2001) ............... 51, 57, 59

*Burton Sec.*, SEC No-Action Letter,
1977 WL 10680 (Dec. 5, 1977) ..................................... 8

*Certain Broker-Dealers Deemed Not to Be Investment
Advisers*, 70 Fed. Reg. 20,424 (Apr. 19, 2005) ............... 6, 29

*Commission Votes for District Court Actions: 2022*, SEC
(last updated May 18, 2023), https://bit.ly/3j0aQsz........... 17

*Crowdfunding*,
80 Fed. Reg. 71,388 (Nov. 16, 2015) .............................. 15

*Duker & Duker*,
1939 WL 36426 (SEC Dec. 19, 1939) ........................... 8, 29

*E.H. Rollins & Sons, Inc.*,
1945 WL 73020 (SEC Feb. 22, 1945) ............................. 25

*Elray Res., Inc.*,
    2016 WL 5571631 (SEC Sept. 30, 2016) ...................................... 51, 52

Form BD, https://bit.ly/3M1CrnE ........................................................... 33

*Further Definition of "As a Part of a Regular Business,"*
    87 Fed. Reg. 23,054 (Apr. 18, 2022) ..................... 12, 13, 27, 46, 61, 62

*Further Definition of "Swap Dealer,"*
    77 Fed. Reg. 30,596 (May 23, 2012) .................................................... 54

*G.L. Ohrstrom & Co.*,
    1938 WL 33306 (SEC Dec. 16, 1938) .................................................. 25

*Gordon Wesley Sodorff, Jr.*,
    1992 WL 224082 (SEC Sept. 2, 1992) ...................................... 8, 36, 37

H. Peirce, Comm'r, SEC, *Rip Current Rulemakings*
    (June 22, 2022), https://bit.ly/3NtSexF .............................................. 12

H.R. Doc. No. 76-477 (1939) ................................................................... 27

J.W. White, Director, Div. of Corp. Fin., SEC, *The Promise of*
    *Transparency* (Feb. 23, 2007), https://bit.ly/3peihis ........................... 51

*Joseph McCulley Sales*, SEC No-Action Letter,
    1972 WL 9127 (Sept. 1, 1972) ............................................................. 55

Letter from L. Spirgel, Assistant Director, Div. of Corp. Fin.,
    SEC (Sept. 10, 2012), https://bit.ly/45o6EG8 ..................................... 53

Letter to J.P. Riedler, Assistant Director, Div. of Corp. Fin.,
    SEC (July 1, 2011), https://bit.ly/3nEJUk7 ........................................ 52

*Nat'l Council of Sav. Insts.*, SEC No-Action Letter,
    1986 WL 67129 (July 27, 1986) ............................................................. 8

Notice of Effectiveness (Feb. 13, 2013),
    https://bit.ly/3MOGXaJ ....................................................................... 52

*Planning Rsch. Corp.*, SEC No-Action Letter,
   1980 WL 14999 (Dec. 8, 1980) .................................................................. 58

*Registration Under the Advisers Act*,
   69 Fed. Reg. 72,054 (Dec. 10, 2004) ...................................................... 48

*Revision of Holding Period Requirements
   in Rules 144 and 145*,
   62 Fed. Reg. 9242 (Feb. 28, 1997) .......................................................... 15

*Revisions to Rules 144 and 145*,
   72 Fed. Reg. 71,546 (Dec. 17, 2007) ............................................... 15, 58

*Rule 144 Holding Period*,
   86 Fed. Reg. 5063 (Jan. 19, 2021) ................................................... 15, 17

*Rules for the Regulation of Over-the-Counter Markets*,
   1936 WL 31460 (SEC Jan. 20, 1936) ..................................................... 25

*Samuel Krieger*, SEC No-Action Letter,
   1982 WL 29327 (July 12, 1982) ................................................................ 54

SEC Br., *SEC v. Almagarby*,
   No. 21-13755 (11th Cir. Oct. 6, 2022) ........................ 31, 35, 36, 40, 41,
                                                                                42, 48, 49, 50, 53

SEC Br., *SEC v. Spartan Sec. Grp.*,
   No. 22-13129 (11th Cir. Mar. 20, 2023) .............................................. 67

SEC Br., *XY Planning Network, LLC v. SEC*,
   963 F.3d 244 (2d Cir. 2020) (No. 19-2886(L)) ...................................... 4

SEC Mot. for Summ. J., *SEC v. Almagarby*,
   No. 17-cv-62255 (S.D. Fla. Oct. 18, 2019) .......................................... 12

SEC News Release No. 13-249,
   2013 WL 6157327 (Nov. 25, 2013) ...................................................... 50

SEC Opp'n to Mot. for J. on Pleadings,
*SEC v. Carebourn Cap., L.P.*,
No. 21-cv-2114 (D. Minn. Mar. 10, 2022)...............................17, 18, 32

SEC Opp'n to Mot. for Reconsideration,
*SEC v. Badian*, No. 1:06-cv-2621 (S.D.N.Y. Oct. 31, 2011)..............51

SEC Opp'n to Mot. for Summ. J., *SEC v. Almagarby*,
No. 17-cv-62255 (S.D. Fla. Nov. 4, 2019)...............................10, 11, 12

SEC Opp'n to Mot. to Dismiss,
*SEC v. LG Cap. Funding, LLC*,
No. 1:22-cv-3353 (E.D.N.Y. Oct. 27, 2022).........................................47

SEC Opp'n to Mot. to Dismiss,
*SEC v. Morningview Fin., LLC*,
No. 1:22-cv-8142 (S.D.N.Y. May 19, 2023).........................................43

SEC Opp'n to Mot. to Dismiss, *SEC v. Lyon*,
No. 1:06-cv-14338 (S.D.N.Y. Mar. 16, 2007)................................49, 50

SEC Reply in Supp. of Mot. for Summ. J.,
*SEC v. Almagarby*, No. 17-cv-62255 (Nov. 18, 2019)........................43

*   SEC, *Report on the Feasibility and Advisability of the
Complete Segregation of the Functions of Dealer and
Broker* (1936)...................................4, 5, 6, 22, 23, 26, 29, 44

SEC Sur-Reply Br., *SEC v. Almagarby*,
No. 21-13755 (11th Cir. Dec. 12, 2022)...........31, 34, 41, 42, 44, 45, 46

*Updating EDGAR Filing Requirements
and Form 144 Filings*,
87 Fed. Reg. 35,393 (June 10, 2022) ...................................................17

## Other Authorities

165 Cong. Rec. H8931 (daily ed. Nov. 18, 2019)......................................67

3DIcon Corp., Registration Statement
(Form S-1/A) (Aug. 31, 2012)........................................52

A. Scalia & B.A. Garner, *Reading Law* (2012)..................28, 32

C.F. Hodges, *Wall Street* (1930).......................................24, 29

\* C.H. Meyer, *Law of Stockbrokers and Stock Exchanges* (1933 cum. supp.).............................. 4, 5, 22, 23, 24, 25, 29

CFTC Br., *CFTC v. Sidoti*,
178 F.3d 1132 (11th Cir. 1999) (No. 97-5757) ...................64

Comments of Small Public Co. Coalition, File No. S7-24-20
(Mar. 22, 2021), https://bit.ly/3p4KQP4............................17

*Customer Relationship Summary*, Fidelity (Mar. 28, 2023),
https://perma.cc/5F7N-MFMJ ...........................................10

Elray Resources, Inc., Quarterly Report
(Form 10-Q) (Aug. 15, 2016)..............................................52

H.R. Rep. No. 73-85 (1933)...............................................38

H.R. Rep. No. 76-1775 (1940)............................................28

H.R. Rep. No. 76-2639 (1940)............................................28

H.R. Rep. No. 91-1613 (1970)..............................................9

H. Sender, *Hedge Funds Skid on Convertible Bonds*,
Wall. St. J. (June 30, 2004) ..............................................48

*Hedge Fund Operations: Hearing Before H. Comm. on Banking & Fin. Servs.*, 105th Cong. (1998).........................9

M. Hudson, *Funds* (2014).......................................................49

*Oversight of SEC: Hearing Before the S. Comm. on Banking, Hous., & Urban Affairs*,
117th Cong. (2022) ........................................................................ 13, 14

*Oversight of the SEC's Division of Enforcement: Hearing Before the Subcomm. on Investor Protection, Entrepreneurship and Capital Markets of the H. Comm. on Fin. Servs.*, 117th Cong. (2022) ................................................ 11, 60

*Public Printing*,
1903 WL 3830 (Pa. Att'y Gen. June 12, 1903)................................... 54

S.P. Goldman, *Stock Exchange Law* (1923)............................................ 44

S. Rep. No. 73-792 (1934) ....................................................... 6, 43

Twentieth Century Fund, *The Security Markets* (1935)................... 29, 30

W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and Dealers*, 43 Yale L.J. 46 (1933)............................................... 31

W. Strunk, *The Elements of Style* (1920)................................................ 33

## INTRODUCTION

This case is part of the Securities and Exchange Commission's broader attempt to effect a transformative expansion in its regulatory authority by twisting the statutory term "dealer." For nearly a century, everyone—including the Commission—has understood that a "dealer" (like a "broker") is in the business of effectuating customer securities orders. A "broker" acts as the customer's agent, buying and selling securities *for* the customer, whereas a "dealer" acts as a principal, effectuating the customer's order by taking the opposite side of the transaction, buying *from*, or selling *to*, the customer.

In this and other recent cases, the Commission (over multiple dissents) claims to have discovered a whole new meaning. In an argument accepted by the court below—with no discussion of the original meaning of the statutory text—the Commission declared that *anyone* whose "business model is based entirely on the purchase and sale of securities" is a

"dealer" required to register with the Commission, whether they effectu-
ate customer securities orders or not.  Doc.68.at.21.[1]  That cannot possi-
bly be right.  On that limitless definition, every hedge fund, investment
company, investment adviser, family office, and day trader has seemingly
been operating as an unregistered dealer for decades.  The Commission's
assurance that it "is not obligated to sue" everyone is cold comfort to the
thousands of investors who, under the Commission's new theory, are now
operating at the grace of Commission lawyers.  Doc.89.at.30.

The Commission is wrong.  Its new theory has no basis in the text,
structure, or history of the Securities Exchange Act of 1934, ch. 404, 48
Stat. 881, and this Court should reverse.  The appellant, Justin Keener,
does not effectuate customer securities orders, and the Commission does
not allege otherwise.  He is not a "dealer," as decades of industry prac-
tice—with firms doing *exactly* what Mr. Keener does, with the express
approval of the Commission itself—confirm.

The ruling below, which discusses none of this, cannot stand.

---

[1]  Citations of "Doc.X.at.Y" refer to district court docket X, page Y.  Page
citations reference the CM/ECF page number at the top of the page.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 15 U.S.C. § 78u(d). Doc.1¶6. The district court entered final judgment on December 20, 2022, disposing of all claims. Doc.147. Mr. Keener timely filed a notice of appeal on December 21, 2022. Doc.148; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.    Whether the district court erred in embracing the Commission's new interpretation of the '34 Act's "dealer" definition as extending beyond effectuating customer orders.

II.    Whether the Due Process Clause bars a finding of liability because Mr. Keener lacked fair notice of the Commission's unprecedented interpretation.

III.    Whether the district court erred in awarding a civil penalty, disgorgement, injunction, penny-stock bar, and interest.

3

## STATEMENT OF THE CASE

### A.    In 1934, Brokers And Dealers Effectuate Customer Orders.

For nearly a century, everyone—including the Commission—has understood that a "dealer" (like a "broker") is in the business of facilitating customer securities orders.  As the Commission has put it, brokers and dealers "effect transactions for customers."  SEC Br. 7, *XY Planning Network, LLC v. SEC*, 963 F.3d 244 (2d Cir. 2020) (No. 19-2886(L)), ECF No. 170.

**1.**    When Congress enacted the '34 Act, the concept of "broker" and "dealer" was well-established.  *Johnson v. Winslow*, 279 N.Y.S. 147, 156 (N.Y. Sup. Ct. 1935) (their "rights and duties" have "been before the courts for adjudication repeatedly").  The terms "broker" and "dealer" referred to the two alternative methods of effectuating customer orders.  A "broker" would act as "the agent of his customer."  SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936) (SEC Report) (Doc.71-2.at.15).  He would "not himself sell to or buy from the customer," but, for a commission, would "act[] as the customer's representative in making a purchase from or a sale to a third party."  C.H. Meyer, *Law of Stockbrokers and*

*Stock Exchanges* § 43-a, at 32, 34 (1933 cum. supp.) (Meyer) (Doc.71-3.at.4-5). A "dealer," "[o]n the other hand," *would* "sell to or buy from his customer." SEC Report, at XIV (Doc.71-2.at.15). If a customer wanted to sell, a dealer would effectuate the sale by taking the opposite side, "buy[ing] … from [the] customer," *id.*, with a slight mark-up on the resale, Meyer 34 (Doc.71-3.at.5).

In ordinary parlance, the distinction between brokers and dealers was expressed in terms of whose "account" facilitated the customer's order. A broker, acting as agent, would be said to trade "solely for the account of the customer." SEC Report, at XIV (Doc.71-2.at.15). As the standard trade confirmation put it, "[w]e have this day" bought or sold "*for your account* and risk." Meyer 34 (Doc.71-3.at.5) (emphasis added); *see Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935). A dealer, in contrast, would be said to effectuate the customer's order by taking the opposite side in "his own account." SEC Report, at XIV (Doc.71-2.at.15). On a customer sell order, for example, a dealer would "buy[] from his customer[]," then confirm "to [the] customer[]" that he (the dealer) had (with "his own account") "purchase[d] from you" (the customer). Meyer 33-34 (Doc.71-3.at.4-5); *see Weisbrod*, 282 Ill. App. at 255.

5

**2.**     Congress incorporated this language into the '34 Act.

After addressing, in the Securities Act of 1933, ch. 38, 48 Stat. 74, the registration and "original issuance" of securities, Congress, in the '34 Act, turned to the "subsequent trading" of securities, *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1066 (2018)—*i.e.*, to the brokers and dealers that "execut[ed] trades as part of" a "package of services provided to customers," *Certain Broker-Dealers Deemed Not to Be Investment Advisers*, 70 Fed. Reg. 20,424, 20,428 n.38 (Apr. 19, 2005).

Congress had two principal concerns.  It was worried brokers and dealers were mishandling customer securities.  S. Rep. No. 73-792, at 11 (1934).  And, because most brokers and dealers combined the "functions of broker and dealer" in single entities (*i.e.*, broker-dealers), *id.*, Congress was concerned customers were "unaware" of the capacity in which their broker-dealers were acting, SEC Report, at XV (Doc.71-2.at.16); *see* § 11(e), 48 Stat. at 892.  Were they trading solely as the customer's agent, as brokers, or participating on the opposite side of the transaction, with a "financial[] interest[]," as dealers?  SEC Report, at XV (Doc.71-2.at.16).

Congress addressed these concerns in the '34 Act.  It, first, defined "broker" and "dealer" in the exact words people used to distinguish the

6

two alternative ways of effectuating customer orders—a "broker" traded "for the account of others"; a "dealer" "for his own account."  § 3(a)(4)-(5), 48 Stat. at 883:

> "The term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others."

> "The term 'dealer' means any person engaged in the business of buying and selling securities … for such person's own account …."

15 U.S.C. § 78c(a)(4)(A), (a)(5)(A).

Using the own-account, others'-account terminology, Congress then instructed brokers and dealers to "disclose[] to [their] customer[s] in writing" whether, in executing a customer order, the broker or dealer was "acting as a dealer for his own account" or as a "broker for [the] customer." § 11(d)(2), 48 Stat. at 892 (codified as amended at 15 U.S.C. § 78k(d)). Congress also set standards for brokers' and dealers' handling of customers' money and securities, *e.g.*, §§ 7(c)-(d), 8(c), 14(b), 48 Stat. at 887-95 (codified as amended at 15 U.S.C. §§ 78g(c)(1), 78h(a)-(b), 78n(b)(1)), and,

7

to enforce those standards, authorized (and later required[2]) the Commission to provide for the registration of brokers and dealers, § 15, 48 Stat. at 895-96 (codified as amended at 15 U.S.C. § 78o(a)).

## B. For The Next Nine Decades, "Dealer" Is Read In The Context Of Customer-Order Facilitation.

For the next 83 years, there was little question brokers and dealers helped "customers to purchase and sell securities."  1 H.R. Doc. No. 88-95, at 237 (1963) (SEC Report of Special Study of Securities Markets).

From its earliest days, the Commission recognized the "intimate relationship between customers and brokers and dealers." *Duker & Duker*, 1939 WL 36426, at *3 n.6 (SEC Dec. 19, 1939); *id.* at *2 (discussing standards "[i]nherent in the relationship between a dealer and his customer"). The Commission held the "distinguish[ing]" characteristic of a broker or dealer was the provision of services to investor-customers—the "handl[ing] [of] their money and securities." *Gordon Wesley Sodorff, Jr.*, 1992 WL 224082, at *5 & n.27 (SEC Sept. 2, 1992); *accord Nat'l Council of Sav. Insts.*, SEC No-Action Letter, 1986 WL 67129, at *2 (July 27, 1986); *Burton Sec.*, SEC No-Action Letter, 1977 WL 10680, at *1 (Dec. 5,

---

[2]  Act of May 27, 1936, ch. 462, sec. 3, § 15(a), 49 Stat. 1375, 1377.

1977).  And it acknowledged that firms that did *not* effectuate customer orders—*e.g.*, hedge funds—were *not* brokers or dealers.  *E.g.*, *Hedge Fund Operations: Hearing Before H. Comm. on Banking & Fin. Servs.*, 105th Cong. 257 n.2 (1998) (statement of R.R. Lindsey, Director, Div. of Market Regulation, SEC), 1998 WL 781102 (hedge funds trade "for [their] own investment," not to "carry on a public securities business" "deal[ing] directly with public investors").

Congress and market participants operated with a similar understanding.  Congress presupposed the existence of "customers of broker-dealers." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 574 n.16 (1979).  It required brokers and dealers to insure the "customer securities" they held, H.R. Rep. No. 91-1613, at 2 (1970); *see* Securities Investor Protection Act of 1970, Pub. L. No. 91-598, 84 Stat. 1636 (codified as amended at 15 U.S.C. §§ 78aaa *et seq.*), and to disclose information "[p]rior to" "effecting" "customer" orders, Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, sec. 505, § 15, 104 Stat. 931, 954 (codified as amended at 15 U.S.C. § 78o(h)(2)).

Market participants, likewise, presumed that brokers and dealers "handle[d]" orders for "customer[s]." *Shivangi v. Dean Witter Reynolds,*

9

*Inc.*, 825 F.2d 885, 887 (5th Cir. 1987). Brokers and dealers used—and continue to use—the exact own-account, others'-account language to differentiate the two methods of effectuating customer orders. *E.g.*, *Customer Relationship Summary*, Fidelity 2 (Mar. 28, 2023), https://perma.cc/5F7N-MFMJ (we may "buy from you or sell to you … *from our own accounts* ('principal trades')" or "buy and sell … *for your account* … ('agency trades')" (emphases added)); *Shivangi*, 825 F.2d at 887 (similar). It is undisputed that of the 3,434 currently registered "dealers," *every single one* "provide[s] services to customers." Doc.72¶¶96, 98, 100; Doc.88¶¶96, 98, 100.

### C.    The Commission Claims To Discover A New Meaning.

In 2017, the Commission claimed to discover a new meaning, declaring that a "dealer" could be *any* business that bought and sold securities for its "own account," whether it facilitated customer trading or not. SEC Opp'n to Mot. for Summ. J. 3, 12, *SEC v. Almagarby*, No. 17-cv-62255 (S.D. Fla. Nov. 4, 2019), ECF No. 79. As the Commission put it, a company could be "required to register" as a "dealer" even if it "never purchased the stock of … clients … or rendered any of the services that

would be the hallmark of a dealer." *Id.* at 9. "None of that," the Commission asserted, was "relevant" to the "analysis." *Id.* The only question was whether a company's "business model was based entirely on the purchase and sale of securities." *Id.* at 8. If it was, the Commission said, "that fact constitute[d] conclusive proof that the company [was] a dealer." *Id.*

The Commission pressed this theory in two ways.

**1.** First, as the current Chairman of the House Financial Services Committee's Oversight Subcommittee put it, the Commission tried to "slip [its] drastic market-changing interpretation[] of the securities laws" into a case against a 29-year-old college student, Ibrahim Almagarby. *Oversight of the SEC's Division of Enforcement: Hearing Before the Subcomm. on Investor Protection, Entrepreneurship and Capital Markets of the H. Comm. on Fin. Servs.*, 117th Cong. at 23:34 (2022) (statement of Rep. Huizenga), https://bit.ly/3MBCGad.[3]

---

[3] *Almagarby* is pending at No. 21-13755. Although a single judge denied Mr. Keener's motion (ECF No. 19-1) to consolidate, that decision isn't binding on this panel. 11th Cir. R. 27-1(g). According to the Commission, the two cases are "virtually indistinguishable," Doc.116.at.18:3-4; the panel should consolidate.

11

Seizing on a hyper-literal reading of the '34 Act's text—"buying and selling securities ... for [one's] own account," 15 U.S.C. § 78c(a)(5)(A)— the Commission declared Mr. Almagarby was a "dealer" because he (literally) "bought and sold securities for [his] own account[]," SEC Mot. for Summ. J. 17, *Almagarby* (Oct. 18, 2019), ECF No. 73: "[W]here a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer." SEC *Almagarby* Opp'n to Mot. for Summ. J. 8.

The Commission urged the district court to "look no further," *id.*— and it didn't. Without mentioning the original meaning of the statutory text, the district court adopted the Commission's theory. Doc.68.at.21; *see SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020).

**2.**    Second, in what Commissioner Peirce called a "far-reaching change[]" to the agency's "regulatory regime," *Rip Current Rulemakings* (June 22, 2022), https://bit.ly/3NtSexF, the Commission put forth in a proposed rulemaking a "further definition" of "dealer." *Further Definition of "As a Part of a Regular Business*," 87 Fed. Reg. 23,054 (Apr. 18, 2022). Embracing *Almagarby*, *e.g.*, *id.* at 23,058 n.45, the Commission declared that many of the world's largest, most high-profile investors—

12

including many "private funds" (*e.g.*, hedge funds), *id.* at 23,057—had actually been "dealers," under the '34 Act's original text, for many decades, without anyone having noticed. The Commission asserted that a "dealer" included (among other things) "any firm" that "transact[ed] more than a specified amount per month," *Oversight of SEC: Hearing Before the S. Comm. on Banking, Hous., & Urban Affairs*, 117th Cong. at 42:07 (2022), https://bit.ly/3VliJHE; *see* 87 Fed. Reg. at 23,062 (establishing "bright-line"), and that, for this reason, many "prominent [market] participants," *id.* at 23,081, would need to promptly "apply for dealer registration," *id.* at 23,062.

### D. Over Multiple Dissents, The Commission Selectively Applies Its New Theory To Convertible Lenders.

Although, in its proposed rulemaking, the Commission offered many market participants a "one-year compliance period," 87 Fed. Reg. at 23,078, the Commission aggressively sued others—in particular, convertible lenders, such as Mr. Keener.

Mr. Keener runs a small family office, "JMJ Financial." Doc.72¶¶3, 5-6; Doc.88¶¶3, 5-6. He does not provide services to investors, Doc.72¶¶77-79; Doc.88¶¶77-79, and has never received or executed a customer securities order, Doc.72-2.at.12:24-13:21; Doc.72-3.at.225:2-

226:19; *see* Doc.73-7.at.7 (response no. 14) (admitting Mr. Keener sold stock "in the open market," *i.e.*, not to customers); *id.* at 7-8 (response no. 15) (no evidence Mr. Keener served institutional investors). Mr. Keener invests his own money, not the money of outside investors or customers. Doc.72¶8; Doc.88¶8. He alone decides when and how to invest his money, Doc.72¶9; Doc.88¶9, and invests in a range of assets, from stocks to real estate to mortgage debt, Doc.72¶7; Doc.88¶7; *see* Doc.72-3.at.36:22-37:1; *id.* at 23:22-24:2; Doc.72-2.at.39:24-40:5.

As part of his portfolio, Mr. Keener loaned money to small businesses. *E.g.*, Doc.72¶19; Doc.88¶19. Some loans were simple promissory notes, where the borrower agreed to repay Mr. Keener in cash. Doc.72¶7; Doc.88¶7; *see* Doc.72-3.at.36:22-37:1. Others were *convertible* notes, where the borrower agreed to repay the loan in cash or allow Mr. Keener (in his discretion) to satisfy the debt through a conversion, swapping debt for stock of the borrower. Doc.72¶¶12, 17; Doc.88¶¶12, 17; *e.g.*, Doc.72-21§2.

Convertible loans such as these are commonplace, Doc.72¶18; Doc.88¶18, and the Commission has encouraged them for decades as a way for small public companies to raise affordable capital. Small public

14

companies often lack the cashflow or collateral required by traditional lenders. *Crowdfunding*, 80 Fed. Reg. 71,388, 71,492 (Nov. 16, 2015). Convertible loans, therefore, are often small public companies' only source of affordable financing. *Rule 144 Holding Period*, 86 Fed. Reg. 5063, 5073 (Jan. 19, 2021). The lender's ability to convert the loan into stock and "resell" the stock to "recoup [its] capital" provides the lender financial protection, akin to collateral. *Revision of Holding Period Requirements in Rules 144 and 145*, 62 Fed. Reg. 9242, 9243-44 (Feb. 28, 1997). This security lets the lender offer loans at more affordable rates, which is why Commission rules have authorized this form of financing for years. *Revisions to Rules 144 and 145*, 72 Fed. Reg. 71,546, 71,564 (Dec. 17, 2007). Generally, the '33 Act bars the sale of unregistered securities. 15 U.S.C. § 77e(a). But, in SEC Rule 144 (17 C.F.R. § 230.144), the Commission specifically allowed lenders like Mr. Keener to, after a minimum holding period of usually six months, "convert" the borrower's debt into shares of unregistered stock and "promptly resell" an unlimited number of shares. 86 Fed. Reg. at 5066-67.

There's no dispute Mr. Keener complied with Rule 144. Doc.72¶¶48-50; Doc.88¶¶48-50; *see* Doc.1¶12. Through his "QuickLoan"

program, Mr. Keener loaned money to public companies. Doc.72¶¶20-22; Doc.88¶¶20-22. Many companies paid off all or part of the loan in cash. Doc.72-3.at.227:7-14; Doc.67-4.at.28 (Tr.102:22-103:3). Others did not. If a company did not pay off the loan in cash, generally after at least six months (sometimes much longer, *e.g.*, Doc.72-30.at.2), Mr. Keener would, in his discretion, attempt to "convert[] the note into stock" and sell the stock to recoup his investment, Doc.67¶18; *see* Doc.91¶18; Doc.72¶28; Doc.88¶28. In many cases, Mr. Keener was unable to recoup anything and lost his entire investment. Doc.91.at.35¶4; Doc.101.at.11¶4.

Mr. Keener's loans were fully and publicly disclosed, Doc.72-17¶44; Doc.124-11.at.5-54; *e.g.*, Doc.72-27.at.6, 9, and often reviewed by the Commission itself, *e.g.*, Doc.124-10.at.2. All of Mr. Keener's stock transactions were executed through registered broker-dealers and publicly reported. Doc.72¶¶53, 70; Doc.88¶¶53, 70. And his transactions were approved by his attorneys, broker-dealers, and clearing firms, plus the borrowers' attorneys, transfer agents, and boards. Doc.72¶¶25, 47-50, 53; Doc.88¶¶25, 47-50, 53; Doc.91.at.37¶¶17-23; Doc.101.at.13¶¶17-23.

This is perfectly legal and exactly what Rule 144 contemplates— but today's Commission does not like Rule 144. Because the converted

shares are not registered with the Commission, the current Commission tried to repeal parts of the rule. 86 Fed. Reg. 5063. But the Commission was forced to abandon that effort in the face of overwhelming opposition.[4] So, it relied on enforcement and its new *Almagarby* theory, instead. Over the dissents of multiple commissioners (including in this case),[5] the Commission pressed lawsuits alleging that seemingly every convertible lender (including Mr. Keener) was actually a "dealer" under the *Almagarby* theory. As the Commission saw it, the "*only* definitional requirement … is that a dealer engages in the business of buying and selling securities," SEC Opp'n to Mot. for J. on Pleadings 25, *SEC v. Carebourn Cap., L.P.*, No. 21-cv-2114 (D. Minn. Mar. 10, 2022), 2022 WL 1913692 (emphasis added), and a convertible lender, the Commission maintained,

---

[4] *Compare* Comments of Small Public Co. Coalition, File No. S7-24-20 (Mar. 22, 2021), https://bit.ly/3p4KQP4 (criticizing repeal), *with Updating EDGAR Filing Requirements and Form 144 Filings*, 87 Fed. Reg. 35,393, 35,395 n.11 (June 10, 2022) ("not taking any action").

[5] *Compare SEC v. Crown Bridge Partners, LLC*, No. 1:22-cv-06537 (S.D.N.Y. filed Aug. 8, 2022), *and SEC v. Keener*, No. 1:20-cv-21254 (S.D. Fla. filed Mar. 24, 2020), *with Commission Votes for District Court Actions: 2022*, SEC (last updated May 18, 2023), https://bit.ly/3j0aQsz (recording Commissioners Peirce's and Uyeda's dissents).

buys securities (*i.e.*, acquires notes in exchange for loans) and sells securities (*i.e.*, sells converted shares), *id.* at 21-22; Doc.89.at.12. Thus, according to the Commission, all convertible lenders are "dealers," although none have ever registered.

### E.    The District Court Adopts The Commission's New Theory.

Mr. Keener explained that the Commission's theory was contrary to the original meaning of the statutory text. Doc.90.at.13-14. But the Commission invited the district court to apply *Almagarby* instead: "In *SEC v. Almagarby*, … [the court] found that where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer." Doc.68.at.21. That's what the district court did. Without even mentioning Mr. Keener's statutory argument, and relying in part on a case interpreting a different statute (*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015)) (*see infra* pp.38-39), the court adopted *Almagarby*'s conclusion, denied Mr. Keener's motion for summary judgment, and entered summary judgment for the Commission. Doc.118. The court ordered Mr. Keener to disgorge all profits, pay millions of dollars in fines and interest, and leave his profession. Doc.145.at.23-24.

18

The court entered final judgment, Doc.147, and Mr. Keener appealed, Doc.148.

## STANDARD OF REVIEW

This Court reviews summary-judgment orders de novo. *SEC v. Levin*, 849 F.3d 995, 1000 (11th Cir. 2017). Although the Court reviews remedies for abuse of discretion, *SEC v. Diversified Corp. Consulting Grp.*, 378 F.3d 1219, 1228 (11th Cir. 2004) (per curiam), it considers legal issues de novo, *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993) (per curiam).

## SUMMARY OF ARGUMENT

I.    The Commission's newly-discovered "dealer" interpretation cannot be squared with the statutory text, structure, or history. Congress, in enacting the '34 Act, adopted the *exact* language people used to refer to the two alternative methods of effectuating customer securities orders. A "broker" would trade as the customer's agent, solely for the "account of" the customer, 15 U.S.C. § 78c(a)(4)(A), whereas a dealer would effectuate the customer's order by taking the opposite in his "own

account," *id.* § 78c(a)(5)(A).  Under long-standing rules of statutory inter-pretation, the '34 Act's text must be read in accord with this original meaning and long-held understanding.

The Commission's insistence that the "dealer" definition's reference to buying and selling for one's "own account" sweeps in any business that (literally) buys and sells for itself is not plausible.  The Commission's hy-per-literal reading ignores the statutory context and would expand the Commission's authority in absurd ways.

**II.**    The Due Process Clause prohibits the government from retro-actively punishing conduct that, at the time it was undertaken, was rec-ognized as lawful.  The Commission violated this basic constitutional guarantee by seeking to punish Mr. Keener for following an industry practice that had been openly followed for decades, and that the Commis-sion itself had stated is "not unlawful."

**III.**    At minimum, the life-altering sanctions the district court or-dered must be set aside.  *First*, the sanctions violate principles of equal protection.  The Commission has declared that many of the world's larg-est hedge funds have, unbeknownst to anybody, been "dealers" under the

20

same statutory provision as Mr. Keener, but the Commission has proposed to let *them* voluntarily register; the Commission cannot simultaneously bankrupt Mr. Keener. *Second*, the district court abused its discretion in ordering Mr. Keener to disgorge *all* profits from transactions that even the Commission admits are (aside from Mr. Keener not registering) perfectly lawful. Because there is no causal connection between the alleged failure to register and Mr. Keener's profits—and no investor victims to make whole—disgorgement is unwarranted. *Finally*, the injunction, which copies and pastes the statutory text, is a prohibited obey-the-law injunction under clear circuit precedent.

## ARGUMENT

## I.    The Commission's New "Dealer" Theory Is Contrary To Law.

### A.    Brokers And Dealers Effectuate Orders For Customers.

The text, context, structure, and history of the '34 Act make clear that a "dealer" (like a "broker") is in the business of "effect[ing] securities transactions for customers." *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020). The Commission's new theory—that a "dealer" includes *any* business that buys and sells securities, whether it effects trades for customers or not, Doc.89.at.14—has no basis in the

"original meaning of the statute," *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019), makes nonsense of the overall regulatory regime, and is impossible to square with decades of settled practice.

### 1.    The '34 Act Uses Well-Known, Widely Used Terms That Refer To The Methods Of Effectuating Customer Orders.

In the '34 Act, Congress defined "broker" and "dealer" in the *exact* words that people used to distinguish the two alternative methods of effectuating customer securities orders.  That "original meaning" controls. *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).

a.    In 1934, there were two—and only two—methods of effectuating customer orders.  A firm could trade *for* the customer, as an agent (or "broker"), or *with* the customer, on the opposite side of the transaction, as a principal (or "dealer").  Meyer 32 (Doc.71-3.at.4); *supra* pp.4-5.  In ordinary parlance, the distinction between "broker" and "dealer" was expressed in terms of whose "account" facilitated the customer's order.  *Supra* p.5.  A broker, acting as the customer's agent, would be said to trade "solely for the account of the customer."  SEC Report, at XIV (Doc.71-2.at.15).  Whereas a "dealer," acting across from the customer, would be said to effectuate the customer's order by taking the opposite side in "his

22

own account." *Id.* Instead of trading for the *customer's* account (like a broker), a dealer would effectuate the customer's order—say, a buy order—by selling "to [the] customer" from the dealer's "*own* account." *Id.* (emphasis added).

Congress, in the '34 Act, adopted this *exact* language. A "broker" would trade "for the account of others," whereas a "dealer," Congress continued, in the very next sentence, would trade "for his own account." § 3(a)(4)-(5), 48 Stat. at 883 (codified as amended at 15 U.S.C. § 78c(a)(4)-(5)). These words were "obviously transplanted" from another source, *Stokeling v. United States*, 139 S. Ct. 544, 551 (2019): this is the exact way people distinguished (and continue to distinguish, *supra* p.10) the two methods of effectuating customer orders. As contemporaneous trade confirmations put it, a broker would act for the *customer's* account: "We have this day bought" (or "sold") "*for your account*." Meyer 34 (Doc.71-3.at.5) (emphasis added). A dealer, in contrast, would facilitate the customer's order with its *own* account: "We are pleased to confirm purchase" (from the dealer's account) "from you," or "sale" (from the dealer's account) "to you." *Id.* When Congress took these words and replanted them

23

into the U.S. Code, it "br[ought] the old soil with it." *SuVicMon Dev., Inc. v. Morrison*, 991 F.3d 1213, 1224 (11th Cir. 2021).

Congress's use of the own-account, others'-account distinction in other parts of the Act confirms the original meaning of this language. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). In section 11(d), Congress required a broker or dealer to "disclose[] to [his] customer in writing … whether he is acting as a dealer *for his own account*" or "as a broker for [the] customer." 48 Stat. at 892 (emphasis added). This "own account" reference can *only* be referring to the manner of effectuating customer orders—contrasting the dealer's way of facilitating customer orders with that of a broker.

The evidence of this contemporaneous, widely-understood meaning is overwhelming. Prominent treatises of the time are replete with own-account, others'-account references that could *only* be read as distinguishing the two ways of effectuating customer orders. Charles Hodges' *Wall Street* (1930) treatise differentiated brokers and dealers as follows: "A dealer sells to and buys from a client whereas a broker buys and sells *for the account* of a client." *Id.* at 361 (emphasis added). Meyer's *Law of Stockbrokers* (1933) treatise similarly explained that a "broker" is the

24

"agent" of "his customer"; he trades for the "*account* and risk" of the customer.  Meyer 32, 34 (Doc.71-3.at.4-5) (emphasis added).  What "distinguishe[s]" the "*dealer* … from a *broker*," Meyer's emphasized, is the dealer "sells to his customers … securities which he has purchased *for his own account* elsewhere," or "buys from his customer securities *for his own account* with a view of disposing of them elsewhere."  *Id.* at 32-33 (Doc.71-3.at.4) (emphases added).  "Account" unambiguously distinguished the way in which brokers or dealers effectuated customer orders.

The Commission used the same language in the same way.  Early decisions explained that "for the account of" was "characteristic of agency," *E.H. Rollins & Sons, Inc.*, 1945 WL 73020, at *6 (SEC Feb. 22, 1945); it meant a firm was acting as a *broker*, trading "for [the *customer's*] account," as opposed to a *dealer*, trading "for [one's] *own* account … *with* … [the] customer[]," *G.L. Ohrstrom & Co.*, 1938 WL 33306, at *7 (SEC Dec. 16, 1938) (emphases added).  Commission rules reflected this distinction, requiring brokers and dealers to "disclose to [their] customer[s] … whether [they] [were] acting as a dealer *for [their] own account*," or "a broker" for the *customer's* account.  *Rules for the Regulation of Over-the-*

25

*Counter Markets*, 1936 WL 31460, at \*6 (SEC Jan. 20, 1936) (emphasis added).

The Commission's founding father, James Landis, and then-Commissioner (future-Justice) William O. Douglas, similarly used the own-account, others'-account language to differentiate the ways of effectuating customer orders. Their 1936 report explains that the "characteristic activities of a dealer" are that he "sells securities to his customer which he has purchased … elsewhere or buys securities from his customer with a view to disposing of them elsewhere." SEC Report, at XIV (Doc.71-2.at.15). "In any such transaction," the report emphasizes, the dealer "*acts for his own account* and *not* as agent for the customer." *Id.* (emphases added). A "broker," "[o]n the other hand," "*is* the agent of his customer"; his transaction "is solely *for the account of the customer*." *Id.* (emphases added). There is no way to read these words as referring to anything other than the facilitation of customer orders.

**b.**     Powerful confirmation comes from the "contemporaneous construction" applied by those "called upon to carry" the '34 Act "into effect." *United States v. Pugh*, 99 U.S. 265, 269 (1878). From the outset,

"[e]veryone seemed to accept" that *only* businesses that facilitated customer orders were dealers.  *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1308 (11th Cir. 2020).

The treatment of investment companies and investment advisers is instructive.  In 1934, as today, those firms had (in the words of today's Commission) a "business model [that] [was] based entirely on the purchase and sale of securities." Doc.68.at.21.  That's all they did. *E.g.*, *Inv. Tr. of Mut. Inv. Co. v. Comm'r*, 27 B.T.A. 1322, 1322 (1933) ("it makes purchases and sales of securities").  Yet, it didn't occur to anybody that these firms might be "dealers."  Contemporaneous Commission reports acknowledged that investment companies were *not* governed by rules that applied to "'brokers and dealers' only," 2 H.R. Doc. No. 76-279, at 1523 n.434 (1939), and that "[f]ederal regulation" of investment advisers did "not exist," H.R. Doc. No. 76-477, at 31 (1939).  These statements would have "be[en] incorrect" had dealer meant what today's Commission claims.  *Murphy v. NCAA*, 138 S. Ct. 1461, 1484 (2018); *cf., e.g.*, 87 Fed. Reg. at 23,094 (suggesting, today, investment companies *could* be dealers); *id.* at 23,064 (same for investment advisers).

Congress's contemporaneous understanding is equally informative. Just six years after enacting the '34 Act, Congress passed the Investment Company Act of 1940, ch. 686, 54 Stat. 789, and the Investment Advisers Act of 1940, ch. 686, 54 Stat. 847. The '40 Acts were explicitly premised on the understanding that investment companies and investment advisers were *not* brokers or dealers. H.R. Rep. No. 76-2639, at 10 (1940); H.R. Rep. No. 76-1775, at 21 (1940). The Investment Company Act addressed fair-dealing, recordkeeping, and other matters, *see* § 1(b)(3)-(5), 54 Stat. at 790, that the '34 Act would *already* have addressed had investment companies been "brokers" or "dealers," *see* §§ 17(a) (recordkeeping), 18(a) (misleading statements), 48 Stat. at 897-98; Act of June 25, 1938, ch. 677, sec. 1, § 15A(b)(7), 52 Stat. 1070, 1071 (fair-and-equitable principles of trade). Congress's actions in 1940 cannot be squared with the Commission's theory here.

### 2. The Context Reinforces The Customer-Order-Facilitation Interpretation.

**a.** "[T]he most significant … context" in construing statutory definitions is the ordinary meaning of the defined words themselves. A. Scalia & B.A. Garner, *Reading Law* 232 (2012); *see Bond v. United States*, 572 U.S. 844, 861 (2014).

Here, there's no question the defined words, "broker" and "dealer," referred to the two alternative ways of effectuating customer orders. As the Commission has explained, "[s]ince the early days of the brokerage industry," brokers and dealers have served investors by "executing trades as part" of a "package of services provided to customers." 70 Fed. Reg. at 20,428 n.38. This "intimate relationship between customers and brokers and dealers" was acknowledged by everyone. *Duker*, 1939 WL 36426, at *3 n.6; *e.g.*, SEC Report, at XIV (Doc.71-2.at.15) ("his customer"); Meyer 32 (Doc.71-3.at.4) ("his customers"); 2 H.R. Doc. No. 76-279, at 1525 ("their customers"); Hodges 361 ("from a client"); Twentieth Century Fund, *The Security Markets* 266 (1935) ("for a customer"). Congress didn't have some *other* context in mind.

**b.**     The statutory phrase "the business of buying and selling securities" reinforces the customer-order-facilitation context. 15 U.S.C. § 78c(a)(5)(A). The definite article "the" ("*the* business") demonstrates Congress had a *specific* business in mind "when it enacted the statute." *Skilling v. United States*, 561 U.S. 358, 404-05 (2010). It was "*that*" business, *id.*—"buy[ing] and sell[ing]" to effect "an order … for a customer,"

Twentieth Century Fund 266—that Congress addressed, "not *all*" busi-

nesses of buying and selling, *Skilling*, 561 U.S. at 404-05.

**c.** The legal backdrop confirms this reading. By the 1930s,

caselaw in a number of contexts established that dealers facilitated cus-

tomer orders. *E.g.*, *Donander Co. v. Comm'r*, 29 B.T.A. 312, 314-15 (1933)

("dealer" "has application" only "to a merchant who holds himself out to

sell to customers"); *Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950, 952 (2d

Cir. 1930) (dealer "purchased securities to fill specific orders" and "h[eld]

them for customers").

The common law is particularly instructive. "[W]here Congress

uses terms that have accumulated settled meaning" under the common

law, courts infer "that Congress means to incorporate the established

meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999).

Even where a statute "abrogates the common law in certain respects,"

courts "presume that Congress retained all other elements of [the com-

mon law] that are consistent with the statutory text." *Universal Health*

*Servs., Inc. v. United States*, 579 U.S. 176, 187 n.2 (2016).

At common law, the concept of "broker" and "dealer" presupposed

the facilitation of customer orders. The words "broker" and "dealer" were

specifically used to distinguish the two alternative ways in which a firm could effectuate customer orders. W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and Dealers*, 43 Yale L.J. 46, 60-61 (1933) (detailing five-factor inquiry to distinguish brokers from dealers, entirely presupposing customer orders); *e.g.*, *Johnson*, 279 N.Y.S. at 156-59; *Weisbrod*, 282 Ill. App. at 255. It is implausible that Congress, in 1934, intended a different context.

### 3. The Act's Structure Confirms The Customer-Order-Facilitation Interpretation.

**a.** The "interplay between" broker and dealer is an important structural clue confirming the customer-order-facilitation interpretation. *Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021). The Commission agrees the definition of "broker"—effecting transactions for the "account of others," 15 U.S.C. § 78c(a)(4)(A)—refers *only* to trading on behalf of "customers." SEC.Almagarb.Br.35.[6] The Commission also agrees the definition of "dealer"—buying and selling for one's "own account," 15

---

[6] "SEC.*Almagarby*.Br." and "SEC.*Almagarby*.Sur-Reply" refer to the Commission's briefs in No. 21-13755.

U.S.C. § 78c(a)(5)(A)—*includes* transactions that facilitate customer orders.  SEC Opp'n 24, *Carebourn*, 2022 WL 1913692 ("a dealer *may* do" that).

The Court should stop there.  Reading both definitions as referring to methods of effectuating customer orders "makes sense of the statutory structure" by "treat[ing]" both definitions "consistently."  *Van Buren*, 141 S. Ct. at 1658.

The Commission's contrary approach "creates 'inconsistencies.'"  *Id.* at 1659 (cleaned up).  Under the Commission's reading, the first definition ("broker") refers to *one* method of effectuating customer orders, and the second definition ("dealer") refers to the *other* method of effectuating customer orders *and also any other type of trading*.  This reading fails to place both definitions "into an harmonious whole."  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012).

Underscoring the Commission's error is the *noscitur a sociis* canon—the commonsense principle that words are known by the company they keep.  In multiple instances, the '34 Act "links the words" broker and dealer.  Scalia & Garner 198.  It places both definitions in back-to-back sentences.  48 Stat. at 883.  It defines both words in parallel

32

terms, implying a related meaning.  W. Strunk, *The Elements of Style* 26 (1920).  And on numerous occasions, it joins the terms as "broker or dealer" (or something similar).  §§ 3(a)(3), 5, 7(c), (c)(2), (d), 8, 8(a), 9(a)(3)-(5), 11(d)-(e), 12(a), 14(b), 15, 17(a)-(b), 30(a), 48 Stat. at 883-904. The terms are so related the Commission doesn't distinguish them; firms can register *only* "as a broker-dealer," not one or the other.  17 C.F.R. § 249.501(a); *see* Form BD, https://bit.ly/3M1CrnE (item 2.A).

The *noscitur* canon teaches that where words are linked like this, the words are read in light of their "common 'core of meaning.'"  *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012).  That common meaning is clear:  "both terms refer to different forms of generally similar conduct," *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013)—different methods of effectuating customer orders.

**b.**    The customer-order-facilitation meaning also "reflects" brokers' and dealers' "place in the [overall] statutory scheme and, in particular, [their] relationship to the other protections that the Act affords." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 348 (2010).

33

The broker-dealer regulatory regime is premised on the protection of customer orders and accounts.  The '34 Act, for example, requires brokers and dealers to send "notice[s] to [their] customers," 15 U.S.C. § 78o(e); meet "financial responsibility requirements" to keep "custody … of customers' securities," *id.* § 78o(c)(3)(A); and join a fund to insure "each of [their] customers[']" accounts, *id.* § 78fff-4(c).  This makes sense *only* in the context of customer-order facilitation.

### B.    The Commission's Contrary Position Is Untenable.

### 1.    The Commission Ignores Context And History.

In its latest brief on the issue—in this Court in *Almagarby*—the Commission insists that "dealer" is not "limited … to those [businesses that] effectuate customer orders" because Congress, in defining dealer, "*[l]e[ft] out*" the word "customer."  SEC.*Almagarby*.Sur-Reply.1.  The Commission's focus on "explicit" "limits" "ignores [the Court's] obligation to ask what the statutory text fairly implies."  *United States v. Jackson*, 995 F.3d 1308, 1310 (11th Cir. 2021) (W. Pryor, C.J., respecting the denial of reh'g en banc).

Here, the contextual implication is unmistakable.  Congress, in defining broker and dealer, used the *exact* words that people used to refer

34

to the two ways of effectuating customer orders. *Supra* p.23. It used the same words in the same way elsewhere. *Id.* at 24. The terms Congress chose, "broker" and "dealer," *themselves* were widely used to refer to entities that executed "customer" orders. *Id.* at 28-29. And, at common law, the concepts of "broker" and "dealer" presupposed customer-order facilitation. *Id.* at 30-31.

Congress also linked "broker" and "dealer" throughout the Act. It is undisputed that there are two methods of effectuating customer orders. *Supra* pp.31-32. And the Commission *admits* that the "broker" definition refers to the *first* method. SEC.*Almagarby*.Br.35. In this context, it is hard to imagine that the related "dealer" definition—appearing in the Act's very next sentence, *see* § 3(a)(4)-(5), 48 Stat. at 883—and defining a term that is linked, side-by-side with "broker," on 27 occasions, *supra* p.33—refers to anything but the *second* method. *Cf. Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2488 (2021) (per curiam) (adjacent sentences cabin one another).

## 2. The Commission Would Destroy Regulatory Safeguards.

Under current law, customer-protection rules don't protect "brokers" and "dealers" from each other. *E.g.*, 17 C.F.R. § 240.15c3-3(a)(1);

35

FINRA Rule 160(b)(4). For *real* broker-dealers, that isn't a problem; they have direct access to exchanges and other trading venues and custody of their own funds and securities. But for everyone else—hedge funds and the like, who (like Mr. Keener, *see* Doc.72¶¶40-41, 70; Doc.88¶¶40-41, 70) rely on actual broker-dealers to hold their money and securities and execute their orders—the Commission's theory leaves them with no regulatory protections. Their broker-dealers could lose their securities and execute their orders outside prevailing market prices—and customer-protection rules wouldn't apply. *Cf.* 17 C.F.R. § 240.15c3-3(b)(1) (protecting only "customers," not broker-dealers); FINRA Rule 5310 (same).

The Commission has no answer. *Cf.* SEC.*Almagarby*.Br.39 (calling this "logical[]").

### 3.    The Commission Flouts Precedent.

**a.**    Even prior Commissions didn't buy the Commission's no-customers theory. In *Sodorff*, the Commission unanimously held a dealer effectuates customer orders.

Sodorff, a salesman at a (registered) broker-dealer, operated his own (unregistered) broker-dealer on the side. 1992 WL 224082, at *2.

"[W]ithout [his employer's] knowledge," *id.* at *6, Sodorff "solicit[ed] customers" to purchase stock directly from him, *id.* at *2. The Commission held that *this* was "dealer" activity because Sodorff used "his own account" to facilitate customer orders. *Id.* at *5. Sodorff "solicited investors and handled their money and securities, rendered investment advice, and sent subscription agreements to investors for their review and signature"—classic steps in executing customer orders. *Id.* "These factors," the Commission held, are what "distinguish the activities of a dealer" from a non-dealer. *Id.* at *5 n.27.

*Sodorff* is dispositive here. "The Commission has never issued an opinion or rule taking a different view, and its lawyers cannot adopt a new approach by filing briefs." *SEC v. Nat'l Presto Indus., Inc.*, 486 F.3d 305, 315 (7th Cir. 2007).

**b.**     Judicial precedent further undermines the Commission's no-customers theory. *Every* court of appeals to construe "dealer" under the '34 Act has done so in the context of customer-order facilitation. *E.g.*, *SEC v. Ridenour*, 913 F.2d 515, 516 (8th Cir. 1990) (defendant traded opposite "clients"); *Roth v. SEC*, 22 F.3d 1108, 1110 (D.C. Cir. 1994)

(same). The Commission, below, cited *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968), but that case also concerned customer-order facilitation.[7] The putative dealer's (National Plan's) "principal business" was "to 'put on bond issues'"—*i.e.*, "direct[] the bond sales program" by traveling "throughout the country" selling bonds over-the-counter to customers. *Id.* at 361.

While the Commission below also cited *Big Apple*, there, the Exchange-Act arguments were "abandoned." 783 F.3d at 806. Footnoted commentary (at 809 n.11) on an unbriefed, abandoned issue is not binding (or illuminating). *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1204 n.7 (11th Cir. 2004); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1216 n.20 (11th Cir. 1991). The Court in *Big Apple* interpreted a *different* word ("business") in a *different* statute (the '33 Act), with *different* text. Congress explicitly said this '33 Act text (15 U.S.C. § 77b(a)(12)) extends beyond "merely the ordinary dealer." H.R. Rep. No. 73-85, at 14 (1933). *Big*

---

[7] This Court is bound by former Fifth Circuit decisions handed down before October 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*Apple* is silent regarding the meaning of the different, '34-Act text ("buying and selling securities … for [one's] own account") at issue here. *Cf. Reeves v. Astrue*, 526 F.3d 732, 735 (11th Cir. 2008) (principles "articulated … in the context of interpreting different language in a different statute" are not controlling); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("When conducting statutory interpretation, we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'").

The Commission's theory here, under the '34 Act, is unprecedented. *Cf. Util. Air Regul. Grp. v. EPA* (*UARG*), 573 U.S. 302, 324 (2014) (claim of "unheralded [regulatory] power" merits "skepticism").

### 4.    The Commission's Theory Is Absurd.

**a.**    Below, the Commission insisted a snippet from the "dealer" definition ("business of buying and selling securities … for [one's] own account," 15 U.S.C. § 78c(a)(5)(A)), must be read hyperliterally: "[W]here a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer." Doc.68.at.21. The Commission stressed that "strict application" of this language was "appropriate," and thus, proof Mr. Keener operated

39

a business—that he "rented office space …; had employees …; advertised …; engaged in a significant volume of transactions; and created a computer system"—was dispositive proof ("as a matter of law") Mr. Keener was a "dealer."  Doc.102.at.7 (cleaned up).

This is absurd.  If having a "business model" that is "based entirely on the purchase and sale of securities" is really "conclusive proof" that someone is a dealer, Doc.68.at.21, every hedge fund, family office, and the like has seemingly been operating as an unregistered dealer for decades.  The Commission's answer below—that it is "not obligated to sue" "hedge funds, family offices," and others, Doc.89.at.30—is no answer at all.  "Agencies are not free to 'adopt … unreasonable interpretations of statutory provisions'" and then selectively enforce those interpretations "'to mitigate the unreasonableness.'"  *UARG*, 573 U.S. at 328.

The reading the Commission pressed below is so indefensible, the Commission's appellate counsel won't defend it.  In this Court in *Almagarby*, the Commission refused even to *acknowledge* its reading below.  *Compare* SEC.*Almagarby*.Br.37 ("*Amici* ascribe to both the Commission and the district court … a sweeping position that neither took:  a dealer includes 'any company whose business model was based on the purchase

40

and sale of securities' ….  The decision below is devoid of such a categorical statement …."), *with* Doc.68.at.21 ("In *SEC v. Almagarby*, … the district court … found that where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer.").

**b.**     The Commission's appellate counsel now claim that what the Commission calls the "trader exception" cabins its theory.  SEC.*Almagarby*.Br.21-24, 36.  The "inconsistency" alone is reason to doubt the Commission's "latest utterance," *Bittner v. United States*, 143 S. Ct. 713, 722 n.5 (2023), but, regardless, the "trader exception" does not exist.

According to the Commission, the "trader exception" was discovered "[a]s early as 1951"—about twenty years after the statute's adoption—in a provision (15 U.S.C. § 78c(a)(5)(B)) that does not mention "trader." SEC.*Almagarby*.Sur-Reply.4.  As the Commission sees it, the "trader exception" works in two steps.  You start with the traditional "dealer" definition in § 78c(a)(5)(A) ("business of buying and selling securities … for [one's] own account"), which sweeps in *everyone*—every hedge fund, investment company, family office, all "business[es]" that "buy[]" and "sell[]" securities with their "own account."  But, the Commission says,

41

that's when the "trader exception" in § 78c(a)(5)(B) comes to the rescue. Section 78c(a)(5)(B) excludes from the dealer definition anyone who fell under paragraph (A)—anyone who was is in the "business of buying and selling securities … for [his] own account"—but who was *not* in such business "as a part of a *regular* business."  (emphasis added.)

According to the Commission, the words "regular business" do *a lot* of work:  they "distinguish[] between a dealer and a trader."  SEC.*Almagarby*.Br.36.  In other words, § 78c(a)(5)(A) ("business of buying and selling securities … for [one's] own account") swallows every financial professional and, then, § 78c(a)(5)(B) frees those whose "characteristics" are more "normally attributable" to a "trader" than a "dealer."  SEC.*Almagarby*.Sur-Reply.5-6.

There's no "textual basis" for this.  *Van Buren*, 141 S. Ct. at 1655. If Congress wanted to differentiate *dealing* and *trading*, it "knew how to say so." *Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1262 (11th Cir. 2020); *see* § 2(12), 48 Stat. at 75 ("dealing or trading").  The words "regular business" cannot plausibly be read to create a multi-factor balancing test regarding whether someone's "characteristics" are, on net, more "normally attributable" to a "dealer" or "trader."  SEC.*Almagarby*.Sur-

42

Reply.5-6. "Regular business" means "regular business." As the Commission "let slip," *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1484 n.5 (2021), "[t]here is no legal basis" for finding that "'regular business' … somehow means something other than a regular business," SEC Reply in Supp. of Mot. for Summ. J. 3, *Almagarby* (Nov. 18, 2019), ECF No. 88. As the Commission put it a few days ago, "regular business" includes "anyone who has operated a company at a regular place of business." SEC Opp'n to Mot. to Dismiss 19, *SEC v. Morningview Fin., LLC*, No. 1:22-cv-8142 (S.D.N.Y. May 19, 2023), ECF No. 23.

That the Commission's overbroad, hyperliteral reading of § 78c(a)(5)(A) necessitated making-up an atextual balancing test in § 78c(a)(5)(B) should "have alerted [the Commission] that it had taken a wrong interpretive turn." *Chamber of Com. v. U.S. Dep't of Labor,* 885 F.3d 360, 383 (5th Cir. 2018).

Section 78c(a)(5)(B) addresses a specific issue. In 1934, most brokers and dealers had (as today) combined the "functions of broker and dealer" in single entities (*i.e.*, broker-dealers), S. Rep. No. 73-792, at 11, and Congress was contemplating requiring a "segregation," § 11(e), 48 Stat. at 892. That, however, would've been impossible. A "broker" trades

43

"for the account of the customer," SEC Report, at XIV (Doc.71-2.at.15), but, on occasion—when it "neglects" a customer's order—is "compelled" to immediately execute the order by taking the opposite side in its "own account," S.P. Goldman, *Stock Exchange Law* 34 (1923). Without the "regular business" exception, this standard method of error correction (using one's "own account" to promptly execute a customer's trade) would turn the occasionally erring broker into a dealer. This would risk violating any "segregation" of the functions of "broker" and "dealer." "Trading" has nothing to do with it.

The Commission's position is implausible. In the Commission's view, Congress, in paragraph (A), defined "dealer" as virtually every financial professional—literally every "business" that "buy[s] and sell[s] securities" for itself, 15 U.S.C. § 78c(a)(5)(A)—but then, in the "mousehole[]" of an exception (paragraph (B)), hid the "elephant[]," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001): a carveout for firms that do not have "characteristics normally attributable to a dealer," SEC.*Almagarby*.Sur-Reply.5. Congress supposedly added this enormously important exception—"the only limitation" on everyone being a dealer, *id.*

at 6—in the most "modest," "vague," and "subtle" way possible, *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022):  the word "regular."  In doing so, Congress purportedly flouted the usual rules of interpretation, *see In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017), causing the *same* word ("business") to have *different* meanings—*i.e.*, to mean virtually every securities "business" in paragraph (A), but only "business[es]" with supposed "dealer" "characteristics" in paragraph (B), SEC.*Almagarby*.Sur-Reply.5.  And all this allegedly went unremarked until "1951," when a former Commission staffer wrote a book.  *Id.* at 4.

The "trader exception" does not exist, and cannot save the Commission from its absurdly overbroad, hyper-literal, and ahistorical reading of "buying and selling securities … for [one's] own account."

### 5.    The Commission Is Unable To Tell Anyone What A "Dealer" Is Or Isn't.

The Commission's position is "so vague" and "standardless," *Johnson v. United States*, 576 U.S. 591, 595 (2015), the Court should reject it on constitutional-avoidance grounds, *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005).

To hear the Commission tell it, Mr. Keener is a "dealer" because *he* "buy[s] and sell[s] securities as part of a 'regular business,'" but what

about everyone *else* who "buy[s] and sell[s] securities as part of a 'regular business'"? Doc.68.at.9. The Commission makes up lines as it goes. According to the Commission, an investor is in the "regular business" of "buying and selling securities" if it trades $25.1 billion in Treasury securities, but *not* if it trades $24.9 billion. 87 Fed. Reg. at 23,106. *But*, if the investor "primarily," through trading, "[e]arn[s] revenue" by "capturing bid-ask spreads," then it *is* in the "regular business" of "buying and selling securities," *unless* it manages "less than $50 million," in which case it's *not*. *Id.* at 23,105. But it *could* be. Because "[w]hether or not a person is a 'dealer' is based on the facts and circumstances, where various factors are 'neither exclusive, nor function as a checklist,'" an investor "may *still* be a dealer" anyway. *Id.* at 23,059 n.51 (emphasis added) (citing case against Mr. Keener); *accord* Doc.68.at.28; Doc.118.at.19.

The Commission's claim that all this is "derived directly from the statutory text"—the words "regular business"—is not credible. SEC.*Almagarby*.Sur-Reply.5; *cf. Whatley v. Zatecky*, 833 F.3d 762, 778-79 (7th Cir. 2016) (even in frequency-of-use sense, "regular basis" is unconstitutionally vague).

46

The I-know-it-when-I-see-it conception of dealing is particularly in-appropriate with the '34 Act—a criminal statute, 15 U.S.C. § 78ff(a). Even in civil cases, a statute with "both criminal and noncriminal appli-cations" must be read "narrow[ly]," *Romero v. Sec'y of Homeland Sec.*, 20 F.4th 1374, 1383-84 (11th Cir. 2021)—not left to post-hoc balancing of "a variety of open-ended factors" by enterprising government lawyers, *Sack-ett v. EPA*, 598 U.S. ___, 2023 WL 3632751, at *15 (2023).  Here, there's no "tool[] of statutory construction" anyone could apply to *regular busi-ness* to learn (let alone, "clear[ly] and definit[ively]") whether his partic-ular business might be a felony.  *Yates v. United States*, 574 U.S. 528, 547-48 (2015); *cf.* SEC Opp'n to Mot. to Dismiss 23 n.24, *SEC v. LG Cap. Funding, LLC*, No. 1:22-cv-3353 (E.D.N.Y. Oct. 27, 2022), ECF No. 28 (stating that "[o]bviously" hedge funds "cross over the line between a trader and dealer" "at some point," but not saying *when* (emphasis re-moved)).

### 6.   The Commission Calls Into Question Decades Of Regulatory Activity.

Even on the narrowest conception of the Commission's theory, dec-ades of regulatory activity are unexplainable.  In this Court in *Alma-garby*, the Commission declared that "acquiring discounted securities

47

from issuers and selling them as quickly as possible" is "classic dealer activity." SEC.*Almagarby*.Br.12. Even putting aside that none of those words (except "selling" and "securities") appear in the statutory text, the Commission would have this Court believe that the Commission "overlooked or ignored" the supposedly classic dealer activity for decades, *Bankamerica Corp. v. United States*, 462 U.S. 122, 130-31 (1983), without "assert[ing] the right to regulate" it, *Fed. Power Comm'n v. Panhandle E. Pipe Line Co.*, 337 U.S. 498, 513-14 (1949).

Courts typically find this "difficult to believe." *Bankamerica*, 462 U.S. at 130. That's an understatement here:

**Hedge Funds.** In 2004, the Commission searched for a "hook on which to" force hedge funds to register with the Commission. *Goldstein v. SEC*, 451 F.3d 873, 882 (D.C. Cir. 2006). The Commission's stated concern was that hedge funds, although not registered, had (among other things) come to "dominate the market for convertible bonds" through convertible arbitrage. *Registration Under the Advisers Act*, 69 Fed. Reg. 72,054, 70,056 & n.26 (Dec. 10, 2004) (citing H. Sender, *Hedge Funds Skid on Convertible Bonds*, Wall. St. J. (June 30, 2004),

48

https://on.wsj.com/3VEHP4A). Convertible arbitrage involves doing precisely what the Commission alleges is "classic dealer activity," SEC.*Almagarby*.Br.12: acquiring a convertible security that "may be converted to shares … at a discount to the market price," "convert[ing]" the security "to shares," and immediately "sell[ing]" the shares for "gain." M. Hudson, *Funds* 38 (2014). It, however, occurred to nobody in 2004 that hedge funds might be dealers. The idea was so foreign the Commission—in a decision struck down by the D.C. Circuit as "manipulat[ing] [the] meaning" of words—declared hedge funds to be "investment advisers" instead. *Goldstein*, 451 F.3d at 882.

**PIPEs.** The Commission's enforcement sweep in 2006-07 with regard to PIPEs (Private Investments in Public Equities) is also impossible to square with the Commission's theory here. The Commission (again) alleged hedge funds were doing precisely what it alleges here: acquiring "securities at large discounts" directly from "issuers" and "selling" those securities into the market for profit. *E.g.*, SEC Opp'n to Mot. to Dismiss 1-2, *SEC v. Lyon*, No. 1:06-cv-14338 (S.D.N.Y. Mar. 16, 2007), ECF No. 11. The Commission (again), however, did not declare this "classic dealer activity." SEC.*Almagarby*.Br.12. Instead, the Commission stated that

49

so long as the securities were registered or exempted under "Section 5" of the '33 Act—as all of Mr. Keener's trades undisputedly were, Doc.72¶¶48-50; Doc.88¶¶48-50—the share-resell process was "not unlawful." SEC Opp'n 7, *Lyon*.

**Microcap Financing.** In this Court in *Almagarby*, the Commission stated that the supposedly "classic dealer activity"—"acquiring" and "selling" "discounted securities"— SEC.*Almagarby*.Br.12, was a form of "microcap 'financ[ing],'" *id.* at 39. But the Commission has long regulated microcap "financer[s]," who (in the Commission's words) acquire "shares at a significant discount from prevailing market prices" and "immediately re-sell them publicly for a … profit." SEC News Release No. 13-249, 2013 WL 6157327 (Nov. 25, 2013). Once again, the Commission would have this Court believe that, at the time, the Commission just missed this "classic dealer activity."

**Convertible Lending.** Finally, the Commission focused below on the acquiring and selling of discounted shares as part of "a convertible note business." Doc.89.at.30. The Commission has regulated convertible-note businesses for decades without calling them "dealers."

In 2007, it created a special "screening process" to require "enhanced disclosure[s]" about the exact type of "convertible" transactions at issue here. J.W. White, Director, Div. of Corp. Fin., SEC, *The Promise of Transparency* (Feb. 23, 2007), https://bit.ly/3peihis. It launched an enforcement sweep to target public companies that were not properly disclosing the convertible loans they received. *E.g.*, *Elray Res., Inc.*, 2016 WL 5571631, at *2 (SEC Sept. 30, 2016). It agreed that other businesses, similar to convertible-note businesses, were not dealers. *Acqua Wellington N. Am. Equities Fund*, SEC No-Action Letter, 2001 WL 1230266, at *1, *5 n.10 (Oct. 11, 2001). And it sued numerous convertible-note businesses for violations having nothing to do with "dealer" status—even acknowledging that convertible-note lending (by non-dealers) is "not inherently illegal." SEC Opp'n to Mot. for Reconsideration 7, *SEC v. Badian*, No. 1:06-cv-2621 (S.D.N.Y. Oct. 31, 2011), 2011 WL 7615665. Yet, throughout all this—despite being told repeatedly that convertible-note

51

businesses were *not* "registered broker-dealer[s],"[8] and reviewing transactions of Mr. Keener[9] and his competitors[10] specifically—the Commission never once called out this supposedly "classic dealer activity."

The Commission even *approved* some of the very transactions at issue here. Take the first set on the Commission's list: transactions with 3DIcon Corp. Doc.122-1.at.2. In 2012, 3DIcon disclosed to the Commission that it issued multiple convertible notes to Mr. Keener (*i.e.*, JMJ Financial). 3DIcon Corp., Registration Statement 13 (Form S-1/A) (Aug. 31, 2012), https://bit.ly/3OrDvDV. 3DIcon asked the Commission to register the "[s]tock underlying [the] convertible promissory notes" so that JMJ, upon conversion of the notes, could resell the stock, *id.* at 28—and the Commission agreed, Notice of Effectiveness (Feb. 13, 2013), https://bit.ly/3MOGXaJ. Even though 3DIcon had stated that JMJ was "not [a] broker-dealer[]," Registration Statement at 28, and even though

---

[8]  *E.g.*, Letter to J.P. Riedler, Assistant Director, Div. of Corp. Fin., SEC (July 1, 2011), https://bit.ly/3nEJUk7

[9]  *E.g.*, Doc.124-10.at.2 (asking about "JMJ Financial Transaction"); *id.* at 6 (disclosing potential conversion "into 4,464,286 shares").

[10]  *Compare Elray*, 2016 WL 5571631, at *2, *with* Elray Resources, Inc., Quarterly Report 9-11 (Form 10-Q) (Aug. 15, 2016), https://bit.ly /3VAsBNM.

the Commission had reviewed and inquired about the JMJ disclosures specifically, *e.g.*, Letter from L. Spirgel, Assistant Director, Div. of Corp. Fin., SEC 3 ¶ 11 (Sept. 10, 2012), https://bit.ly/45o6EG8, it apparently occurred to nobody at the Commission this was "classic dealer activity," SEC.*Almagarby*.Br.12.

That's because it isn't. *Cf. West Virginia*, 142 S. Ct. at 2610 ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.").

### 7.    The Commission Makes A Mess Of Other Statutory Language.

If all this were not enough to doubt the Commission, the Commission's reading would make a mess of other statutory language.

**a.**    The phrase "buying and selling securities" means to buy and sell the *same* security, at around the *same* time. The word "and" implies a "certain temporal proximity" between the buy and sell. *Lake Bldg. Prods., Inc. v. Sec'y of Labor*, 958 F.3d 501, 505 (6th Cir. 2020). And, under well-settled interpretive rules in the 1930s, the fuller phrase, "buying and selling," means "buy[ing] and sell[ing] *the same article and in the*

53

*same condition.*" *State v. Yearby*, 82 N.C. 561, 562 (1880); *e.g.*, *State v. San Patricio Canning Co.*, 17 S.W.2d 160, 162 (Tex. Civ. App. 1929) (shrimp canner not "dealer" in shrimp because he bought raw shrimp and sold canned shrimp, which were in "different form and condition"); *Public Printing*, 1903 WL 3830, at *1 (Pa. Att'y Gen. June 12, 1903) (similar for butcher). Congress, in adopting the buying-and-selling language, was presumptively aware of, and adopted, this convention. *Keene Corp. v. United States*, 508 U.S. 200, 212 (1993).

Limiting "dealer" to one who buys and sells the same security, at around the same time, tracks with how dealers operated in the 1930s, and with later Commission interpretations, too. In 1934, dealers "ordinarily" effectuated customer orders by trading "twice" in quick succession; to facilitate a buy order, a dealer would purchase from another dealer, then promptly sell to the customer. Twentieth Century Fund 266. The Commission has acknowledged "the conjunctive 'buying *and* selling'" refers to this "two-way trading," *Further Definition of "Swap Dealer,"* 77 Fed. Reg. 30,596, 30,607 & n.176 (May 23, 2012), and has conceded that when a firm's buys and sells are of different forms, the firm isn't dealing, *Samuel Krieger*, SEC No-Action Letter, 1982 WL 29327, at *1 (July 12,

54

1982) (purchases here, sales abroad); *Joseph McCulley Sales*, SEC No-Action Letter, 1972 WL 9127, at *1 (Sept. 1, 1972) (ads for buys, not for sells).

The Commission's theory here is incompatible with the meaning of "buying and selling securities." Mr. Keener's purchases and sales were separated by at least a six-month gap. Doc.72¶28; Doc.88¶28; Doc.91.at.35¶3; Doc.101.at.11¶3. He also didn't buy and sell the same security in the same form. Just as a shrimp canner bought raw shrimp and "converted [the shrimp] into" canned shrimp, *San Patricio*, 17 S.W.2d at 162, Mr. Keener "purchased … convertible notes," "convert[ed]" them "into stock," and "sold" the stock. Doc.67¶¶8, 18; Doc.91¶¶8, 18. That isn't "buying and selling" in the statutory sense—and that the Commission says it is, is further proof the Commission's "dealer" conception is wrong.

**b.** The Commission's theory "render[s] meaningless" the word *account*. *Liu v. SEC*, 140 S. Ct. 1936, 1948 (2020). A dealer, under the statute, buys and sells "for his own account," 48 Stat. at 883, but, under the Commission's theory, account does "no work," *Maslenjak v. United*

*States*, 582 U.S. 335, 342 n.2 (2017).  As demonstrated by the Commission's briefs, which repeatedly exclude "for [one's] own account" from the analysis, Congress, under the Commission's theory, could've dropped "account" and said a dealer buys and sells "for himself," *cf.* Act of Apr. 5, 1938, ch. 72, § 863, 52 Stat. 198, 198.  *See* Doc.68.at.9 ("Those who buy and sell securities as part of a 'regular business' must register").  Only the customer-order-facilitation interpretation gives effect to "account" by calling to mind the widely-understood own-account, others'-account distinction, detailed above.

## II.    The Retroactive Application Of The Commission's New "Dealer" Theory Violates Fundamental Principles Of Fair Notice.

Even if the Commission's theory *were* permissible as a matter of statutory interpretation, fundamental principles of "fair notice" would still require reversal.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  No one could've seen the Commission's theory coming.

To borrow from then-Judge Kavanaugh in *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), *reinstated on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018), put aside "the legalese for a moment."  *Id.* at 49.  Suppose that for twenty years, a group of pedestrians cross the street at a certain place.

56

Every day, a police officer watches them. Some days he waves them across. *Cf. supra* pp.52-53. Other days he stops them to enforce other laws—*e.g.*, tells them to turn their music down—but confirms that crossing the street is "not unlawful." *Cf. supra* pp.49-50. Other groups, citing these interactions, write to the police to confirm that crossing *other* streets is not unlawful either. *Cf. Acqua Wellington*, 2001 WL 1230266, at *5 n.10. The police agree. *Cf. id.* at *1.

But, they later change their mind. After the pedestrians had openly crossed the street for decades, the police round them up, fine them thousands of dollars for every previous crossing, and, for pedestrians who were walking to work, order them to disgorge all their wages. "No one would seriously contend that the [police] had acted fairly or in a manner consistent with basic due process in that situation." *PHH*, 839 F.3d at 49. Yet that's precisely this case.

Here, the Commission argues that Mr. Keener should be forced to disgorge all his profits, fined millions of dollars, and barred from his profession, even though he acted in accord with longstanding industry practice—publicly monitored by the Commission for decades, *supra* pp.50-53—and relied upon Commission statements that his precise conduct

was "not unlawful," *supra* pp.49-50. The Supreme Court and other courts have recognized that, in the face of longstanding "industry[] practice," agency "inaction" *alone* creates an "acute" "potential for unfair surprise." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157-58 (2012); *accord Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (finding unfair surprise where industry was engaged in conduct for "years," yet "the Commission took no steps to advise the public that it believed the practice was questionable"); *Stoller v. CFTC*, 834 F.2d 262, 265 (2d Cir. 1987) (similar).

The surprise here is even more unfair: the Commission approved the conversion-resale process (with a non-dealer) in 1980, *Planning Rsch. Corp.*, SEC No-Action Letter, 1980 WL 14999, at *2 (Dec. 8, 1980); codified that position (for non-dealers, 72 Fed. Reg. at 71,546) in 2007, *id.* at 71,555-56 & n.143; stated the now-challenged conduct (by non-dealers) was "not unlawful," *supra* pp.49-50; and approved some of Mr. Keener's transactions specifically, *supra* pp.52-53. *Cf. Cox v. Louisiana*, 379 U.S. 559, 570-71 (1965); *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973).

The Commission cannot reasonably maintain that Mr. Keener had "reason to suspect" this "longstanding [industry] practice" was actually dealer activity. *Christopher*, 567 U.S. at 157. The record shows "many experienced [securities] professionals"—including the former Director of the Division of Market Regulation, the Commission's primary expert on dealer regulation[11]—were *also* unaware of the Commission's current theory. *Bittner*, 143 S. Ct. at 725 (opinion of Gorsuch, J.). Others who missed it include:

- the Second Circuit;[12]

- numerous previous SEC commissioners;[13]

- many senior officials in the Division of Corporation Finance;[14] and

---

[11] *Acqua Wellington*, 2001 WL 1230266, at *5 n.10 (citing convertible-note businesses as obvious example of non-dealer activity).

[12] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (explaining that (non-dealer) convertible-note businesses provide "access to much-needed capital" without noticing dealer activity).

[13] *Supra* pp.48-49 (trying to regulate convertible-bond arbitragers without noticing dealer activity).

[14] *Supra* pp.51-53 & nn.8-10 (screening convertible-note transactions without noticing dealer activity).

- scores of enforcement personnel.[15]

The current Chairman of the House Financial Services Committee's Oversight Subcommittee has himself warned that no one saw the Commission's theory coming. *Oversight of the SEC's Division of Enforcement*, *supra*, at 25:09 (statement of Rep. Huizenga) (likening it to changing speed limits on the fly). If *these* people "were unable to anticipate the [Commission's] current theory," it is unclear "how 'the common world' had fair notice of it." *Bittner*, 143 S. Ct. at 725 (opinion of Gorsuch, J.) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)); *cf. Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976) (confusion among agency personnel proves fair-notice issue).

The Court should reverse for this reason alone.

## III.  The Sanctions The District Court Ordered Are Unlawful.

At the very least, the sanctions should be reversed.

---

[15] *Supra* pp.48-53 (prosecuting numerous convertible-note and similar businesses without noticing dealer activity).

**A.     The Sanctions Violate Principles Of Equal Protection.**

Principles of equal protection "incorporate[d]" into the Fifth Amendment, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1241 n.4 (11th Cir. 2003), do not permit the Commission to impose "different consequences" on different persons for the same offense, *M.L.B. v. S.L.J.*, 519 U.S. 102, 127 (1996). Yet that's what the Commission did here.

The Commission alleges Mr. Keener is in "the 'business' of buying and selling securities for his own account." Doc.89.at.14. But, under the Commission's new theory, so is everyone else. *E.g.*, 87 Fed. Reg. at 23,061. The Commission is not permitted to throw Mr. Keener into virtual bankruptcy—order him to disgorge his profits and pay millions in fines, Doc.147.at.2—while simultaneously offering "prominent [market] participants," 87 Fed. Reg. at 23,081, a year to register. They all, under the Commission's theory, do the same thing ("buying and sell securities for [their] own account," Doc.89.at.14; 87 Fed. Reg. at 23,061), and there is no reason—besides political convenience—to throw the book at one group (small-time investors like Mr. Keener) but not the other (large, politically-connected hedge funds).

61

The district court abused its discretion twice over.

*First*, the court held it could ignore Mr. Keener's equal-protection argument because it had previously "rejected [Mr.] Keener's due process," *i.e.*, fair-notice, "arguments." Doc.145.at.4. That is wrong. Equal protection and due process are separate issues, even though they both arise under the Fifth Amendment. *See United States v. Giles*, 640 F.2d 621, 624-29 (5th Cir. Unit A Mar. 1981). Accordingly, rejection of a due-process argument is *not* "fatal to an equal protection claim." *Lyes v. City of Riviera Beach*, 126 F.3d 1380, 1389 (11th Cir. 1997), *reinstated on reh'g en banc*, 166 F.3d 1332, 1336 (11th Cir. 1999).

*Second*, in its one-sentence "merits" analysis, the court suggested that "due process" (presumably meaning equal protection) wasn't triggered by "a *proposed* rule." Doc.145.at.4. That misses the point: The Commission announced that many of the world's largest hedge funds are doing, in a statutory sense, *exactly* what the Commission alleges here— "buying and selling securities for [their] own account," 87 Fed. Reg. at 23,061; *cf.* Doc.89.at.14 (same)—but, the Commission said those entities will suffer no consequences, except (maybe) being asked to register. The

Commission offers no rational "distinction" why the largest market participants should be offered the opportunity to register, but Mr. Keener "den[ied]" that chance and fined millions of dollars instead. *Atchison, Topeka & Santa Fe Ry. Co. v. Vosburg*, 238 U.S. 56, 60 (1915).

### B.    Disgorgement Is Unwarranted.

In ordering more than $7 million in disgorgement, on top of massive fines and other sanctions, Doc.145.at.19, the district court further abused its discretion.

1.    There's no causal connection between the property disgorged (Mr. Keener's "profits") and the alleged failure to register. Doc.145.at.14. That alone requires reversal. *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999) (disgorgement extends to "property causally related to the wrongdoing" (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989))). (Indeed, the district court erroneously disgorged profits from outside the convertible-note business (*i.e.*, from two bridge loans). Doc.72-3.at.80:12-83:17.)

"[C]ausation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020). In other words, if "one thing" changes

and so does the outcome, that thing is a cause of the outcome; if not, it isn't. *Id.* Here, the question is whether Mr. Keener would've earned less profits had he changed his registration status. The answer is no. The Commission *admits* Mr. Keener would've earned the same profits had he registered. Doc.129.at.6 n.4 ("[o]f course a registered dealer could have engaged in [Mr. Keener's] convertible note business"). The Commission's causal case crumbles; because the same "result would have occurred" with or "without" registration, lack of registration didn't cause the profits. *United States v. Feldman*, 936 F.3d 1288, 1312 (11th Cir. 2019).

*Sidoti* compels this conclusion. The CFTC there made the exact causal argument the Commission makes here. It claimed that because Sidoti had "fail[ed] to register"—there, "as a principal" of a broker—"all profits received by him" while unregistered were "illegal," and thus subject to disgorgement. CFTC Br. 47, *Sidoti*, 178 F.3d 1132 (No. 97-5757), 1998 WL 34084731. This Court rejected that argument, agreeing with Sidoti that his "failure to register as a principal" did *not* establish a causal "nexus for deeming illegal all profits received by him in connection with" acting as a principal. 178 F.3d at 1138. *Sidoti* is directly on point, and the district court erred in brushing it aside.

64

**2.**     The district court also misapplied the Supreme Court's holding in *Liu*, 140 S. Ct. 1940. "Disgorgement is an equitable remedy," *Levin*, 849 F.3d at 1006, and "to avoid transforming" it "into a punitive sanction," courts, under *Liu*, must "restrict[] the remedy to an individual wrongdoer's net profits *to be awarded for victims*," 140 S. Ct. at 1942 (emphasis added). Here, however, there are no victims. Accordingly, there is no basis for disgorgement.

*First*, as the Commission's expert admitted, Mr. Keener's trading didn't cause another investor to lose money. Doc.66-13.at.7:5-7 ("I don't show causation," "it would be hard, or impossible"); *cf.* Doc.124-1¶¶14-15 (no causation).

*Second*, even if it did, the result had nothing to do with the *alleged violation*. As this Court has repeatedly recognized, registration violations do not cause investor victims. In *Alvarez v. United States*, the Court found a lack of registration "had no effect" on investors because—as the Commission admits here, Doc.129.at.6 n.4—the same events could've occurred had there been registration. 862 F.3d 1297, 1302 (11th Cir. 2017). Likewise, in *CFTC v. Southern Trust Metals, Inc.*, the Court found a person's failure to register as a futures merchant didn't "cause [an investor's]

loss." 894 F.3d 1313, 1330 (11th Cir. 2018). While "losing money" may be a "foreseeable result of investing with an unregistered trader," the Court explained, that's "not because [the] trader's failure to register will itself inevitably cause a loss. More likely, any loss will result from some other factor, such as the trader's incompetence or dishonesty, which the failure to register might correlate with but not cause." *Id.* "The intrinsic qualities of the trader," in other words—"*not* his or her failure to register—would be the likely cause of the loss." *Id.* (emphasis added).

The same reasoning applies here, and the district court, again, erred in brushing this Court's precedent aside. The district court stated that *Alvarez* was inapposite because Mr. Keener's trading "was inherently unlawful." Doc.145.at.16. That is wrong. Even the Commission admits that had Mr. Keener registered, he could've done what he did here. Doc.129.at.6 n.4. *Alvarez*'s reasoning controls: "if [the defendant] had registered," the same outcome "would still have" occurred. 862 F.3d at 1302. The district court also stated *Southern Trust* wasn't "applicable" because it concerned "proximate[]," not "but-for causation." Doc.145.at.16. That, too, is wrong. "[P]roximate cause necessarily encompasses … 'but-for' causation" and, in *Southern Trust*, this Court

held—"[a]s in *Alvarez*"—that there was *no* causal link between a "registration violation[]" and investor "losses." 894 F.3d at 1329, 1331.

The Commission, below, resisted application of this Court's precedent by suggesting the National Defense Authorization Act, Pub. L. No. 116-283, 134 Stat. 3388 (2021), provided the Commission "greater flexibility" in seeking disgorgement. Doc.129.at.8. Not so. While the disgorgement language that would be incorporated into the NDAA was being debated, the Supreme Court, in *Liu*, was considering whether the '34 Act granted the Commission "disgorgement authority at all." 165 Cong. Rec. H8931 (daily ed. Nov. 18, 2019) (statement of Rep. McAdams). The NDAA made clear that the Commission *could* seek "disgorgement," 15 U.S.C. § 78u(d)(3)(A), but, as the Commission admits, the NDAA didn't change the "equitable" nature of disgorgement. Doc.129.at.8; *accord* SEC Br. 42 n.8, *SEC v. Spartan Sec. Grp.*, No. 22-13129 (11th Cir. Mar. 20, 2023) ("[T]he Commission's position is that the [NDAA] authorize[s] equitable disgorgement"). It's disgorgement's "ground[ing] in equity," *id.*, that "restrict[s] the remedy to an … award[] for victims," *Liu*, 140 S. Ct. at 1942, of which, here, there are none.

67

**3.**    The district court's reasoning—that disgorgement furthers deterrence, Doc.145.at.15; Doc.138.at.13—highlights the court's error. The (massive) civil penalties *already* "deter[] individuals." Doc.145.at.22. Disgorgement, an equitable, nonpunitive remedy, serves other purposes. *Kokesh v. SEC*, 581 U.S. 455, 464 (2017) ("deterrence is not a legitimate nonpunitive" objective (cleaned up)).

## C.    The Obey-The-Law Injunction Is Invalid.

The injunction is faulty and emblematic of the broader issue with the Commission's theory:  no one knows what a dealer is under it.

This Court has repeatedly held, "in the context of SEC enforcement actions," that an "injunction which merely tracks the language of the securities statutes" fails to "'clearly and specifically describe permissible and impermissible conduct' as required by" the Federal Rules.  *SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016).  The injunction here suffers this deficiency.  Unless he is registered as a "dealer," the injunction bars Mr. Keener from "effect[ing] transactions in … any security" while engaged in the "regular business of buying and selling securities … for his own account."  Doc.147.at.1-2.  That is copied and pasted from 15 U.S.C. §§ 78c(a)(5)(A)-(B), 78o(a)(1), and, under the Commission's new

68

theory, no one knows how those words will be applied. What if Mr. Keener buys some Microsoft stock and later sells it? That's "buying and selling" "any security." Doc.147.at.1. And if he does this "more than a few isolated" times, the Commission says that's "regular[]." Doc.89.at.23. So, if Mr. Keener acts as part of a "commercial enterprise," *id.* at 12, does he go to prison for contempt?

The district court had no answer. The Commission's response wasn't much better. The Commission claimed the "summary judgment order ma[de] clear what conduct led to" Mr. Keener's liability. Doc.143.at.9. But an injunction must convey "its strictures" within its "four corners." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012). The injunction here is not limited to "conduct" from the "summary judgment order" anyway, Doc.143.at.9; it bars Mr. Keener from trading "any security" as part of a "regular business of buying and selling securities," Doc.147.at.1. Mr. Keener has a right to know which transactions, under the words of the injunction, will land him in prison.

The truth is, under the Commission's theory, nobody knows.

69

## CONCLUSION

The Court should reverse the judgment below and direct entry of judgment in Mr. Keener's favor.

Respectfully submitted,

Dated:  May 31, 2023

/s/ *Helgi C. Walker*

BARRY GOLDSMITH
M. JONATHAN SEIBALD
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y. 10166-0193
(212) 351-4000

HELGI C. WALKER
BRIAN A. RICHMAN
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
HWalker@gibsondunn.com

CHRISTOPHER F. REGAN
ORRICK, HERRINGTON
    & SUTCLIFFE LLP
2001 M Street NW, Suite 500
Washington, D.C. 20036
(202) 349-8000

*Counsel for Defendant-Appellant Justin W. Keener*

70

**ADDENDUM OF PERTINENT**

**STATUTORY AND CONSTITUTIONAL PROVISIONS**

**PERTINENT STATUTORY AND CONSTITUTIONAL PROVISIONS**

1. The Fifth Amendment to the United States Constitution, U.S. Const. amend. V, provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

2. Subsections 3(a)(4)(A) and 3(a)(5)(A)-(B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(4)(A), (a)(5)(A)-(B), provide:

**(a) Definitions.—**

When used is this chapter, unless the context otherwise requires—

\* \* \*

### (4) BROKER

**(A)** IN GENERAL.—The term "broker" means any person engaged in the business of effecting transactions in securities for the account of others.

\* \* \*

### (5) DEALER

**(A)** IN GENERAL.—The term "dealer" means any person engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise.

**(B)** EXCEPTION FOR PERSON NOT ENGAGED IN THE BUSINESS OF DEALING.—The term "dealer" does not include a person that buys or sells securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in a fiduciary capacity, but not as part of a regular business.

3. Section 15(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a)(1), provides:

**(a)  Registration of all persons utilizing exchange facilities to effect transactions; exemptions**

(1) It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

## 1.    Type Volume

_X__        This document complies with the type-volume limit of Federal Rules of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 12,998 words.

## 2.    Type face and Type-Style

_X__        This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point New Century Schoolbook font.

Dated:  May 31, 2023                    /s/ *Helgi C. Walker*
_____

                                        Helgi C. Walker
                                        *Attorney for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May, 2023, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

Dated:  May 31, 2023                    /s/ *Helgi C. Walker*

                                                Helgi C. Walker
                                                *Attorney for Appellant*