22-14237

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆

U.S. Securities and Exchange Commission,

*Plaintiff-Appellee,*

—v.—

Justin W. Keener d/b/a JMJ Financial,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:20-CV-21254-BB

BRIEF OF *AMICI CURIAE* THE MANAGED FUNDS ASSOCIATION AND
THE NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS
SUPPORTING DEFENDANT-APPELLANT AND REVERSAL

Andrew J. Ceresney
Philip A. Fortino
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
aceresney@debevoise.com
pafortino@debevoise.com

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT (CIP)

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Amici certify that the Certificate of Interested Persons contained in Defendants-Appellants' Brief is complete, other than the following additions:

1. Ceresney, Andrew

2. Fortino, Philip

3. Managed Funds Association

4. National Association of Private Fund Managers

5. Securities and Exchange Commission

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici each states that it does not have a parent corporation and that no publicly held company owns 10 percent or more of its stock.

Pursuant to Eleventh Circuit Rule 26.1-3(b), Amici certify that they are not aware of any publicly traded company or

corporation that has an interest in the outcome of this case or

appeal.

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................... 1

STATEMENT OF ISSUE ............................................................. 2

INTRODUCTION AND SUMMARY OF ARGUMENT ............. 2

ARGUMENT ................................................................................. 5

    I.    The District Court's Holding Could Suggest
           Private Funds Should Register as Dealers
           and Is Inconsistent with the Overall
           Structure of the Securities Laws ............................ 5

          A.    Applying Exchange Act Dealer
                   Regulations to MFA and NAPFM's
                   Members Would Be Unprecedented and
                   Would Make No Sense ....................................... 5

          B.    Congress Provided for Regulation of
                   Investment Advisers and Funds in
                   Other Parts of the Securities Laws ............. 10

    II.   The Dealer Definition Should Be Limited to
           Entities That Buy from and Sell to
           Customers ................................................................. 13

    III.  At a Minimum, Determining "Dealer" Status
           Requires a Consideration of Additional
           Facts and Circumstances ........................................ 17

          A.    The Holding Below Erroneously
                   Construed *Big Apple* as Setting Forth a
                   Single Factor Test for Dealer Status ........... 18

          B.    Prior SEC Interpretations of Section
                   15(a) Also Indicate that a Holistic

**Approach to Determining Dealer Status Is Warranted**........................................ 20

**CONCLUSION** ................................................................. **25**

<u>**TABLE OF CITATIONS**</u>

**Cases**

*SEC v. Almagarby*,
    No. 21-13755 (11th Cir. Oct. 6, 2022) ................................... 7, 26

*SEC v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2015) ........................................... *passim*

*SEC v. Keener*,
    580 F. Supp. 3d 1272 (S.D. Fla. 2022) ................................. 2, 18

**Statutes**

15 U.S.C.

    § 77b(a)(12) ................................................................. 14
    § 78c(a)(4) .................................................................. 16
    § 78c(a)(5) .................................................................. 15
    § 78t(e) ....................................................................... 7
    § 78u-3 ........................................................................ 7
    § 80b-1 ....................................................................... 11
    § 80b-2(a)(7) ............................................................... 14
    § 80b-3 ................................................................... 11, 12
    § 80b-4 ................................................................... 11, 12
    § 80b-5 ....................................................................... 12
    § 80b-6 ....................................................................... 12

**Regulations**

17 C.F.R.

    § 202.1(d) ................................................................... 23
    § 230.506 .................................................................... 13
    § 240.15c3-1 ................................................................. 9
    § 240.15c3-3 ................................................................. 9
    § 240.15c3-5 ................................................................. 9

§ 240.17a-5 .................................................................. 9

§ 275.203-1 ................................................................. 12

§ 275.204-1 ................................................................. 12

§ 279.1 ...................................................................... 12

## SEC Materials

*Burton Sec.*, SEC No-Action Letter, 1977 WL 10680
(Dec. 5, 1977) ............................................................. 24

*Davenport Mgmt., Inc.*, SEC No-Action Letter, 1993
WL 120436 (Apr. 13, 1993) ......................................... 24

*In re Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992
WL 224082 (Sept. 2, 1992), ......................................... 25

*Louis Dreyfus Corp.*, SEC No-Action Letter, 1987 WL
108160 (July 23, 1987) ................................................ 24

*Nat'l Council of Sav. Inst.*, SEC No-Action Letter, 1986
WL 67129 (July 27, 1986) ........................................... 24

*U.S. Sav. Ass'n of Tex.*, SEC No-Action Letter, 1987
WL 107923 (Apr. 2, 1987) ........................................... 24

*OTC Derivatives Dealers*, Exchange Act Release No.
34-40594, 63 Fed. Reg. 59,362 (Nov. 3, 1998) ........................... 22

*Interpretation Guide to Net Capital Computation for
Brokers and Dealers*, Exchange Act Release No.
8024 (Jan. 18, 1967), 32 Fed. Reg. 856 (Jan. 25,
1967) ...................................................................... 9

SEC Br., *SEC v. Almagarby*, No. 21-13755 (11th Cir.
Oct. 6, 2022) ............................................................. 7

iv

SEC, *Report on the Feasibility and Advisability of the
    Complete Segregation of the Functions of Dealer
    and Broker* (1936).) ............................................................16, 17

## Other Authorities

H.R. Rep. No. 76-2639 (1940) ....................................................10, 11

S. Rep. No. 76-1775 (1940) ............................................................ 11

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* include two entities—the Managed Funds Association ("MFA") and the National Association of Private Fund Managers ("NAPFM").  MFA represents the interests of over 170 member firms—investment advisers to private funds—and its mission is to advance the ability of alternative asset managers to raise capital, invest, and generate returns for their beneficiaries. Its members manage over $2.2 trillion in assets across a diverse group of investment strategies.

NAPFM, a Texas non-profit corporation, represents the legal and economic interests of investment advisers in the private fund management industry, which serve a diverse set of investors including pensions, endowments, and insurance companies.

---

[1]    The parties consented to this filing.  No party's counsel authored this brief in whole or part, and no one other than Amici or their members or counsel contributed money for the brief's preparation or submission.

1

**STATEMENT OF ISSUE**

Whether the district court erred in holding that proof that an entity's business is entirely based on the buying and selling of securities conclusively determines that the entity is a "dealer" under Section 15(a) of the Securities Exchange Act of 1934.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Purporting to apply this Court's ruling in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015), the district court erroneously stated that proof that an entity's business model is based entirely on the buying and selling of securities "constitutes conclusive proof that the company is a dealer" for the purposes of Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"). *SEC v. Keener*, 580 F. Supp. 3d 1272, 1286 (S.D. Fla. 2022).

Construing "dealer" as used in Section 15(a) of the Exchange Act to encompass any entity whose business is the buying and selling of securities would give the statute far too broad a sweep.

2

It potentially could result in many *investors* being inappropriately classified as "dealers," which would be inconsistent with the text and the history of the statute. Many private funds, for example, have a business model based almost entirely on the buying and selling of securities for investment purposes and potentially could be considered "dealers" under the district court's reasoning. Even the Securities and Exchange Commission ("SEC"), which advocates for a broad definition of "dealer," has disavowed such an extreme position and has expressly distinguished investment management activity from dealer activity in its briefing in another matter currently pending before the Court.

To the extent that the lower court held that "dealer" status turns solely on whether a business is based upon buying and selling securities, its holding was erroneous. The Managed Funds Association ("MFA") and the National Association of Private Fund Managers ("NAPFM") agree with Appellant that the term "dealer" should be construed to include only persons that execute orders for customers. This interpretation would be most consistent with the

text of the statute; the meaning Congress intended when Section 15(a) was first adopted in 1934, as evidenced by case law and prominent treatises at the time; the SEC's own statements soon after passage of the statute; and the overall structure of the securities laws.

But, even if the Court does not limit dealer status to those persons who buy and sell on behalf of customers, the Court should reject the district court's overly broad assertion that any business that actively trades securities is *ipso facto* a dealer. As noted, such reasoning would have broad unintended consequences that reach far beyond this case—potentially making any professional investor or investment fund, such as a private fund or mutual fund, into a dealer and subjecting such investors to a body of regulations that have no logical application to them and to potential liability for having previously engaged in ordinary investment activities. Rather, the Court should make clear—as even the SEC has stated time and again in the context of interpreting the Exchange Act—that dealer status only may be

4

found when there is further evidence to support dealer status

beyond the mere buying and selling of securities.

## ARGUMENT

I.    **The District Court's Holding Could Suggest Private Funds Should Register as Dealers and Is Inconsistent with the Overall Structure of the Securities Laws**

A.    **Applying Exchange Act Dealer Regulations to MFA and NAPFM's Members Would Be Unprecedented and Would Make No Sense**

MFA and NAPFM represent investment advisers to private

funds.  MFA's more than 170 members invest over $2.2 trillion in

assets for pension funds, university endowments, charitable

foundations, and other institutional investors.  MFA and NAPFM

members (collectively, "Members") purchase and sell securities for

the account of the funds they manage to achieve an investment

return.  Their strategies take market risk based on the advisers'

views of market conditions and analysis of individual securities in

order to generate returns for the fund's owners.  Many of the

strategies Members pursue on behalf of private funds are

alternative investment strategies not available elsewhere. These funds, therefore, serve as key avenues for institutional investors to diversify their holdings. Traditionally, these investors have not been regarded as dealers by the SEC, commentators, or the courts.

The district court's holding that buying and selling securities alone is conclusive evidence of dealer status could sweep almost every investment fund—including private funds and investment companies such as mutual funds—and their advisers into the Exchange Act, which is not designed for, and is ill-suited to, investment advisers and private funds. Investment funds engage in buying and selling securities for their own accounts. If the lower court's holding that buying and selling securities for one's own account was alone sufficient to make a person a dealer was upheld, all investment funds could be forced to register as dealers. Moreover, advisers may be responsible for the buying and selling of securities by the private funds they advise and, if a private fund were determined to have been acting as a dealer without registering as such, the adviser could be subjected to liability

6

under the securities laws for aiding and abetting or causing such violations or as a control person of the fund.  Securities Exchange Act of 1934, §§ 20(e), 21, 15 U.S.C. §§ 78t(e), 78u-3.

Even the SEC has not advocated for such a result.  In its briefing in *SEC v. Almagarby*, also pending before this Court, the SEC acknowledged that buying and selling securities with an "investment purpose," as private funds do, was *not* dealer activity. *See* Brief for the Securities & Exchange Commission at 19, *SEC v. Almagarby*, No. 21-13755 (11th Cir. Oct. 6, 2022) (noting that appellant "was candid that he did not acquire shares with an investment purpose") (internal quotation marks and citation omitted).  The SEC explicitly disavowed the position adopted by the district court here that any company whose business model is based on the purchase and sale of securities was a "dealer."  *Id.* at 37 ("*Amici* ascribe to both the Commission and the district court [in *Almagarby*] a sweeping position that neither took:  a dealer

7

includes 'any company whose business model was based on the purchase and sale of securities.'") (citation omitted).[2]

The SEC's decision not to embrace the district court's holding is well-considered. If private funds were determined to be "dealers," they would have to comply with the additional regulatory requirements applicable to dealers, including registering with FINRA; maintaining minimum net capital; implementing safeguards to control risks associated with direct access to securities markets; and periodic filings with the Commission regarding net capital, cash flow, and internal controls implemented to detect instances of non-compliance with regulatory requirements. *See* Exchange Act § 15(b)(8), 15 U.S.C.

---

[2] Although the SEC has disavowed advocating for the district court's holding before this Court, it has embraced it before a district court in another circuit. *See* SEC Opposition Brief at 1, *SEC v. Morningview Financial, LLC*, No. 22-cv-08142 (S.D.N.Y. May 19, 2023) ("[Defendants] regularly bought and sold securities for their own account, and therefore meet the Exchange Act's broad definition of 'dealer.'").

§§ 78o(b)(8), 78fff-4(c); 17 C.F.R. §§ 240.15c3-1, 240.15c3-3, 240.15c3-5, 240.17a-5, 17 C.F.R. Part 248.

Many of these regulations—designed to protect broker-dealers' customers—would not make sense for private funds. For example, it would not make sense to apply the net capital requirements to private funds. These requirements are designed to protect customers in cases where broker-dealers fail.[3] Private funds, by contrast, have no customers. And it would make no sense to impose market access control rules on private funds, which do not have direct access to the securities markets but rather access them *through registered broker-dealers.* In addition, many customer protections under the rules issued by the SEC and self-regulatory agencies apply only to customers and do

---

[3]    *See, e.g.*, Interpretation Guide to Net Capital Computation for Brokers and Dealers, Exchange Act Release No. 8024 (Jan. 18, 1967), 32 Fed. Reg. 856 (Jan. 25, 1967) ("Rule 15c3-1 (17 CFR 240.15c3-1) was adopted to provide safeguards for public investors by setting standards of financial responsibility to be met by brokers and dealers. The basic concept of the rule is liquidity; its object being to require a broker-dealer to have at all times sufficient liquid assets to cover his current indebtedness.").

not apply to registered brokers or dealers.  Deeming private funds to be dealers also would deprive them of the customer protections they have long enjoyed—and, as investors who transact through broker-dealers—should be allowed to continue to enjoy.  Finally, such a dramatic change would substantially increase the already significant operating costs of private funds, which likely would result in there being fewer options available to investors to access alternative investment strategies.

### B.  Congress Provided for Regulation of Investment Advisers and Funds in Other Parts of the Securities Laws

Treating private funds as dealers also is contrary to how Congress structured the federal securities laws.  Several years after enacting the Exchange Act, Congress recognized that it did not provide for the regulation of investment funds and investment advisers.  *See, e.g.*, H.R. Rep. No. 76-2639, at 10 (1940) ("[T]he great majority of investment companies have never come within the purview of" the Exchange Act); S. Rep. No. 76-1775, at 21 (1940) ("Virtually no limitations or restrictions exist with respect

10

to the honesty and integrity of" investment advisers.).  It, therefore, provided for such regulation through the enactment of the Investment Advisers Act of 1940 (the "Advisers Act") and the Investment Company Act of 1940 (the "Investment Company Act").

Investment advisers are subject to stringent regulation under the Advisers Act and the rules promulgated thereunder. Recognizing that the business of investment advisers is to provide investment advice to clients, the focus of the Advisers Act regime is to regulate conflicts of interest that may arise between advisers and their clients.  *See* Advisers Act, § 201 *et seq.*, 15 U.S.C. § 80b-1 *et seq.*  To that end, it imposes registration, record-keeping, and reporting requirements on advisers.  *See id.* §§ 203–204, 15 U.S.C. §§ 80b-3–80b-4.  Advisers register with the Commission by filing Form ADV, which requires advisers to disclose information about their business, including information about ownership, business practices, fees, conflicts of interest, and disciplinary proceedings. *See* 17 C.F.R. §§ 275.203-1, 279.1.  The reporting requirements for

11

advisers include the regular filing of annual amendments to ADV, 7 C.F.R. § 275.204-1 and instructions to Form ADV, which provide investors valuable information regarding the adviser and its funds, Form PF, which reports on regulatory assets under management and detailed information on the adviser's private funds, *id.* §§ 275.204(b)-1, 279.9, and Form 13F, which identifies equity holdings controlled by large advisers, *id.* § 240.13f-1. Advisers also are subject to anti-fraud provisions, which obligate them to, among other things, exercise fiduciary duties in their management of investor funds. 15 U.S.C. §§ 80b-3–80b-6.

Private funds likewise are subject to a number of regulations. First and foremost, the Investment Company Act provides strict criteria for the organization of private funds, placing limits on the number or type of investors who may participate. *See* Investment Company Act of 1940, § 3(c), 15 U.S.C. § 80a-3(c). Moreover, advisers marketing private funds to investors must comply with the exempt offering requirements of the Securities Act and Regulation D promulgated thereunder,

which place limits on the manner of solicitation and types of investors, and which are not available to regulatorily defined "bad actors." *See* 17 C.F.R. § 230.506. In addition, funds are required to file regular reports of their equity holdings in specific issuers, including Schedule 13D, or 13G, as applicable. *See id.* §§ 240.13d-1, 240.13d-101, 240.13d-102.

Thus, Congress directly provided for the regulation of investment advisers and private funds after recognizing that the Exchange Act was not intended as the means of regulating these entities.

## II.    The Dealer Definition Should Be Limited to Entities That Buy from and Sell to Customers

MFA and NAPFM agree with the arguments advanced by Appellant that the term "dealer" under the Exchange Act encompasses only those persons who transact on behalf of customers. Such a definition would be consistent with the text, history, and structure of the securities laws.

13

Here, the district court purported to base its holding on *Big Apple*. But that decision does not control this case. That decision interpreted the term "dealer" in Section 5 of the Securities Act, not Section 15(a) of the Exchange Act. The statutes defined the terms very differently. The Securities Act (which *Big Apple* interpreted) broadly defines "dealer" to include any person engaged "in the business of . . . ***trading*** in securities," and encompassed within its definition both brokers and dealers. 15 U.S.C § 77b(a)(12) (emphasis added). When the Exchange Act was enacted the following year, Congress did *not* adopt the existing definition of "dealer" (as it did when it enacted other securities laws[4]). Instead, Congress crafted a *narrower* definition that separated the definition of dealers from brokers, and exempted traders from the dealer definition. *See* 15 U.S.C § 78c(a)(5) ("The term 'dealer' does ***not*** include a person that buys or sells securities . . . for such

_____

[4]       *See* Investment Company Act of 1940, § 2(a)(11), 15 U.S.C. § 80a-2(a)(11) ("The term 'dealer' has the same meaning as given in the Securities Exchange Act of 1934"); Investment Advisers Act of 1940, § 202(a)(7), 15 U.S.C. § 80b-2(a)(7) (same).

person's own account, either individually or in a fiduciary

capacity, but not as a part of a regular business." (emphasis

added)).  Thus, the definition of "dealer" in the Exchange Act is

necessarily narrower than the definition in the Securities Act and

*Big Apple* should not be read to control the interpretation of that

definition under the Exchange Act.[5]

As Keener argues, the narrower definition of "dealer" in the

Exchange Act should be construed in a manner that gives effect to

Congressional intent, as reflected in the text and structure of the

statute.  The Exchange Act indisputably was designed to regulate

both brokers and dealers.  The statute defines "broker" as "any

person engaged in the business of effecting transactions in

securities for the account of others."  15 U.S.C. § 78c(a)(4)(A).  It

defines a "dealer" as "any person engaged in the business of

_____

[5]    Although *Big Apple* observed in a brief footnote that the
definitions of "dealer" in both acts are similar, 783 F.3d at 809
n.11, that observation was *dicta* because the defendant had
"abandoned" any challenge to its "dealer" status under the
Exchange Act and did not brief the issue.  *Id.* at 806.

buying and selling securities . . . for such person's own
account . . . ." *Id.* § 78(c)(a)(5)(A). The natural reading of these
provisions is that brokers and dealers are engaged in the *same
business involving customers*, except that brokers transact as
agents for the accounts of customers, whereas dealers transact as
principals for their own accounts.

As the SEC explained in an interpretive release shortly after
the passage of the Exchange Act, both brokers and dealers'
businesses were oriented toward providing the same service to
customers in different ways. The SEC explained that brokers
purchased and sold securities as the agents for their customers.
SEC, *Report on the Feasibility and Advisability of the Complete
Segregation of the Functions of Dealer and Broker*, at XIV (1936)
(the "1936 Release"). With respect to dealers, the SEC observed
that rather than acting as an agent for its customer, a "dealer
sells securities to his customers which he has purchased or
intends to purchase elsewhere or buys securities from his
*customer* with a view of disposing them elsewhere." *Id.* (emphasis

added).  Thus, the SEC recognized that the dealer definition applies to entities that are transacting with customers.

As Appellant's brief further details, the universal understanding of the term dealer at the time the Exchange Act was enacted—including in case law and prominent treatises—was buying and selling securities on behalf of customers.  And as noted above, the structure of the securities laws, including the subsequent passage of the Investment Advisers and Investment Company Acts, which applied to entities and advisers that were not subject to regulation under the Exchange Act, further supports this narrow reading.  Accordingly, the Court should hold that, for the purposes of the Exchange Act, "dealer" means a person who buys securities from and sells securities to customers for profit.

### III.  At a Minimum, Determining "Dealer" Status Requires a Consideration of Additional Facts and Circumstances

Even if the Court does not adopt Keener's position, the Court should, at a minimum, decline to adopt the district court's

17

extremely broad assertion that "where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer." *Keener*, 580 F. Supp. 3d at 1286. That proposition expands the definition of "dealer" beyond any prior conception of the term. In the alternative to Keener's position, the Court should adopt a facts and circumstances test that identifies additional factors—beyond the mere buying and selling securities—that would be required to find that an entity is a dealer.

A. **The Holding Below Erroneously Construed *Big Apple* as Setting Forth a Single Factor Test for Dealer Status**

Even assuming that *Big Apple* controls, it does not support the district court's holding. Contrary to the lower court's suggestion, *Big Apple* did not set forth a single-factor test for dealer status that ignored or displaced the traditional factors that the SEC and market participants have used to distinguish "dealers" from mere traders. The Court in *Big Apple* focused on the requirement that a dealer be engaged in the "business" of

18

buying and selling securities.  *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015).  It then turned to a dictionary definition of "business" and concluded that a defining feature of a business is its "for profit" motive.  *Id.*  Putting those elements together, the Court stated the uncontroversial premise that dealers attempt to generate profits through buying and selling securities.

But this was not the end of the Court's analysis.  The Court also expressly considered whether there was "further evidence of . . . dealer status."  *Id.* at 810.  Specifically, the Court emphasized that the business model "depended on acquiring ***client*** stock and selling that stock ***to support operations*** and earn a profit."  *Big Apple*, 783 F.3d at 809; *id.* at 809–10 ("defendants do not contest that they received most of their compensation by obtaining and ***selling their clients' stocks***") (emphasis added).  The opinion also noted that defendants operated call centers to solicit brokers and drafted promotional press releases and other advertising materials designed to drum

19

up interest in the stock.  *Big Apple*, 783 F.3d at 791.  Indeed, Big

Apple's efforts to advertise itself as a source of capital to issuers,

its development of a client base of issuers, and its service of those

clients by actively promoting the distribution of their securities

were central features of the *Big Apple* decision.  Thus, it was not

merely the buying and selling of securities but that, combined

with other aspects of the business, that led the Court to conclude

that it was a dealer under the Securities Act.

### B.    Prior SEC Interpretations of Section 15(a) Also Indicate that a Holistic Approach to Determining Dealer Status Is Warranted

The district court's holding is also inconsistent with decades

of Commission guidance, which makes it clear that the

determination of "dealer" status turns on more than the mere

buying and selling of securities for profit.  As noted, soon after the

Exchange Act was passed in the 1936 Release, the SEC made

clear that "dealers" bought and sold for their own account in order

to effectuate customer orders.  Through its subsequent

interpretive guidance, the SEC has repeatedly emphasized that

dealer status depends on all the facts and circumstances and has identified numerous other factors—besides buying and selling securities—that may further be indicative of dealer activity.

Nearly forty years after the Exchange Act was passed, in 1975, the SEC adopted the position that there are other "traditional" indicia of dealer activity, beyond those identified in the 1936 Release, and explained that "whether a [person] is 'engaged in the business' of buying and selling municipal securities for its own account as a dealer is a factual question to be resolved in light of all relevant circumstances." *Adoption of Rule 15Ba2-1, Related Form MSD, Rule 15Ba2-2 & Temp. Rule 15Ba2-3(T)*, Exchange Act Release No. 11,742, 1975 WL 163406, at *3 (Oct. 15, 1975).  The additional factors referenced by the SEC in this release included:  (1) underwriting activity, *i.e.*, participating in the distribution of newly issued securities; (2) maintaining a trading account or carrying a dealer inventory; and (3) advertising or listing as a dealer in certain publications, and otherwise holding oneself out as a dealer to other dealers or investors.  *Id.*

21

In 1998, 2002 and 2012, the SEC again provided guidance on the activities that are characteristics of dealers for the purposes of the Exchange Act. *OTC Derivatives Dealers*, Exchange Act Release No. 34-40594, 63 Fed. Reg. 59,362 at 59,370 n.61 (Nov. 3, 1998). The list of indicative dealer activity, the most comprehensive provided by the SEC to date, included:

> (1) purchasing or selling securities as principal ***from or to customers***; (2) carrying a dealer inventory in securities … ; (3) quoting a market in or publishing quotes for securities (other than quotes on one side of the market on a quotations system generally available to non-broker-dealers . . .) in connection with the purchase or sale of securities permitted under Rule 15a-1; (4) holding itself out as a dealer or market-maker or as being otherwise willing to buy or sell one or more securities on a continuous basis; (5) engaging in trading in securities for the benefit of others (including any affiliate) … ; (6) providing incidental investment advice with respect to securities; (7) participating in a selling group or underwriting with respect to securities; or (8) engaging in purchases or sales of securities from or to an affiliated broker-dealer except at prevailing market prices.

*Id.* Again, whether the person bought from or sold to customers received top billing among the relevant considerations.

Based on these releases, SEC Staff in the Division of Market Regulation (now the Division of Trading and Markets), issued numerous no-action letters to market participants. No-action letters advise the recipient, based on representations made by the recipient about their conduct, that the Staff would not recommend enforcement action against them. 17 C.F.R. § 202.1(d). Although no-action letters are staff interpretations, they nonetheless evidence that the factors previously identified by the SEC, such as purchasing from or selling to customers,[6] market making,[7]

---

[6]     *Louis Dreyfus Corp.*, SEC No-Action Letter, 1987 WL 108160, at *1 (July 23, 1987) (not recommending enforcement action in the government securities context because, *inter alia*, the entity had no customers and traded "solely with major brokerage firms and banks or their government securities affiliates").

[7]     *Nat'l Council of Sav. Inst.*, SEC No-Action Letter, 1986 WL 67129, at*1 (July 27, 1986) (finding that the factor of market making weighed against a finding of dealer status where an entity did not "make a market" in securities).

underwriting activity, [8] carrying an inventory,[9] and advertising itself as a dealer,[10] were being adopted by market participants, with the encouragement of the Staff.

In formal adjudications, the SEC also has taken the position that dealer status turns on a consideration of all the facts and circumstances. *See, e.g.*, *In re Gordon Wesley Sodorff, Jr. for Rev. of Disciplinary Action Taken by the Nat'l Ass'n of Sec. Dealers, Inc.*, 50 S.E.C. 1249, 1992 WL 224082, at *5 (Sept. 2, 1992). Specifically, the SEC has found that a defendant was a dealer

---

[8]    *Davenport Mgmt., Inc.*, SEC No-Action Letter, 1993 WL 120436, at *11–12 (Apr. 13, 1993) (not recommending enforcement action for unregistered activity as a dealer, in part because the entity represented that it may "identify potential investors for companies seeking to raise capital" but would not "act as an underwriter").

[9]    *U.S. Sav. Ass'n of Tex.*, SEC No-Action Letter, 1987 WL 107923, at *1 (Apr. 2, 1987) (not recommending enforcement action in the government securities context, in part because it did not "carry a dealer inventory").

[10]    *Cf. Burton Sec.*, SEC No-Action Letter, 1977 WL 10680, at *1 (Dec. 5, 1977) (explaining that a trader does not "hold himself out as being willing to buy and sell securities").

where the defendant (i) "solicited investors," (ii) "handled their money and securities," (iii) "rendered investment advice," and (iv) earned profits not "from appreciation in the value of the securities, but rather from his markup over the price he paid." *Id.*

## CONCLUSION

In conclusion, we urge the Court to hold that being engaged in a business based upon the buying and selling of securities is not sufficient, standing alone, to qualify a person as a dealer under the Exchange Act. Such a construction finds no support in the case law or prior SEC interpretations and, tellingly, recently has been expressly disavowed by the SEC in its briefing in the *Almagarby* matter. As noted, MFA and NAPFM support the definition of "dealer" advanced by Appellant that would require a finding that, in addition to buying and selling securities, the business also, at a minimum, served customers. But if the Court does not adopt that requirement, in the alternative, it should make it clear that a facts-and-circumstances test governs.

Dated:  June 7, 2023

/s/  Andrew J. Ceresney

Andrew J. Ceresney
Philip A. Fortino
DEBEVOISE &
PLIMPTON LLP
66 Hudson Boulevard
New York, New York  10001
Tel. (212) 909-6000
aceresney@debevoise.com
pafortino@debevoise.com

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 4,365 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Office Word in 14-point Century Schoolbook font.

Dated:  June 7, 2023

*/s/  Andrew J. Ceresney*

Andrew J. Ceresney
Philip A. Fortino
Counsel for *Amici Curiae*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June, 2023, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

Dated:  June 7, 2023

*/s/  Andrew J. Ceresney*

Andrew J. Ceresney
Philip A. Fortino
Counsel for *Amici Curiae*