No. 22-14237

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

v.

JUSTIN W. KEENER, D.B.A. JMJ FINANCIAL,

*Defendant-Appellant*.

---

On Appeal from the United States District Court for the
Southern District of Florida,
Hon. Beth Bloom, U.S. District Judge
Lauren Fleischer Louis, U.S. Magistrate Judge
Case No. 1:20-cv-21254-BB

---

**BRIEF OF THE ALTERNATIVE INVESTMENT MANAGEMENT
ASSOCIATION, LTD. AS *AMICUS CURIAE* SUPPORTING
DEFENDANT-APPELLANT AND REVERSAL**

---

Gabriel K. Gillett
  *Counsel of Record*
Grace C. Signorelli-Cassady
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 840-7220
ggillett@jenner.com


*Counsel for Amicus Curiae*

No. 22-14237, *Securities and Exchange Commission v. Justin W. Keener*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), *amicus curiae* here certify that, to the best of its knowledge, the Certificate of Interested Persons contained in Plaintiff-Appellant's brief is complete except for the following:

- Alternative Investment Management Association, Ltd. – *Amicus curiae*

- Gillett, Gabriel K. – Counsel for *amicus curiae*

- Jenner & Block LLP – Counsel for *amicus curiae*

- Signorelli-Cassady, Grace C. – Counsel for *amicus curiae*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, *amicus curiae* hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

The Alternative Investment Management Association, Ltd. ("AIMA") further states that it is a UK private company limited by guarantee. It does not issue share capital and no publicly held company holds more than a 10% interest in AIMA.

No. 22-14237, *Securities and Exchange Commission v. Justin W. Keener*

*Amicus curiae* further certifies that it is not aware of any publicly traded company or corporation that has an interest in the outcome of this case or appeal.

/s/ Gabriel K. Gillett
Gabriel K. Gillett

# TABLE OF CONTENTS

**Pages(s)**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................... C-1

TABBLE OF CITATIONS .................................................................iii

INTEREST OF *AMICUS CURIAE* .......................................................... 1

STATEMENT OF THE ISSUE ............................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 3

ARGUMENT ........................................................................... 6

I.    Registered Investment Advisers And Funds Are Operated And Regulated Differently From Dealers ................................................ 6

    A.    Registered Investment Advisers And Funds Seek To Deliver Returns For Investors ............................................................. 6

    B.    Registered Investment Advisers And Funds Are Subject To Oversight By The SEC And Others ...................................... 9

    C.    Registered Investment Advisers And Funds Are Different From Dealers And Are Regulated Differently ..................... 10

II.   This Court Should Hold, Consistent With The Text, History, And Structure Of The Exchange Act, That "Dealer" Means An Entity That Executes Customer Orders ................................................. 12

    A.    The SEC's Interpretation Of "Dealer" Contravenes The Statutory Text, Its Own Guidance, And Well-Established Understandings .................................................................... 13

    B.    Interpreting "Dealer" Consistent With Its Established Meaning Not Limit The SEC's Ability To Effectively Regulate Misconduct ........................................................... 22

C.    Policy Decisions About The Meaning Of "Dealer" Should Be Left To Congress Or, Where Appropriate, The SEC ............ 24

III.   The Court Should At Minimum Ground Any Decision In The SEC's Factors That Distinguish "Dealers" From Registered Investment Advisers And Funds .................................................... 27

IV.   There Is No Basis For Requiring Disgorgement Of Profits That Lack Even A "But For" Causal Relationship To The Failure To Register .......................................................................................... 30

CONCLUSION ........................................................................................ 33

CERTIFICATE OF COMPLIANCE ....................................................... 35

CERTIFICATE OF SERVICE ................................................................. 36

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Alvarez v. United States,*
  862 F.3d 1297 (11th Cir. 2017)........................................................ 32

*Axon Enter., Inc. v. FTC,*
  143 S. Ct. 890 (2023).................................................................... 20

*Bittner v. United States,*
  143 S. Ct. 713 (2023).................................................................... 31

*Calder v. Bull,*
  3 U.S. (3 Dall.) 386 (1798) ............................................................. 31

*CFTC v. S. Tr. Metals, Inc.,*
  894 F.3d 1313 (11th Cir. 2018)........................................................ 32

*CFTC v. Sidoti,*
  178 F.3d 1132 (11th Cir. 1999)........................................................ 32

*Christopher v. SmithKline Beecham Corp.,*
  567 U.S. 142 (2012)...................................................................... 31

*Cochran v. SEC,*
  20 F.4th 194 (5th Cir. 2021) ........................................................... 20

*DIRECTV, Inc. v. Brown,*
  371 F.3d 814 (11th Cir. 2004).......................................................... 18

*Dirks v. SEC,*
  463 U.S. 646 (1983)...................................................................... 20

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012)...................................................................... 31

iii

*Gabelli v. SEC*,
    568 U.S. 442 (2013) ................................................................... 21

*\*Goldstein v. SEC*,
    451 F.3d 873 (D.C. Cir. 2006) ........................................... 7, 21

*Helvering v. Fried*,
    299 U.S. 175 (1936) ................................................................... 15

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ....................................................... 26, 27

*\*Kokesh v. SEC*,
    581 U.S. 455 (2017) ........................................................... 20, 33

*\*Liu v. SEC*,
    140 S. Ct. 1936 (2020) ........................................... 20, 31, 32, 33

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007) ................................................................... 26

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ............................................................... 20

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994) ................................................................... 17

*Pauley v. BethEnergy Mines, Inc.*,
    501 U.S. 680 (1991) ................................................................... 27

*Savage Servs. Corp. v. United States*,
    25 F.4th 925 (11th Cir. 2022) ................................................. 28

*Schafer v. Helvering*,
    299 U.S. 171 (1936) ................................................................... 15

*Sec. Allied Corp. v. Comm'r*,
    95 F.2d 384 (2d Cir. 1938) ...................................................... 15

*SEC v. Almagarby*,
    479 F. Supp. 3d 1266 (S.D. Fla. 2020) ................................. 23

*SEC v. Big Apple Consulting USA, Inc.*,
   783 F.3d 786 (11th Cir. 2015) ...................................... 17, 19

*SEC v. Hallam*,
   42 F.4th 316 (5th Cir. 2022) ............................................ 32

*SEC v. Keener*,
   580 F. Supp. 3d 1272 (S.D. Fla. 2022).................... 3, 12, 17, 23, 29, 30

*Shapiro v. United States*,
   335 U.S. 1 (1948) .......................................................... 15

*United States v. Hall*,
   64 F.4th 1200 (11th Cir. 2023) ......................................... 19

*W. Va. v. EPA*,
   142 S. Ct. 2587 (2022).......................................... 21, 24, 25

*Wilson v. Comm'r*,
   76 F.2d 476 (10th Cir. 1935)............................................ 15

*Wis. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018).................................................. 18–19

*XY Plan. Network, LLC v. SEC*,
   963 F.3d 244 (2d Cir. 2020) ............................................ 11

**Statutes and Rules**

5 U.S.C. § 706(2)(A) ............................................................ 25

15 U.S.C. § 77b(a)(12)........................................................... 18

15 U.S.C. § 78c(a)(5) ...................................................... 1, 2, 18

*15 U.S.C. § 78c(a)(5)(A) .................................................. 3, 11, 14

*15 U.S.C. § 78c(a)(5)(B) ...................................................... 3, 14

15 U.S.C. § 78fff-4(c) ........................................................... 12

15 U.S.C. § 78u(d)(5) ........................................................... 33

15 U.S.C. § 80a-1(b)(2) ............................................................... 11

15 U.S.C. § 80a-3 ......................................................................... 10

15 U.S.C. § 80a-3(a) .................................................................... 11

17 C.F.R. § 230.144(d)(1)(i) ....................................................... 23

17 C.F.R. § 230.500 *et seq.* ....................................................... 9–10

17 C.F.R. § 240.15c3-1 ............................................................... 12

17 C.F.R. § 240.15c3-3 ............................................................... 12

17 C.F.R. § 240.15c3-5 ............................................................... 12

17 C.F.R. § 245.101 .................................................................... 10

Fed. R. App. P. 29 ......................................................................... 1

Pub. L. No. 106–102, §§ 216, 219, 113 Stat 1338 (Nov. 12, 1999).......... 28

*Regulation Best Interest: The Broker-Dealer Standard of
Conduct*, 84 Fed. Reg. 33,318-01 (July 12, 2019) ......................... 10, 11

**Revisions to Rules 144 and 145*, 72 Fed. Reg. 71,546-01
(Dec. 17, 2007)....................................................................... 23

## Other Authorities

AIMA Comment Letter, File No. S7-12-22 (May 27, 2022).................... 25

AIMA, FAQs (visited June 6, 2023) .......................................... 7

Cong. Rsch. Serv., *U.S. Retirement Assets: Amount in Pensions and
IRAs* (2022) ......................................................................... 7

*ECM Highlights: FY22*, dealogic (Dec. 19, 2022) ..................... 8

FINRA, *Investment Advisers* (visited June 6, 2023) ............... 6, 7

*Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, SEC Release No. 34-94524, 87 Fed. Reg. 23054 (proposed Apr. 18, 2022) ................... 24–25

Investment Co. Inst., *Mutual Funds Are Key to Building Wealth for Majority of US Households* (Oct. 31, 2022) .................................................. 7

Craig Lewis, *The SEC's Proposed Rules for Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer* (Dec. 2022) ............ 25–26

Nat'l Ass'n of Private Fund Managers Comment Letter, File No. S7-12-22 (May 27, 2022) ............................................................ 25

SEC, Annual Staff Report Relating to the Use of Form PF Data (Dec. 9, 2022) .................................................................................... 9

SEC, *Investment Advisors Overview* (Mar. 31, 2017) ............................... 9

SEC, Investor Bulletin: Investing in an IPO (visited June 5, 2023) ...... 30

SEC, *Letter to Acqua Wellington* (July 11, 2001) ............................ 13–14

SEC, Private Fund (visited June 6, 2023) ............................................. 11

SEC, *Private Fund Adviser Overview* (Oct. 21, 2016) ............................. 9

*Antonin Scalia et al., Reading Law: The Interpretation of Legal Texts (2012) ...................................................................................... 15, 17

Tim Stobierski, Harv. Bus. Sch. Online, *What is Arbitrage?* (July 20, 2021) ............................................................................ 8

## INTEREST OF *AMICUS CURIAE*[1]

The Alternative Investment Management Association, Ltd. ("AIMA") is the global representative of the alternative investment industry. AIMA's members collectively manage more than $2 trillion in hedge fund assets. AIMA's members include some of the world's largest, most sophisticated investors.

AIMA and its members have a strong interest in how courts and the Securities and Exchange Commission ("SEC") define the meaning of the term "dealer" under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78c(a)(5). Many members of AIMA—including investment advisers and managers of hedge funds and other investment vehicles—have long understood that they are not "dealers" under the Exchange Act based on the language of the statute, the underlying history and context, and years of guidance from the SEC. But here and in other recent cases the SEC advances the unprecedented and unbridled position that a dealer is *any* person that buys and sells securities as a business,

---

[1] All parties consent to the filing of this brief. No party or party's counsel authored this brief in whole or in part or contributed money intended to fund preparing or submitting the brief. No person other than *amicus* or its members or counsel contributed money intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29.

regardless of whether they satisfy the statutory definition as it has historically been understood and applied.

That view is wrong. If it becomes the law it would cause major consequences and hardship for markets and market participants—including advisers, funds, insurance companies, individual investors, and others— by imposing ill-fitting regulation that would not benefit investors or regulators and create a risk of substantial penalties for conduct that was understood to be legal when it occurred.

## STATEMENT OF THE ISSUE

Whether the District Court erred in holding that any firm "engaged in the business of buying and selling securities" is a "dealer" under 15 U.S.C. § 78c(a)(5).

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case raises fundamental issues of statutory construction because the District Court, breaking with nearly a century of precedent, reinterpreted the securities laws contrary to their long-understood meaning. The Exchange Act defines "dealer" as "any person engaged in the business of buying and selling securities … for such person's own account," 15 U.S.C. § 78c(a)(5)(A), and includes an express exemption for persons buying and selling securities "not as a part of a regular business," *id.* § 78c(a)(5)(B). At the SEC's urging, however, the District Court read circuit precedent involving a case arising under a different statute as holding that where "a company's business model is based entirely on the purchase and sale of securities, that fact constitutes ***conclusive*** proof that the company is a dealer" under the Exchange Act. *SEC v. Keener*, 580 F. Supp. 3d 1272, 1286 (S.D. Fla. 2022) (emphasis added); *see* Dist. Ct. Dkt. 89 (SEC Opp'n to MSJ) at 17; Dist. Ct. Dkt. 68 (SEC MSJ) at 12.

Defendant-Appellant Keener is correct that the District Court erred. Its novel reading contravenes the Exchange Act's text, conflicts with the long-settled understanding of the Exchange Act's meaning since its passage nearly a century ago, and contradicts the SEC's own prior

guidance and holdings. The "dealer" definition was never intended to cast the wide net the SEC now claims. It is limited to those who transact as part of their "regular business" for the benefit of customers—and was not intended to apply to an investment adviser that buys on behalf of others or to a fund that buys and sells securities for investment purposes.

The District Court's holding in this case would have sweeping consequences if affirmed. Under the broad theory that any business buying or selling securities is a "dealer"—regardless of whether the transactions were part of a "regular business" for executing customer orders, or regardless of the presence of other factors the SEC and market participants have traditionally relied on—almost any professional adviser or investor could be argued to qualify. This could obligate not only hedge funds, but also mutual funds, pension funds, insurance companies, family offices, banks, endowments, foundations, individual investors, and others to register as dealers, subject them to burdensome regulations that have no logical application to their business, and place them at risk of severe sanctions for engaging in ordinary investment activities that were never thought to require dealer registration.

This Court should reject the District Court's overly broad analysis in favor of the well-settled meaning of "dealer" the SEC and market participants have adhered to for nearly ninety years. As Keener argues, a "dealer" makes a regular business of buying and selling securities to facilitate customer orders. This interpretation is textually and historically correct, and avoids ensnaring broad swaths of investors in a thicket of inappropriate and unnecessary regulation.

If the SEC wishes to prohibit the activity at issue here, it has ample tools available. It could ask Congress to amend the definition of "dealer." Perhaps it could issue a new rule or amend an existing one that fills statutory interstices, balances costs and benefits, and accounts for stakeholder input. (The SEC's current proposal to redefine "dealer" does not, which raises questions about its decision to pursue enforcement actions and rulemaking simultaneously.) But cherry-picked enforcement actions like this one, proceeding at the SEC's discretion, are not appropriate for upsetting the well-established meaning of "dealer." Whatever the vehicle, the SEC may not misconstrue the text, history, and settled understanding of the Exchange Act to target activity it may dislike.

Finally, Keener is correct that any past failure to register as a dealer does not allow the SEC to obtain disgorgement of profits that would have been earned regardless of registration and that caused no harm to investors. It is unfair and improper to penalize advisers or investors for past activities that were considered lawful at the time.

## ARGUMENT

## I. Registered Investment Advisers And Funds Are Operated And Regulated Differently From Dealers.

### A. Registered Investment Advisers And Funds Seek To Deliver Returns For Investors.

Investors today have a range of investments and investment vehicles available to achieve their financial goals. Many rely on the expertise of investment advisers, who are "paid for providing advice about securities to their clients." FINRA, *Investment Advisers*, https://www.finra.org/investors/investing/working-with-investment-professional/investment-advisers (visited June 6, 2023).

One investment vehicle is a hedge fund. Hedge funds are "usually structured as limited partnerships" to achieve "maximum separation of ownership and management," where "the general partner manages the fund (or several funds) for a fixed fee and a percentage of the [fund's]

gross profits" and "[t]he limited partners are passive investors and generally take no part in management activities." *Goldstein v. SEC*, 451 F.3d 873, 876 (D.C. Cir. 2006); *see* AIMA, FAQs, https://www.aima.org/educate/about-alts/faqs.html (visited June 6, 2023). In managing the fund, the general partner typically hires an adviser that may have discretion to trade for the fund's own account. *See* FINRA, *supra*. Hedge funds can provide competitive, diversified, uncorrelated risk-adjusted returns, as well as downside protection and flexibility. *See* AIMA FAQs, *supra*; *Goldstein*, 451 F.3d at 876.

Investors can also utilize other investment vehicles like private equity funds, registered investment companies, pension funds (public or private), and family offices. Collectively, their economic impact is substantial. In 2021, U.S. pension plans held over $27 trillion in assets. *See* Cong. Rsch. Serv., *U.S. Retirement Assets: Amount in Pensions and IRAs* (2022), https://crsreports.congress.gov/product/pdf/IF/IF12117/2. In 2022, mutual funds were owned by 115.3 million investors and 52.3% of U.S. households. Investment Co. Inst., *Mutual Funds Are Key to Building Wealth for Majority of US Households* (Oct. 31, 2022), https://www.ici.org/news-release/22-news-ownership.

Among instruments available to investors are convertible bonds, which typically have periodic interest payments but also include "the option to convert [the security] into shares of the underlying company at a later date, often at a discounted rate." *See* Tim Stobierski, Harv. Bus. Sch. Online, *What is Arbitrage?* (July 20, 2021), https://online.hbs.edu/blog/post/what-is-arbitrage. Convertible bonds are attractive to companies looking to reduce their cost of capital and offer investors upside potential if the company's common stock appreciates. Since 2021, more than $270 billion in convertible bonds have been issued. *See ECM Highlights: FY22*, dealogic (Dec. 19, 2022), https://dealogic.com/insight/ecm-highlights-fy22/.

For advisers, funds, and investors, the ultimate goal is to find opportunities for returns on investment. Those opportunities may come from a broker or dealer registered with the SEC, who has been engaged by an issuer looking for investors. Opportunities also may come as a result of the fund or its adviser contacting a registered broker or dealer seeking investments that meet particular criteria. Typically, investments are made through or with the assistance of a broker or dealer intermediary.

**B.    Registered Investment Advisers And Funds Are Subject To Oversight By The SEC And Others.**

Since 2010, investment advisers to private funds, or with assets under management that exceed $150 million, are required to register with the SEC—and are thus subject to SEC oversight and regulation. SEC, *Private Fund Adviser Overview* (Oct. 21, 2016), https://www.sec.gov/divisions/investment/guidance/private-fund-adviser-resources. Advisers are examined for compliance by SEC staff and required to file reports with the SEC, for example. SEC, *Investment Advisors Overview* (Mar. 31, 2017), https://www.sec.gov/divisions/investment/advoverview.htm (describing compliance and disclosure obligations).

Private funds that hire registered investment advisers are also within the SEC's purview. Since 2011, the SEC has required registered investment advisers to disclose detailed information about the private funds they manage, including "fund size, use of borrowings and derivatives, strategy, and types of investors." SEC, Annual Staff Report Relating to the Use of Form PF Data (Dec. 9, 2022), https://www.sec.gov/files/2022-pf-report-congress.pdf. Private funds are also subject to securities laws when they raise money from investors. *See* 17 C.F.R. § 230.500 *et*

*seq.* In addition, mutual funds and other entities are subject to the Investment Company Act, 15 U.S.C. § 80a-3, while pension funds can come under SEC scrutiny as well, *see* 17 C.F.R. § 245.101.

### C. Registered Investment Advisers And Funds Are Different From Dealers And Are Regulated Differently.

Registered investment advisers and the private funds they manage are very different from dealers. They are subject to different regulatory frameworks, "have different types of relationships with investors, offer different services, and have different compensation models when providing investment recommendations or investment advisory services to customers." *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33,318-01, 33,319 (July 12, 2019).

Dealers typically hold themselves out as willing buyers and sellers of securities. They typically advertise and solicit buyers and sellers, or issuers, each of whom may be a dealer's customer or counterparty. Dealers also hold inventory (often acquired in bulk) to pair those who wish to buy and sell a particular security at different times. "A broker-dealer's recommendations may include recommending transactions where the broker-dealer is buying securities from or selling securities to retail customers on a principal basis or recommending proprietary products." *Id.*

"Investment advisers, on the other hand, typically provide ongoing, regular advice and services in the context of broad investment portfolio management." *Id.*

Dealers "effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee." *XY Plan. Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020) (citing 15 U.S.C. § 78c(a)(5)(A)). Private funds, on the other hand, are "created to pool money from multiple investors … to make investments on behalf of the fund." SEC, Private Fund, https://www.sec.gov/education/capitalraising/building-blocks/private-fund (visited June 6, 2023). Funds, unlike dealers, do not have clients or customers. A fund is the adviser's client, and a fund has investors who are the fund's equity owners and benefit from its returns. Importantly, a fund's investors do not transact as a counterparty on the opposite side of the fund.

Registered investment advisers and funds are also regulated differently from dealers. Dealers are governed by the Exchange Act, not the Investment Advisers Act or the Investment Company Act. *See* 15 U.S.C. § 80a-1(b)(2) (distinguishing investment advisers from dealers); *id.* § 80a-3(a) (defining investment companies). Among other things, dealers must:

maintain minimum net capital levels to satisfy customer claims (17 C.F.R. § 240.15c3-1); possess or control all fully paid and excess margin securities the broker-dealer carries for its customers' accounts (17 C.F.R. § 240.15c3-3); join a fund to insure customer accounts (*see* 15 U.S.C. § 78fff-4(c)); and implement safeguards to control risks associated with direct access to securities markets (17 C.F.R. § 240.15c3-5).

These rules are designed to protect broker-dealers' customers. But these rules have no utility when applied to funds, which have no customers, and may harm fund investors by imposing costs to comply with ill-fitting requirements.

## II. This Court Should Hold, Consistent With The Text, History, And Structure Of The Exchange Act, That "Dealer" Means An Entity That Executes Customer Orders.

At the SEC's urging, the decision below broadly construed the term "dealer" in the Exchange Act as anyone "engaged in the business" of "buying and selling securities." *Keener*, 580 F. Supp. 3d at 1286–88; *see* Dist. Ct. Dkt. 68 (SEC MSJ) at 12; Dist. Ct. Dkt. 89 (SEC Opp'n to MSJ) at 17; *see also* SEC Opp'n to MSJ at 6–8, *SEC v. Almagarby*, No. 17-cv-62255 (S.D. Fla. Nov. 4, 2019), ECF No. 79. This expansive interpretation eschewed bedrock principles of statutory construction in favor of a novel,

hyper-literal, myopic reading that undermines the statutory language, historical context, and the SEC's own longstanding position on what constitutes "dealing." This Court should reject it.

### A. The SEC's Interpretation Of "Dealer" Contravenes The Statutory Text, Its Own Guidance, And Well-Established Understandings.

Keener correctly explains that the District Court's interpretation of "dealer" flouts multiple rules of statutory interpretation and lacks a limiting principle. *See* Keener Br. at 21–56. As Keener's brief shows, the SEC's reading of the statute contradicts the historical evidence about the meaning of the term "dealer"—which demonstrates that Congress understood dealers (as distinct from brokers) to buy and sell securities "from" and "to" a customer "act[ing] for his own [i.e., the dealer's] account and not as agent for the customer." *Id.* at 26 (emphasis omitted) (citing contemporaneous sources). Keener also shows how the SEC's newfound interpretation of "dealer" contradicts the SEC's own statements and actions over the years. *See id.* at 8–10 (citing congressional testimony by SEC); *see also* SEC, *Letter to Acqua Wellington* (July 11, 2001), https://www.sec.gov/divisions/marketreg/mr-noaction/2001/acqua-wel-

13

lington-071101.pdf (providing assurance that activity nearly indistinguishable from the activity here would not be subject to SEC enforcement action).

Before this Court in *Almagarby*, the SEC sought to mitigate the potential extreme ramifications of its reading of the statute by relying on the "regular business" exemption to narrow its interpretation. The SEC acknowledged that AIMA and Keener are correct that mere traders cannot be characterized as dealers, no matter how frequent their trading activity. SEC Sur-Reply 4–5, No. 21-13755 (11th Cir. Dec. 12, 2022), ECF No. 51-2. But the SEC, unlike Keener, contends traders fit within the dealer definition in § 78c(a)(5)(A) only to be exempted from being a dealer by the "not as a regular business" language in § 78c(a)(5)(B). AIMA agrees with Keener that traders do not fit within the main definition of § 78c(a)(5)(A). *See* Keener Br. at 41–42.

But even assuming *arguendo* that § 78c(a)(5)(A) were read as broadly as the SEC suggests, the term "regular business" in § 78c(a)(5)(B)—when read in proper context, and once the SEC's reason-

ing is applied consistently and followed to its natural conclusion—provides further support for Keener's argument that § 78c(a)(5)(A) applies only to dealers who traded for their own account to fill *customer* orders.

When the Exchange Act was passed in 1934, "many" tax-related court rulings interpreted the phrase "not in the course of an established business" in the definition of securities dealer to mean that traders who did not have an established place of business to serve customers could not be dealers—regardless of the frequency of their trading and even where their trading was part of the work of a partnership or other business organization. *Schafer v. Helvering*, 299 U.S. 171, 173–74, 173 n.1 (1936); *see Helvering v. Fried*, 299 U.S. 175 (1936); *Sec. Allied Corp. v. Comm'r*, 95 F.2d 384, 386 (2d Cir. 1938) (corporation held not to be dealer when "[i]t had no place of business to which customers could come to buy"); *Wilson v. Comm'r*, 76 F.2d 476, 478 (10th Cir. 1935). Congress had these settled interpretations in mind when it included the "regular business" exemption in the Exchange Act, tracking this existing language. *See Shapiro v. United States*, 335 U.S. 1, 16 (1948); Antonin Scalia et al., Reading Law: The Interpretation of Legal Texts (2012) (describing "Prior-Construction Canon").

15

That historical context is critical to understanding the Exchange Act's meaning. To a contemporary reader familiar with democratized, professionalized, and regularized investing, a business that buys and sells stock to earn trading profits may seem like a "regular business." But in 1934, in the wake of the Stock Market Crash of 1929, traders who purchased and sold securities were regarded as speculators—distinct from professional broker-dealers who achieved steady profits from executing customer orders (earning commissions, fees, or the bid-ask spread). The exemption thus makes clear that these entities engaged in investment or speculation for their own account are not "dealers" under the Exchange Act.

The SEC accepts that the historical context for this exemption is important to understanding it, and relies on historical sources to suggest the exemption means that a range of traders and others cannot be dealers. SEC Sur-Reply 4-6. But in a strained effort to impose liability here, the SEC simultaneously asks the Court to ignore historical context and adopt a broad, hyper-literal reading of the definition in § 78c(a)(5)(A) as a way to broaden who qualifies as a dealer. The SEC cannot have it both ways.

16

The proper textualist approach would consistently consider the historical context and the historically understood meaning in construing the statute holistically. The key question is where the line must be drawn between dealers and non-dealers. As Keener argues, history and context counsel for drawing the line based on whether an entity executes customer orders or transacts for its own investment purpose not on behalf of customers. *See* Keener Br. at 4–8, 21–34.

The District Court neither drew this distinction nor accounted for the statute's historical context and meaning. Instead, it erroneously adopted a hyper-literal understanding of the term "regular business" based on today's standards—divorced from how that term was understood in 1934. *Cf. MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) ("the most relevant time for determining a statutory term's meaning" is when it became law); Scalia et al., *supra* at 356.

Moreover, the District Court relied heavily on this Court's decision in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015). *Keener*, 580 F. Supp. 3d at 1286. But *Big Apple* is not controlling because it interpreted "dealer" under Securities Act § 5, not Exchange Act § 15—the operative provision here. That distinction makes a difference.

17

The Securities Act of 1933 defines "dealer" broadly as "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or *trading* in securities issued by another person." 15 U.S.C. § 77b(a)(12) (emphasis added). Thus, the Securities Act has no exemption that limits the definition of "dealer"—it explicitly includes "trading" and lumps together both brokers and dealers in a single, catch-all definition.

By contrast, just one year later in 1934, Congress crafted a more nuanced definition in the Exchange Act—defining "broker" and "dealer" separately, using language that in context referred to customers, eliminating any reference to "trading," and adding the exemption that covers investors and others who are transacting "not as a part of a regular business." 15 U.S.C. § 78c(a)(5). Disregarding those differences ignores that "[w]here the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning." *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2004); *see also Wis. Cent. Ltd. v. United States*, 138 S.Ct. 2067,

2071 (2018) (noting "differences in language" between companion statutes "convey differences in meaning").

Although *Big Apple* observed in a brief footnote that the definitions of "dealer" in both the Securities Act and the Exchange Act are "similar," 783 F.3d at 809 n.11, that observation was *dicta* as the defendant had "abandoned" any challenge to its "dealer" status under the Exchange Act and the parties did not brief the issue. *Id.* at 806. And, of course, *Big Apple* did not (and could not properly) suggest the Exchange Act's statutory exemption should be rendered meaningless. *See, e.g.*, *United States v. Hall*, 64 F.4th 1200, 1204 (11th Cir. 2023) (upholding the principle that statutes must be interpreted to give effect to all provisions).

There are also important structural reasons why the definition of "dealer" in the Exchange Act is narrower than the corresponding definition in the Securities Act. The Securities Act definition applicable in *Big Apple* is relevant where, as there, a defendant is engaged in an *unregistered* distribution of shares (for example, penny stocks). By contrast, the Exchange Act's "dealer" definition is not so limited, and also applies to *registered* distributions (for example, blue-chip stocks).

If the term "dealer" were construed as broadly as the District Court suggested, it could wrongly categorize *thousands* of mutual funds, private funds, insurance companies and other persons and entities as "dealers"—subjecting them and their investors to costly capital requirements and customer protection rules that make no sense for entities that lack customers. Even day traders or retirees who trade through an entity for tax or estate planning purposes would potentially face dealer liability.

"Without legal limitations, market participants [would be] forced to rely on the reasonableness of the SEC's litigation strategy, but that can be hazardous." *Dirks v. SEC*, 463 U.S. 646, 664 n.24 (1983). For just this reason, the Supreme Court—in unanimous or near-unanimous opinions—has repeatedly recognized the importance of probing judicial review of SEC actions.[2] Administrative agencies like the SEC cannot "as-

---

[2] *See Axon Enter., Inc. v. FTC*, 143 S.Ct. 890, 900 (2023) (unanimously affirming *Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021), allowing court challenges to SEC in-house proceedings before they concluded); *see also Lucia v. SEC*, 138 S.Ct. 2044, 2053–54 (2018) (reversing D.C. Circuit, 7-2, invalidating SEC in-house adjudications); *Liu v. SEC*, 140 S.Ct. 1936, 1946 (2020) (vacating Ninth Circuit, 8-1, limiting SEC's disgorgement power); *Kokesh v. SEC*, 581 U.S. 455, 465–67 (2017) (unanimously reversing Tenth Circuit, rejecting SEC's view that statute of limitations did

sert[] highly consequential power beyond what Congress could reasonably be understood to have granted" based on "a merely plausible textual basis"—especially when the agency's "newly uncovered" regulatory authority has "conveniently enabled it" to pursue a theory that was previously unsupported. *W. Va. v. EPA*, 142 S.Ct. 2587, 2609, 2614 (2022).

That is what the SEC has done here. Nearly ninety years after the Exchange Act became law—and after years not requiring investment advisers, funds, and other investment vehicles to register as dealers—the SEC suddenly has seen "dealer" in a new light. That long-running silence and failure to exercise power it now asserts is strong proof that the newly asserted power does not exist. *Id.* at 2610.[3]

---

not apply to disgorgement); *accord Gabelli v. SEC*, 568 U.S. 442, 454 (2013) (unanimously reversing Second Circuit, rejecting discovery rule in SEC actions).

[3] The SEC's ill-fated attempt to redefine the meaning of the term "client" in the Investment Advisers Act is also instructive. For years, the SEC interpreted "client" to mean investment funds, not underlying investors, which exempted many fund managers from registration as investment advisers. *Goldstein*, 451 F.3d at 878–80. The SEC then changed its interpretation, to require more managers to register and as a "hook on which to hang more comprehensive regulation of hedge funds." *Id.* at 882-83. The DC Circuit held the SEC could not "justify departing from its own prior interpretation" to impose new registration requirements when the advisory relationship between hedge fund advisers and investors" had not changed. *Id.*

For these reasons, this Court should reverse the judgment and hold that "dealer" status under the Exchange Act requires evidence of executing customer orders—not merely purchasing and selling securities.

**B. Interpreting "Dealer" Consistent With Its Established Meaning Does Not Limit The SEC's Ability To Effectively Regulate Misconduct.**

Interpreting "dealer" as AIMA proposes does not prevent the SEC from regulating conduct it deems improper, including conduct related to convertible securities like those here.

In reality, the crux of the SEC's case is that Keener is acting as an *underwriter* (rather than a dealer). Convertible transactions are not new. For years, with the SEC's blessing, companies have issued convertible debt to investors, who then converted the debt into stock at a discount and resold it at an advantageous time. Here, without being subject to any SEC registration requirement, Keener marketed himself as a source of capital to issuers and then sold newly issued securities into the market.

That activity is regulated under the underwriting-focused provisions of the securities laws. But the SEC's own regulation, Rule 144, created a *safe harbor* against underwriter liability if securities are held for

six months. 17 C.F.R. § 230.144(d)(1)(i). The SEC adopted that safe harbor, pursuant to notice-and-comment rulemaking, after concluding that the prior 12-month safe-harbor made it too difficult for small issuers to raise capital. *See Revisions to Rules 144 and 145*, 72 Fed. Reg. 71,546-01, 71,561–62 (Dec. 17, 2007). The theory underlying the exemption is that a true *underwriter* (whose business is to distribute newly issued securities) would not accept the inherent risks involved in holding securities for six months. But Keener complied with the Rule 144 holding requirements, purchasing securities that were convertible at floating prices (with no floor or minimum conversion price). Keener Br. at 15–16.

If the SEC believes that such distribution poses risks to the market, the solution is to revise or re-consider Rule 144—not strain to rewrite decades of precedent and ignore historical context about the meaning of "dealer." *See Keener*, 580 F. Supp. 3d at 1287–88; *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1272–73 (S.D. Fla. 2020). Whatever issues the SEC perceives around unregistered market participants, microcaps, soliciting issuers directly, convertible securities, or weaknesses in Rule 144, it cannot transform all firms and funds that buy and sell securities into lawbreakers. The law simply does not allow the SEC to force a square peg

23

into a round hole by redefining "dealer" to capture activity that does not satisfy the statutory definition.

### C. Policy Decisions About The Meaning Of "Dealer" Should Be Left To Congress Or, Where Appropriate, The SEC.

If the SEC wishes to address the issues in this case, or root out specific practices by specific types of market participants, it has multiple avenues to attempt to do so. Bringing ad hoc enforcement actions based on a newly devised interpretation of what it means to be a "dealer" is not one of them. Regardless of the vehicle, the SEC may not misconstrue the text, history, and settled understanding of the Exchange Act or exceed its own authority to target activity the SEC may dislike.

Congress, of course, is uniquely situated to alter the definition of "dealer" or expand the SEC's related regulatory reach. *See W. Va.*, 142 S.Ct. at 2609, 2613. Rather than go to Congress, the SEC seems to have instead chosen to pursue through agency rulemaking a new vision of what it means to be a "dealer." *See Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, SEC Release No. 34-94524, 87 Fed. Reg. 23054 (proposed Apr. 18,

2022) (to be codified at 17 C.F.R. pt. 240). Such an effort could be appropriate if the SEC were filling gaps in a statutory scheme, within the scope of the authority delegated by Congress and in compliance with applicable rules—such as properly balancing costs and benefits and taking account of stakeholder perspectives. *See W. Va*, 142 S.Ct. at 2608-09; 5 U.S.C. § 706(2)(A).

But there are many good reasons to think the SEC's regulatory efforts regarding the "dealer" definition fail those requirements. For example, the analysis above, the unprecedented authority the SEC asserted after nearly ninety years, and the "economic and political significance of that assertion," strongly suggest that the SEC lacks authority to interpret "dealer" to cover wide swaths of the financial industry. *See W. Va.*, 142 S.Ct. at 2608-09. In addition, the record reflects that the SEC's proposed action will impose many costs in exchange for few (if any) benefits. *See, e.g.*, AIMA Comment Letter, File No. S7-12-22 (May 27, 2022), https://www.sec.gov/comments/s7-12-22/s71222-20129909-296079.pdf; Nat'l Ass'n of Private Fund Managers Comment Letter, File No. S7-12-22 (May 27, 2022), https://www.sec.gov/comments/s7-12-22/s71222-20129914-296098.pdf; *see also* Craig Lewis, *The SEC's Proposed Rules for*

*Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer* (Dec. 2022), https://www.sec.gov/comments/s7-12-22/s71222-20152322-320250.pdf (report by former SEC Chief Economist and Director of the Division of Economic and Risk Analysis, highlighting fundamental flaws in proposed rule and harm it may cause to markets and investors). That casts a further cloud over the SEC's questionable choice to sidestep Congress while simultaneously pursuing enforcement actions advancing an expansive and novel interpretation of what it means to be a "dealer."

Whether effectuated by Congress or a properly empowered agency, the result will likely be better than ad hoc enforcement actions like this one. On the front end, decisionmakers "can conduct factual investigations, can consult with affected parties, [and] can consider how their experts have handled similar issues over the long course of administering a regulatory program." *Kisor v. Wilkie*, 139 S.Ct. 2400, 2413 (2019); *see Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 167–68 (2007). On the back end, the result should (in theory) provide clarity about what the

rule is and how to follow it. And if the resulting rule is wrong, the decisionmakers can be held politically accountable. *See Kisor*, 139 S.Ct. at 2413; *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696–97 (1991).

On the other hand, cherry-picked enforcement actions are not the way to go. They create a risk that market participants will be left at the whim of the SEC's arbitrary discretion, subject to a patchwork of inconsistent interpretations of federal law, and beset with uncertainty and unpredictability for both market participants and markets themselves. Indeed, Congress has expressed a preference that interpretive issues related to complex regulatory schemes not be resolved "piecemeal by litigation." *Kisor*, 139 S.Ct. at 2413–14. That provides further reason for this Court to reverse and to reject the SEC's attempt to resolve perceived issues around the meaning of "dealer" through this action.

## III.  The Court Should At Minimum Ground Any Decision In The SEC's Factors That Distinguish "Dealers" From Registered Investment Advisers And Funds.

This Court has many strong grounds to reverse the judgment and reject the SEC's broad view of what it means to be a "dealer" under the Exchange Act. If this Court disagrees and affirms, however, it should at

a minimum anchor its decision in the SEC factors that distinguish "dealers" from advisers and funds. Doing so, and declining to endorse the District Court's overly broad reasoning, would avoid sweeping and serious consequences for markets and market participants—including AIMA and its members.

In 1999 Congress revised the definition of "dealer" under the securities laws by removing the bank exemption from the definition in the Exchange Act and simultaneously amending the definitions in the Investment Company Act and Investment Advisers Act to track the new Exchange Act definition. Pub. L. No. 106–102, §§ 216, 219, 113 Stat 1338 (Nov. 12, 1999). Critically, this revision left the substantive language of the Exchange Act unchanged, aside from the removal of the bank exemption. The 1999 reenactment of the "dealer" definition thus did not adopt the SEC's newfound position—that all businesses buying and selling securities for their own account are dealers. *Savage Servs. Corp. v. United States*, 25 F.4th 925, 945 (11th Cir. 2022) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (citing Supreme Court precedent)).

Several of those SEC-identified factors distinguish the activities of registered investment advisers and funds from the District Court's findings in this case. For example:

(i) Registered investment advisers and funds do not advertise or hold themselves "out to the public as being in the business of buying and selling securities." *See Keener*, 580 F. Supp. 3d at 1283.

(ii) Although buying and selling convertible notes is a component of many registered investment advisers' and funds' "business model and … day-to-day operations," they are not "focused almost entirely upon finding issuer clients that were offering securities (convertible notes) to buy, buying the notes, converting them to stock, and then selling the newly issued stock in the public market." *See id.*

(iii) Registered investment advisers and funds do not have what the district court called "issuer clients." *Id.* Indeed, investment advisers' clients are the funds they advise, and the funds themselves have investors but do not have clients or customers at all. *See supra* at I.C.

(iv) Registered investment advisers and funds do not serve as intermediaries between issuers and investors or service customers. *See Keener*, 580 F. Supp. 3d at 1283. They most often trade through registered broker-dealer intermediaries. *See supra* at I.C.

(v) Registered investment advisers and funds are already subject to SEC oversight and advisers are required to, among other

things, disclose detailed information about funds they manage. *See supra* at I.B.[4]

Thus, any decision in this case should be grounded in its specific facts—not categorically label *any* business buying and selling securities as a "dealer," even in the absence of the factors. Adopting these limitations will avoid an overly broad holding and the chaos that could flow from upending settled expectations of those who have relied on precedent and SEC guidance construing the term "dealer."

## IV. There Is No Basis For Requiring Disgorgement Of Profits That Lack Even A "But For" Causal Relationship To The Failure To Register.

Keener correctly argues that disgorgement is not a proper remedy here. There is no causal link between the profits that Keener earned and

---

[4] Certain facts the SEC and District Court have highlighted do not provide a meaningful basis for determining dealer status. *See, e.g.*, *Keener*, 580 F. Supp. 3d at 1286–89. Whether pricing is fixed or variable does not matter; convertible securities use both. Whether shares are issued at a discount does not matter; some investments like secondary offerings are always at a discount. Whether discounts are backward or forward does not matter; it changes a deal's economics but not its character. Whether securities are sold at the earliest opportunity does not matter; "flipping, alone, is not prohibited under the federal securities laws." SEC, Investor Bulletin: Investing in an IPO 5, https://www.sec.gov/files/ipo-investorbulletin.pdf (visited June 5, 2023).

the failure to register as a dealer, and the disgorgement order contradicts the Supreme Court's ruling in *Liu v. SEC*, 140 S.Ct. 1936 (2020).

In general, the SEC is pursuing a novel and unorthodox theory here. Even if the Court adopts it, principles of fairness and due process dictate that any remedies should be prospective. Market participants that justifiably relied on the settled understanding that dealer registration was not necessary should not be punished for a lack of clairvoyance in foreseeing a change in the understood interpretation of the securities laws. *See Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("It is against all reason and justice" to "punish[] a citizen" for an act "which, when done, was in violation of no existing law."); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (requiring "fair notice" before imposing punishment); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157–58 (2012) (noting agency "inaction" in the face of "industry[] practice" creates an "acute" risk of "unfair surprise"). That approach comports with the rule of lenity, which requires that "statutes imposing penalties are to be 'construed strictly' against the government and in favor of individuals." *Bittner v. United States*, 143 S.Ct. 713, 724 (2023).

Even assuming civil monetary penalties may be levied, disgorgement of profits is inappropriate here. Disgorgement aims to reclaim "a reasonable approximation of profits *causally connected* to the violation." *SEC v. Hallam*, 42 F.4th 316, 329 & n.32 (5th Cir. 2022) (emphasis added); *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999) (disgorgement limited to "property causally related to the wrongdoing"); *Liu*, 140 S.Ct. at 1941–42, 1947–49 (tying disgorgement to "ill-gotten gains" and harm to victims). But here, failure to register as a dealer (assuming registration was required) did not generate any gains or cause harm. The same profits could have been realized if Keener had registered; lack of registration neither attracted customers nor impacted the success of his investments. And there was nothing inherently unlawful about Keener's business or the transactions that resulted in profits or losses when his own capital was at risk. Failure to register thus did not result in any "ill-gotten gains." *Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017) (registration failure "had no effect" on investors); *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir. 2018) ("[L]osing money is a foreseeable result of investing with an unregistered trader, but this is not because a trader's failure to register will itself inevitably cause a loss.").

Moreover, the failure to register as a dealer did not cause harm to investors. Courts considering disgorgement must "avoid transforming an equitable remedy into a punitive sanction," and "[t]he equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit." *Liu*, 140 S.Ct. at 1942, 1948. But there are no "wronged" investors here: the alleged violation was regulatory in nature—not a fraud perpetrated on investors to take their money. Thus, disgorgement here is punitive, not equitable relief "for the benefit of investors" as the statute requires. 15 U.S.C. § 78u(d)(5).

Disgorgement is a powerful remedy the SEC has previously abused to impose impermissibly draconian penalties. *See Kokesh,* 581 U.S. 455; *Liu,* 140 S.Ct. 1936. That reality, plus the SEC's history of scorched-earth litigation, strongly support preemptively barring the SEC from seeking disgorgement based on past failure to register as a dealer when market participants had no reason to believe such registration was required.

## CONCLUSION

For the foregoing reasons, AIMA urges this Court to reverse and issue a narrow opinion that avoids causing harm to markets and market participants.

June 7, 2023                              Respectfully submitted,

                                         */s/ Gabriel K. Gillett*

                                         Gabriel K. Gillett
                                              *Counsel of Record*
                                         Grace C. Signorelli-Cassady
                                         Jenner & Block LLP
                                         353 North Clark Street
                                         Chicago, IL 60654
                                         (312) 840-7220
                                         ggillett@jenner.com

                                         *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G) and Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitation because this brief contains 6,480 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Century Schoolbook font.

*/s/ Gabriel K. Gillett*
Gabriel K. Gillett

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Gabriel K. Gillett*
Gabriel K. Gillett