# 22-14237-JJ

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

U.S. SECURITIES AND EXCHANGE COMMISSION,
Plaintiff-Appellee,

v.

JUSTIN W. KEENER,
Defendant-Appellant.

---

On Appeal from the United States District Court
for the Southern District of Florida, 20-cv-21254

---

## BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

---

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

DOMINICK V. FREDA
Assistant General Counsel

DAVID D. LISITZA
Senior Appellate Counsel

ARCHITH RAMKUMAR
Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-4886 (Ramkumar)
RamkumarA@sec.gov

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

*SEC v. Keener*, No. 22-14237-JJ

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1-1, Appellee Securities and Exchange Commission submits this Certificate of Interested Persons and Corporate Disclosure Statement listing all persons and entities with an interest in the outcome of this action:

1. 3D Icon Corp., microcap issuer (TDCP)[1]

2. 4Cable TV International, Inc., microcap issuer (CATV)

3. 5Barz International, Inc., microcap issuer (BARZ)

4. ABCO Energy, Inc., microcap issuer (ABCE)

5. Abbott, James

6. Accelara Innovations, Inc., microcap issuer (ACNV)

7. Advaxis, Inc., microcap issuer (ADXS)

8. Aim Exploration, Inc., microcap issuer (AEXE)

9. Aja Cannafacturing, Inc., microcap issuer (AJAC)

10. Alkame Holdings, Inc., microcap issuer (ALKM)

---

[1] We have included as interested persons the microcap issuers that were the defendant's customers in his securities business.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

11.    Alliance Bioenergy Plus, Inc., microcap issuer (ALLM)

12.    AmbiCom Holdings, Inc., microcap issuer (ABHI)

13.    American Petro-Hunter, Inc., microcap issuer (AAPH)

14.    AmpliTech Group, Inc., microcap issuer (AMPG)

15.    Apptigo International, Inc., microcap issuer (APPG)

16.    Arrayit Corp., microcap issuer (ARYC)

17.    Artec Global Media, Inc., microcap issuer (ACTL)

18.    AuCoin, Dawn

19.    Augustini, Hope Hall, attorney for the Commission

20.    Avalanche International Corp., microcap issuer (AVLP)

21.    Bergio International, Inc., microcap issuer (BRGO)

22.    Barbero, Megan, general counsel for the Commission

23.    Bill the Butcher, Inc., microcap issuer (BLLB)

24.    Bioneutral Group, Inc., microcap issuer (BONU)

25.    Bloom, Hon. Beth F., District Court Judge

26.    Blue Sphere Corp., microcap issuer (BLSP)

27.    BlueFire Renewables, Inc., microcap issuer (BFRE)

28.    Borneo Resource Investments Ltd., microcap issuer (BRNE)

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

29.    Braunstein, Joshua E., attorney for the Commission

30.    Bravatek Solutions Inc., microcap issuer (BVTK)

31.    Buckley LLP, counsel for Mr. Keener

32.    Capernaros, Peter

33.    Carbon Sciences, Inc., microcap issuer (CABN)

34.    Cardinal Energy Group, Inc., microcap issuer (CEGX)

35.    Cardinal Resources, Inc., microcap issuer (CDNL)

36.    CardioGenics, Inc., microcap issuer (CGNH)

37.    Casiano, John

38.    CD International Enterprises, Inc., microcap issuer (CDII)

39.    CircleStar Energy Corp., microcap issuer (CRCL)

40.    Cirque Energy, Inc., microcap issuer (CRQE)

41.    Clean Coal Technologies, Inc., microcap issuer (CCTC)

42.    Cleartronic, Inc., microcap issuer (CLRI)

43.    Coates International, Ltd., microcap issuer (COTE)

44.    CodeSmart Holdings, Inc., microcap issuer (ITEN)

45.    Conley, Michael A., attorney for the Commission

46.    Conniry, Patrick

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

47.    Cross Click Media, Inc., microcap issuer (COSR)

48.    Cyclone Power Technologies Inc., microcap issuer (CYPW)

49.    Cytomedix, microcap issuer (CXMI)

50.    Daniels Corporate Advisory Co., Inc., microcap issuer (DCAC)

51.    Do, Nhan

52.    Domark International, Inc., microcap issuer (DOMK)

53.    Dwyer, Jared Edward, attorney for Mr. Keener

54.    Echo Automotive, Inc., microcap issuer (ECAU)

55.    Eco Building Products, Inc., microcap issuer (ECOB)

56.    Egg, Alex

57.    Ehouse Global, Inc., microcap issuer (EHOS)

58.    Ellis, Shawn

59.    Endeavor IP, Inc., microcap issuer (ENIP)

60.    Endonovo Therapeutics, Inc., microcap issuer (ENDV)

61.    Epazz, Inc., microcap issuer (EPAZ)

62.    ERF Wireless, Inc., microcap issuer (ERFB)

63.    ERHC Energy, Inc., microcap issuer (ERHE)

64.    Eventure Interactive, Inc., microcap issuer (EVTI)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

65.     E-Waste Systems, Inc., microcap issuer (EWSI)

66.     First Liberty Power Corp., microcap issuer (FLPC)

67.     Focus Gold Corporation, microcap issuer (FGLD)

68.     FONU2, Inc., microcap issuer (FONU)

69.     Freda, Dominick V., attorney for the Commission

70.     Friendable, Inc., microcap issuer (FDBL)

71.     Fuelstream Inc., microcap issuer (FLST)

72.     Galenfeha, Inc., microcap issuer (GLFH)

73.     Gawk Incorporated, microcap issuer (GAWK)

74.     Gibson, Dunn & Crutcher LLP, counsel for Mr. Keener

75.     Global Arena Holding, Inc., microcap issuer (GAHC)

76.     Global Digital Solutions, Inc., microcap issuer (GDSI)

77.     Global Equity International Inc., microcap issuer (GEQU)

78.     Global Vision Holdings, Inc., microcap issuer (GVHBE)

79.     Gold and Gemstone Mining, Inc., microcap issuer (GGSM)

80.     Goldsmith, Barry, attorney for Mr. Keener

81.     Green Automotive Company, microcap issuer (GACR)

82.     Green Endeavors, Inc., microcap issuer (GRNE)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

83.     Green Parts International, Inc., microcap issuer (GNPT)

84.     GreenStone Healthcare Corp., microcap issuer (GRST)

85.     Greenberg, Benjamin G., attorney for Mr. Keener

86.     Greenberg Taurig, P.A., counsel for Mr. Keener

87.     Halfen, David

88.     Hangover Joe's Holding Corp., microcap issuer (HJOE)

89.     Hightower, Jason

90.     High Performance Beverages Co., microcap issuer (DRHC)

91.     Hybrid Coating Technologies, Inc., microcap issuer (HCTI)

92.     Hydrogen Future Corp., microcap issuer (HFCO)

93.     IceWEBB, Inc., microcap issuer (IWEB)

94.     Icon Vapor, Inc., microcap issuer (ICNV)

95.     IFAN Financial, Inc., microcap issuer (IFAN)

96.     IL2M International Corp., microcap issuer (ILIM)

97.     Imerjn Inc., microcap issuer (IMJN)

98.     Immune Therapeutics, Inc., microcap issuer (IMUN)

99.     InCapta, Inc., microcap issuer (INCT)

100.    Integral Technologies, Inc., microcap issuer (ITKG)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

101.    IntelliCell BioSciences, Inc., microcap issuer (SVFC)

102.    Intelligent Highway Solutions, Inc., microcap issuer (IHSI)

103.    Investview, Inc., microcap issuer (INVU)

104.    Jammin Java Corp., microcap issuer (JAMN)

105.    Jankowski, Liz

106.    Kabe Exploration, Inc., microcap issuer (KABX)

107.    Kallo, Inc., microcap issuer (KALO)

108.    Keener, Justin W.

109.    Kleangas Energy Technologies, Inc., microcap issuer (KGET)

110.    Labor Smart, Inc., microcap issuer (LTNC)

111.    Las Vegas Railway Express, Inc., microcap issuer (XTRN)

112.    Latitude 360, Inc., microcap issuer (LATX)

113.    Legend Oil and Gas, Ltd., microcap issuer (LOGL)

114.    Liberated Energy, Inc., microcap issuer (LIBE)

115.    Liberty Star Uranium & Metals Corp., microcap issuer (LBSR)

116.    LifeApps Brand Inc., microcap issuer (LFAP)

117.    Linn, Brandi

118.    Lisitza, David D., attorney for the Commission

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

119. Lithium Exploration Group, Inc., microcap issuer (LEXG)

120. Location Based Technologies, Inc., microcap issuer (LBAS)

121. Louis, Hon. Lauren F., Magistrate Judge

122. M Line Holdings, Inc., microcap issuer (MLHC)

123. Martino, Fran

124. Mayo, Chris

125. MAX SOUND Corporation, microcap issuer (MAXD)

126. MedCareers Group, Inc., microcap issuer (MCGI)

127. Mexus Gold US, Inc., microcap issuer (MXSG)

128. Microelectronics Technology Company, microcap issuer (MELY)

129. Miller, Adam, attorney for Mr. Keener

130. Mind Solutions Inc., microcap issuer (VOIS)

131. Mineral Rite Corporation, microcap issuer (RITE)

132. Minerco, Inc., microcap issuer (MINE)

133. Moller International, Inc., microcap issuer (MLER)

134. Monster Arts, Inc., microcap issuer (APPZ)

135. Moon River Studios, Inc., microcap issuer (MDNT)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

136.    My ECheck, Inc., microcap issuer (MYEC)

137.    Nagel, Conrad

138.    Naked Brand Group, Inc., microcap issuer (NAKD)

139.    Nano Mobile Healthcare, Inc., microcap issuer (VNTH)

140.    Natan, Eilon

141.    National Energy Services, Inc., microcap issuer (NESV)

142.    Neah Power Systems, Inc., microcap issuer (NPWZ)

143.    Net Talk.Com, Inc., microcap issuer (NTLK)

144.    New Western Energy Corporation, microcap issuer (NWTR)

145.    Next Galaxy Corp., microcap issuer (NXGA)

146.    Next Group Holdings, Inc., microcap issuer (AQUA)

147.    NoHo, Inc., microcap issuer (DRNK)

148.    North American Oil & Gas Corp., microcap issuer (NAMG)

149.    North Bay Resources, Inc., microcap issuer (NBRI)

150.    Northwest Biotherapeutics, microcap issuer (NWBO)

151.    Nutranomics, Inc., microcap issuer (NNRX)

152.    N-Viro International Corp., microcap issuer (NVIC)

153.    Omega Commercial Finance Corp., microcap issuer (OCFN)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

154.    Organic Alliance, Inc., microcap issuer (ORGC)

155.    OriginClear Inc., microcap issuer (OCLN)

156.    Pacific Sands Inc., microcap issuer (PSFD)

157.    Patten Energy Solutions Group, Inc., microcap issuer (AMEL)

158.    Pazoo Inc., microcap issuer (PZOO)

159.    PEN Inc., microcap issuer (APNT)

160.    Petrilla, Antony, attorney for the Commission

161.    Petron Energy II, Inc., microcap issuer (PEII)

162.    Pharmagen, Inc., microcap issuer (PHRX)

163.    Piper, Summer

164.    Plandai Biotechnology, Inc., microcap issuer (PLPL)

165.    Players Network, microcap issuer (PNTV)

166.    Posadas, Maria

167.    PositiveID Corporation, microcap issuer (PSID)

168.    Powerdyne International Inc., microcap issuer (PWDY)

169.    Premier Biomedical, Inc., microcap issuer (BIEI)

170.    Pressure BioSciences, Inc., microcap issuer (PBIO)

171.    ProGreen Properties, Inc., microcap issuer (PGEI)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

172.  Propell Technologies Group, Inc., microcap issuer (PROP)

173.  ProText Mobility, Inc., microcap issuer (TXTM)

174.  PuraMed BioScience, Inc., microcap issuer (PMBS)

175.  PureSafe Water Systems, Inc., microcap issuer (PSWS)

176.  Ragan, Christopher F., attorney for Mr. Keener

177.  Ramkumar, Archith, attorney for the Commission

178.  Raskin, Jane S., attorney for Mr. Keener

179.  Raskin & Raskin LLP, counsel for Mr. Keener

180.  Real Estate Contacts, Inc., microcap issuer (REAC)

181.  Red Giant Entertainment, Inc., microcap issuer (REDG)

182.  Regenicin, Inc., microcap issuer (RGIN)

183.  Rejuvel Bio-Sciences, Inc., microcap issuer (NUUU)

184.  Resonate Blends Inc., microcap issuer (KOAN)

185.  Reve Technologies, Inc., microcap issuer (BSSP)

186.  Rich Pharmaceuticals, Inc., microcap issuer (RCHA)

187.  Richman, Brian A., attorney for Mr. Keener

188.  Saleen Automotive, Inc., microcap issuer (SLNN)

189.  Santa Fe Gold Corporation, microcap issuer (SFEG)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

190.    Santa Fe Petroleum, microcap issuer (SFPI)

191.    Santo Mining Corp., microcap issuer (SANP)

192.    Seafarer Exploration Corp., microcap issuer (SFRX)

193.    Securities & Exchange Commission

194.    Seibald, Jonathan M., attorney for Mr. Keener

195.    Service Team Inc., microcap issuer (SVTE)

196.    Seven Arts Entertainment, Inc., microcap issuer (SAPX)

197.    Silver Dragon Resources, Inc., microcap issuer (SDRG)

198.    Silver Falcon Mining, Inc., microcap issuer (SFMI)

199.    Solar Wind Energy Tower, Inc., microcap issuer (CWET)

200.    Solaris Power Cells, Inc., microcap issuer (SPCL)

201.    Soul and Vibe Interactive, Inc., microcap issuer (SOUL)

202.    Soupman, Inc., microcap issuer (SOUP)

203.    Sparta Commercial Services, Inc., microcap issuer (SRCO)

204.    SpectraScience, Inc., microcap issuer (SCIE)

205.    Stevia Corp., microcap issuer (STEV)

206.    STL Marketing Group, Inc., microcap issuer (STLK)

207.    Strikeforce Technologies, Inc., microcap issuer (SFOR)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

208.    STW Resources Holding Corp., microcap issuer (STWS)

209.    Sun River Energy Company, microcap issuer (SNRV)

210.    Sunergy, Inc., microcap issuer (SNEY)

211.    Sunshine Biopharma, Inc., microcap issuer (SBFM)

212.    Sunworks, Inc., microcap issuer (SLTD)

213.    Super Directories, Inc., microcap issuer (SDIR)

214.    TapImmune, Inc., microcap issuer (TPIV)

215.    Tauriga Sciences, Inc., microcap issuer (TAUG)

216.    The Digital Development Group Corp., microcap issuer (DIDG)

217.    The Radiant Creations Group, Inc., microcap issuer (RCGP)

218.    Tombstone Exploration Corp., microcap issuer (TMBXF)

219.    Tonner-One World Holdings, Inc., microcap issuer (OWOO)

220.    Trans-Pacific Aerospace Company, Inc., microcap issuer (TPAC)

221.    Trio Resources, Inc., microcap issuer (TRII)

222.    UnifiedOnline, Inc., microcap issuer (UOIP)

223.    United American Petroleum Corp., microcap issuer (UAPC)

224.    US Precious Metals, Inc., microcap issuer (USPR)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

225.    Vapor Group, Inc., microcap issuer (VPOR)

226.    Vela Tel Global Communications, Inc., microcap issuer (VELA)

227.    Veriteq Corporation, microcap issuer (VTEQ)

228.    Viking Investments Group, Inc., microcap issuer (VKIN)

229.    Vision Industries Corp., microcap issuer (VIIC)

230.    Viswanatha, Veena, attorney for Mr. Keener

231.    Vivos Inc., microcap issuer (ADMD)

232.    VizConnect, Inc., microcap issuer (VIZC)

233.    Walker, Helgi C., attorney for Mr. Keener

234.    WeedHire International, microcap issuer (ANYI)

235.    Weisman, Sandy

236.    Well Power, Inc., microcap issuer (WPWR)

237.    Wellness Center USA, Inc., microcap issuer (WCUI)

238.    WindStream Technologies, Inc., microcap issuer (WSTI)

239.    Workhorse Group, Inc., microcap issuer (AMPD)

240.    World Moto, Inc., microcap issuer (FARE)

241.    Wowio, Inc., microcap issuer (WWIO)

242.    Xfuels, Inc., microcap issuer (AMZZ)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (cont'd)

*SEC v. Keener*, No. 22-14237-JJ

243. XsunX, Inc., microcap issuer (XSNX)

244. Xun Energy, Inc., microcap issuer (XNRG)

245. Yappn Corp., microcap issuer (YPPN)

246. Zonzia Media, Inc., microcap issuer (ZONX)

## COUNTERSTATEMENT REGARDING ORAL ARGUMENT

Appellee Securities and Exchange Commission does not believe that oral argument will substantially assist the Court in deciding this appeal because the issues are adequately covered by the parties' briefs and because this Court's precedents, including *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968), and *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015), already address the major legal questions implicated by this appeal.  *See* Fed. R. App. P. 34(a)(2).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

    DISCLOSURE STATEMENT ........................................................... C-1

COUNTERSTATEMENT REGARDING ORAL ARGUMENT ....................... i

TABLE OF AUTHORITIES ........................................................... vi

INTRODUCTION ........................................................... 1

COUNTERSTATEMENT OF JURISDICTION ........................................... 4

COUNTERSTATEMENT OF THE ISSUES PRESENTED........................... 4

COUNTERSTATEMENT OF THE CASE ....................................... 4

    A.    Statutory Scheme ....................................................... 4

    B.    Facts ...................................................... 7

        1.    FINRA barred Keener after he stonewalled their
investigation into his ownership of one broker-dealer
and his trading at another ................................ 8

        2.    While barred by FINRA, Keener conducted a
dealer business through JMJ .......................... 9

        3.    Keener held JMJ out to brokers and microcap
issuers as willing to buy and sell securities for its
own account ..................................................... 9

ii

4. Keener utilized his QuickLoan program to provide cash-strapped microcap issuers with financing in exchange for discounted shares of the issuers' stocks ................................................................ 11

5. Keener's convertible note business drove down the price of issuers' shares, harming the mostly retail investors who purchased the new issues ........................ 12

C. Procedural History .................................................... 14

STANDARD OF REVIEW ............................................................ 16

SUMMARY OF THE ARGUMENT ................................................ 16

ARGUMENT .................................................................................. 18

I. Keener is liable for acting as an unregistered dealer ......................... 18

A. Keener's conduct falls squarely within the "dealer" definition ................................................................ 19

1. Underwriting activity is "dealer" activity ....................... 19

2. *Eastside Church* and *Big Apple* control ....................... 23

B. Keener held out JMJ as being in the business of buying and selling securities for its own account ............................... 29

C. Keener was not a "trader" ............................................ 31

iii

D.   Keener's argument that the words "own account" limit
     the dealer definition to persons who effectuate customer
     orders is wrong ...................................................................... 33

     1.   Keener forfeited the argument he presses on appeal,
          because he failed to raise it below and because his new
          argument is irreconcilable with positions he did
          raise ................................................................................ 33

     2.   Keener's interpretation is unsupported by the
          statute ............................................................................ 37

     3.   Keener's theory is ahistorical ....................................... 40

     4.   Keener's other statutory arguments are
          unpersuasive ................................................................. 43

     5.   Keener's claim that the Commission is taking an
          inconsistent position in this case is without merit ........ 45

E.   Keener's constitutional arguments are unfounded ................ 49

     1.   The district court correctly rejected Keener's "fair
          notice" and "vagueness" challenges ............................. 49

     2.   The district court correctly rejected Keener's equal
          protection argument ...................................................... 52

iv

II.    The district court acted within its discretion in ordering

equitable remedies ............................................................. 53

A.    The district court acted within its discretion in ordering

Keener to disgorge his unregistered dealer profits ................ 53

1.    The district court acted within its discretion in

concluding that Keener's disgorged profits were

causally connected to his violation ............................... 53

2.    The district court acted within its discretion in

concluding that disgorgement is for the benefit of

investors ....................................................................... 58

B.    The district court acted within its discretion in ordering

injunctive relief ..................................................................... 59

CONCLUSION .............................................................................. 61

# TABLE OF AUTHORITIES

**CASES**                                                                                 **PAGE(S)**

*Alvarez v. United States*,

    862 F.3d 1297 (11th Cir. 2017) .................................................................. 57

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,

    493 F.3d 87 (2d Cir. 2007) ........................................................................ 51

*Bittner v. United States*,

    143 S. Ct. 713 (2023) ................................................................................. 37

*Bonner v. City of Prichard*,

    661 F.2d 1206 (11th Cir. 1981) .................................................................... 1

*Campbell v. Rainbow City*,

    434 F.3d 1306 (11th Cir. 2006) ............................................................ 52-53

*Catalyst Pharms., Inc. v. Becerra*,

    14 F.4th 1299 (11th Cir. 2021) ................................................................. 38

*CFTC v. Sidoti*,

    178 F.3d 1132 (11th Cir. 1999) ............................................................ 55-56

*CFTC v. Southern Trust Metals, Inc.*,

    894 F.3d 1313 (11th Cir. 2018) ........................................................... 56, 57

*CFTC v. Tayeh*,

    848 F. App'x 827 (11th Cir. 2021) ........................................................... 54

*Crown Bridge Partners, LLC v. Sunstock, Inc.*,

   No. 18 Civ. 7632 (CM), 2019 WL 2498370 (S.D.N.Y. June 3, 2019) ...... 14

*Donander Co. v. Comm'r*,

   29 B.T.A. 312 (1933) ................................................................ 43

*Dos Santos v. U.S. Att'y Gen.*,

   982 F.3d 1315 (11th Cir. 2020) ............................................... 36

*\*Eastside Church of Christ v. Nat'l Plan, Inc.*,

   391 F.2d 357 (5th Cir. 1968) .......................................... *passim*

*Goldstein v. SEC*,

   451 F.3d 873 (D.C. Cir. 2006) ................................................ 47

*Harriman Nat'l Bank v. Comm'r*,

   43 F.2d 950 (2d Cir. 1930) ..................................................... 43

*Hazen v. Nat'l Rifle Ass'n of Am.*,

   101 F.2d 432 (D.C. Cir. 1938) ................................................ 20

*Johnson v. Winslow*,

   279 N.Y.S. 147 (N.Y. Sup. Ct. 1935) ...................................... 43

*Landreth Timber Co. v. Landreth*,

   471 U.S. 681 (1985) ............................................................... 27

*Levine v. SEC*,

   407 F.3d 178 (3d Cir. 2005) ............................................. 39, 40

*Liu v. SEC*,

    140 S. Ct. 1936 (2020) .......................................................... 18, 53, 58, 59

*Nat'l Bank of Com. of Dallas v. All Am. Assurance Co.*,

    583 F.2d 1295 (5th Cir. 1978) ............................................................. 26-27

*Norris Bros. v. Commonwealth*,

    27 Pa. 494 (Pa. 1856) ........................................................................... 3, 20

*Reider v. Philip Morris USA, Inc.*,

    793 F.3d 1254 (11th Cir. 2015) .................................................................. 36

*Roth v. SEC*,

    22 F.3d 1108 (D.C. Cir. 1994) ................................................................... 48

*\*SEC v. Big Apple Consulting USA, Inc.*,

    783 F.3d 786 (11th Cir. 2015) ...................................................... *passim*

*SEC v. Blackburn*,

    15 F.4th 676 (5th Cir. 2021) .................................................................... 59

*\*SEC v. Calvo*,

    378 F.3d 1211 (11th Cir. 2004) .............................................. 16, 54, 55, 56

*SEC v. Carebourn Cap., L.P.*,

    No. 21-cv-2114, 2022 WL 1639515 (D. Minn. May 24, 2022) .... 29, 45, 50

*SEC v. Fife*,

    No. 1:20-cv-05227 (N.D. Ill.) ............................................................... 9, 34

*SEC v. Fife*,

   No. 1:20-cv-05227, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) ........... 50

*SEC v. Fierro*,

   No. 20-02104 (GC), 2023 WL 4249011

   (D.N.J. June 29, 2023) .................................................................. *passim*

*SEC v. First City Fin. Corp.*,

   890 F.2d 1215 (D.C. Cir. 1989) ................................................................ 55

*SEC v. Fowler*,

   6 F.4th 255 (2d Cir. 2021) ...................................................................... 54

*SEC v. Goble*,

   682 F.3d 934 (11th Cir. 2012) ................................................................ 60

*SEC v. Hall*,

   759 F. App'x 877 (11th Cir. 2019)........................................................... 60

*SEC v. Kenton Cap., Ltd.*,

   69 F. Supp. 2d 1 (D.D.C. 1998) .............................................................. 49

*SEC v. Levin*,

   849 F.3d 995 (11th Cir. 2017) ................................................................ 57

*SEC v. Morgan Keegan & Co.*,

   678 F.3d 1233 (11th Cir. 2012) .............................................................. 57

*SEC v. Murphy*,

    50 F.4th 832 (9th Cir. 2022) ........................................................ 39, 51, 52

*SEC v. Ridenour*,

    913 F.2d 515 (8th Cir. 1990) ................................................................ 48

*SEC v. River N. Equity LLC*,

    415 F. Supp. 3d 853 (N.D. Ill. 2019) ............................................ 22, 29, 31

*SEC v. Teo*,

    746 F.3d 90 (3d Cir. 2014) ................................................................ 57

*SEC v. World Tree Fin., L.L.C.*,

    43 F.4th 448 (5th Cir. 2022) ............................................................ 59

*United States v. Caniff*,

    955 F.3d 1183 (11th Cir. 2020) ......................................................... 37

*United States v. Garcon*,

    54 F.4th 1274 (11th Cir. 2022) ........................................................ 38

*Washington v. Howard*,

    25 F.4th 891 (11th Cir. 2022) .......................................................... 16

*Weisbrod v. Lowitz*,

    282 Ill. App. 252 (Ill. App. Ct. 1935) ............................................... 43

## STATUTES

7 U.S.C. § 13a-1(d)(3)) ................................................................... 57

Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

    Section 2(a)(1), 15 U.S.C. § 77b(a)(1) ...................................... 26

    Section 2(a)(3), 15 U.S.C. § 77b(a)(3) ...................................... 26

    Section 2(a)(12), 15 U.S.C. § 77b(a)(12) .................................. 25

    Section 4(a)(1), 15 U.S.C. § 77d(a)(1) ..................................... 25

Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq.

    Section 3(a)(4)(A), 15 U.S.C. § 78c(a)(4)(A) .......................... 3, 37

    Section 3(a)(5)(A), 15 U.S.C. § 78c(a)(5)(A) ................................ *passim*

    Section 3(a)(5)(B), 15 U.S.C. § 78c(a)(5)(B) ................................ *passim*

    Section 3(a)(10), 15 U.S.C. § 78c(a)(10) .................................. 26

    Section 3(a)(13), 15 U.S.C. § 78c(a)(13) .................................. 26

    Section 3(a)(14), 15 U.S.C. § 78c(a)(14) .................................. 26

    Section 3(a)(22)(A), 15 U.S.C. § 78c(a)(22)(A) ...................... 44

    Section 3(a)(39), 15 U.S.C. § 78c(a)(39) .................................. 6

    Section 3(a)(51), 15 U.S.C. § 78c(a)(51) .................................. 7

    Section 3(a)(61)(A), 15 U.S.C. § 78c(a)(61)(A) ...................... 44

    Section 6(b)(6), 15 U.S.C. § 78f(b)(6) ..................................... 6

    Section 11(a)(1), 15 U.S.C. § 78k(a)(1) ................................... 39

Section 15, 15 U.S.C. § 78o ........................................................ 14

Section 15(a), 15 U.S.C. § 78o(a) ............................................. 1, 5

Section 15(a)(1), 15 U.S.C. § 78o(a)(1) ............................ 5, 53-54

Section 15(b)(1), 15 U.S.C. § 78o(b)(1) ................................. 5, 6

Section 15(b)(4), 15 U.S.C. § 78o(b)(4) .................................... 6

Section 15(c), 15 U.S.C. § 78o(c) ............................................... 6

Section 17(a)(1), 15 U.S.C. § 78q(a)(1) ..................................... 6

Section 17(b), 15 U.S.C. § 78q(b) .............................................. 6

Section 17(e)(1)(A), 15 U.S.C. § 78q(e)(1)(A) .......................... 6

Section 19(d), 15 U.S.C. § 78s(d) .............................................. 6

Section 21(d)(2), 15 U.S.C. § 78s(d)(2) ..................................... 8

Section 21(d), 15 U.S.C. § 78u(d) .............................................. 4

Section 21(d)(1) , 15 U.S.C. § 78u(d)(1) ................................. 60

Section 21(d)(5), 15 U.S.C. § 78u(d)(5) ............................. 53, 58

Section 21(d)(6), 15 U.S.C. § 78u(d)(6) .................................... 7

Section 21(e), 15 U.S.C. § 78u(e) .............................................. 4

Section 27, 15 U.S.C. § 78aa .................................................... 4

28 U.S.C. § 1291 ...................................................................... 4

## RULES AND REGULATIONS

Federal Rule of Appellate Procedure 34(a)(2) ............................. i

<u>Rules Under the Securities Exchange Act of 1934,</u>

<u>17 C.F.R. §§ 240.0-1, et seq.</u>

Rule 3a51-1, 17 C.F.R. § 240.3a51-1 ........................................................ 7

Rule 15b9-1(a), 17 C.F.R. § 240.15b9-1(a) ............................................ 51

Rule 15c1-2, 17 C.F.R. § 240.15c1-2 ....................................................... 6

Rule 15c3-1, 17 C.F.R. § 240.15c3-1 ....................................................... 6

Rule 15c3-1(a)(2)(vi), 17 C.F.R. § 240.15c3-1(a)(2)(vi) ......................... 51

Rule 15c3-1(a)(6)(ii), 17 C.F.R. § 240.15c3-1(a)(6)(ii) ........................... 51

Rule 15c3-3(e), 17 C.F.R. § 240.15c3-3(e) ............................................. 6

Rule 15c3-3(k)(2)(i), 17 C.F.R. § 240.15c3-3(k)(2)(i) ............................ 51

Rule 17a-3(a), 17 C.F.R. § 240.17a-3(a) ................................................. 6

Rule 17a-4, 17 C.F.R. § 240.17a-4 ........................................................... 6

Rule 17a-5(a), 17 C.F.R. § 240.17a-5(a) ................................................. 6

Rule 17a-5(d)(1), 17 C.F.R. § 240.17a-5(d)(1) ........................................ 6

Rule 17a-5(d)(2), 17 C.F.R. § 240.17a-5(d)(2) ........................................ 6

Rule 17a-5(d)(3), 17 C.F.R. § 240.17a-5(d)(3) ........................................ 6

Rule 17a-11(a), 17 C.F.R. § 240.17a-11(a) .............................................. 6

Rule 17a-11(b), 17 C.F.R. § 240.17a-11(b) .............................................. 6

## LEGISLATIVE MATERIALS

2 H.R. Doc. No. 76-279 (1939)........................................................ 46

H.R. Doc. No. 76-477 (1939) ...................................................46-47

S. Rep. No. 99-426 (1986)........................................................ 22-23

## COMMISSION MATERIALS

*Acqua Wellington N. Am. Equities Fund Ltd.,*

   SEC Staff No-Action Letter, 2001 WL 1230266

   (Oct. 11, 2001) ............................................................. 47-48, 51

*Adoption of Rule 15Ba2-1, Related Form MSD, Rule 15Ba2-2*

   *and Temporary Rule 15Ba2-3(T), Ba2-3(T)*, Exchange Act

   Release No. 11,742, 8 SEC Docket 82, 1975 WL 163406

   (Oct. 15, 1975) ........................................................................ 21

*Bravo Enters. Ltd.,*

   Exchange Act Release No. 75,775, 112 SEC Docket 1493,

   2015 WL 5047983 (Aug. 27, 2015) ........................................ 7

*Certain Broker-Dealers Deemed Not To Be Investment Advisers*,

   70 Fed. Reg. 2716 (proposed Jan. 14, 2005) ........................ 46

*Davenport Mgmt., Inc.,*

   SEC Staff No-Action Letter, 1993 WL 120436 (Apr. 13, 1993) ............. 47

*Definition of Terms in and Specific Exemptions for Banks*,

    67 Fed. Reg. 67,496 (Nov. 5, 2002) ....................................................... 19

*Definition of Terms in and Specific Exemptions for Banks*,

    68 Fed. Reg. 8686 (Feb. 24, 2003) ............................................. 21, 31, 33

*Further Definition of "Swap Dealer"*,

    77 Fed. Reg. 30,596 (May 23, 2012)....................................................... 45

*Further Definition of "As a Part of a Regular Business" in the*

    *Definition of Dealer and Government Securities Dealer*,

    87 Fed. Reg. 23,054 (proposed Apr. 18, 2022) ..................................... 52

*Gordon Wesley Sodorff, Jr.*,

    Exchange Act Release No. 31,134, 52 SEC Docket 1246,

    1992 WL 224082 (Sept. 2, 1992) ................................................. 21, 32, 48

*Registration Requirements for Foreign Broker-Dealers*,

    54 Fed. Reg. 30,013 (July 18, 1989) ....................................................... 19

*Registration Under the Advisers Act of Certain Hedge Fund Advisers*,

    69 Fed. Reg. 72,054 (Dec. 10, 2004) ..................................................... 47

SEC Staff, Division of Trading and Markets, *Guide to*

    *Broker-Dealer Registration* (Apr. 2008),

    https://www.sec.gov/about/reports-publications/investor-

    publications/guide-broker-dealer-registration................................. 29, 50

## OTHER AUTHORITIES

Alexander Hamilton Frey, *Federal Regulation of the Over-the-Counter Securities Market*, 106 U. PA. L. REV. 1 (1957) ........................ 32

Black's Law Dictionary 239 (10th ed. 2009) .............................................. 20

Black's Law Dictionary 521 (3d ed. 1933) ................................................. 20

Charles H. Meyer, THE SECURITIES EXCHANGE ACT OF 1934 ANALYZED AND EXPLAINED (1934) .................................................................. 3-4, 41-42

*Convertible Securities*, Investor.gov, SEC, https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities?source=uc1401cs0010001 (last visited Aug. 25, 2023) ...................................................... 13

*Disciplinary and Other FINRA Actions* (June 2012), FINRA, https://www.finra.org/sites/default/files/DisciplinaryAction/p127040.pdf .......................................................................................................... 9

John Bouvier, BOUVIER'S LAW DICTIONARY AND CONCISE ENCYCLOPEDIA (7th ed. 1914) ................................................................. 20

Louis Loss, SECURITIES REGULATION (1st ed. 1951) ......................... 29, 31-32

Stephen Labaton, *Profile*: *Louis Loss*; *For the Father of Securities Law, Yet Another Milestone,* N.Y. Times (Sept. 26, 1993) .................... 32

## INTRODUCTION

The Securities Exchange Act of 1934 ("Exchange Act" or "Act") requires "any person engaged in the business of buying and selling securities ... for such person's own account through a broker or otherwise" to register with the Securities and Exchange Commission as a "dealer." 15 U.S.C. §§ 78c(a)(5)(A), 78o(a). Recognizing that the undisputed facts establish that defendant Justin Keener ("Keener") acted as an unregistered "dealer" under the dealer definition's plain text as well as this Court's binding precedents—*see Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) [2]; *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015)—the district court granted the Commission's motion for summary judgment. The district court then entered a final judgment enjoining Keener from further violating the dealer registration requirement and from engaging in any penny stock offering for five years and ordering Keener to disgorge his illicit profits and to be subject to a civil penalty.

Over a three-year period, Keener acquired billions of discounted shares of hundreds of penny stocks directly from the issuers and unloaded

---

[2] Fifth Circuit decisions decided on or before September 30, 1981, bind this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

those shares to public investors in the marketplace—a practice known as underwriting activity. Through his sole proprietorship JMJ Financial ("JMJ"), Keener spent millions each year paying salaried employees in multiple offices to solicit hundreds of cash-strapped penny stock issuers to enter into financing agreements whereby Keener provided the issuers with cash in exchange for debt securities that Keener could convert into deeply discounted stock shares. Unlike conventional convertible debt instruments, Keener's convertible securities were "floorless"—in other words, structured to guarantee that Keener received discounted shares regardless of share-price fluctuation. After converting the debt securities into stock, Keener sold those new issues on the open market, thus profiting from the spread between the discounted conversion price and the prevailing market price.

Keener does not dispute those salient facts. He instead advances a new theory on appeal: that a "dealer" must effectuate customer orders to fall within the Exchange Act's definition—and that this has been "obvious[]" (Br. 23) since 1934. But Keener failed even to mention this "obvious[]" interpretation below, and it is unsupported by any court decision, treatise, or Commission statement in the last 90 years. Had Congress meant to restrict "dealers" to entities that effectuate customer orders, it could have done so by including a "customer" limitation in the "dealer" definition.

2

Congress surely knew how; it limited the Exchange Act's "broker" definition to "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). The dealer definition includes no such limiting language.

Furthermore, the "own account" language in the statutory dealer definition in which Keener purports to find this limitation has nothing to do with effectuating customer orders. A person trades for his "own account" by assuming the transaction's economic risk. The Exchange Act uses "own account" elsewhere in precisely this manner, in contexts that would be incomprehensible if "own account" were interpreted to require effectuation of orders on behalf of customers.

Keener's argument is also ahistorical. In defining a dealer as any person engaged in the "business of buying and selling securities" for such person's "own account," Congress was drawing on decades of understanding that a "dealer" is "one who buys to sell again." *Norris Bros. v. Commonwealth*, 27 Pa. 494, 495 (Pa. 1856). It is thus unsurprising that, from its enactment, the dealer definition was understood to cover "the operations of a trader" "*who has no customers* but merely trades for his own account through a broker" so long as those operations "are sufficiently extensive to be regarded as a regular business[.]" Charles H. Meyer, THE

3

SECURITIES EXCHANGE ACT OF 1934 ANALYZED AND EXPLAINED 33-34 (1934) (emphasis added).  What was clear in 1934 remains so today.

Because the district court applied the dealer definition consistent with the statute's plain language and this Court's precedents and acted within its considerable discretion in adopting its chosen remedies, its decision should be affirmed.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction over this enforcement action brought by the Commission pursuant to 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.  *See* Tab 1 at 3.  This Court has jurisdiction over Keener's timely appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

I.    Whether the district court correctly concluded that Keener was a dealer;

II.    Whether the district court acted within its discretion in ordering equitable remedies.

## COUNTERSTATEMENT OF THE CASE

### A.    Statutory Scheme

Section 15 of the Exchange Act makes it "unlawful for any ... dealer ... to make use of the mails or any means or instrumentality of interstate

commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless the dealer is registered with the Commission.  15 U.S.C. § 78o(a)(1).  Unless an exemption applies, a dealer's registration is effective only after the dealer "become[s] a member of a registered securities association" or a "national securities exchange" (referred to as "self-regulatory organizations" or "SROs").  *Id.* § 78o(b)(1).

A dealer is "any person engaged in the business of buying and selling securities … for such person's own account through a broker or otherwise." *Id.* § 78c(a)(5)(A).  The provision contains a carve-out, known as the "trader exception," for persons who buy and sell securities for their own accounts "but not as a part of a regular business."  *Id.* § 78c(a)(5)(B). Scienter is not required to violate the dealer registration provision.  *See id.* § 78o(a).

As this Court has recognized, the registration requirement "is of the utmost importance in effecting the purposes of the [Exchange] Act" because "[i]t is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records."  *Eastside Church*, 391 F.2d at 362.

For example, the Exchange Act prohibits a person subject to certain disqualifying events—which include being barred by the Commission or an SRO—from becoming a member of an SRO (15 U.S.C. § 78c(a)(39)) and, consequently, from having their dealer registration become effective (*id.* § 78o(b)(1)). And the Commission can revoke or suspend a dealer's registration if the dealer is convicted of certain crimes or enjoined for certain securities law violations. *Id.* § 78o(b)(4). Dealers are likewise subject to disciplinary action by the appropriate SRO, reviewable by the Commission. *Id.* §§ 78f(b)(6), 78s(d).

Registrants must keep and make available for periodic Commission examination records of their financial activities. *See id.* §§ 78q(a)(1), (b); 17 C.F.R. §§ 240.17a-3(a), 240.17a-4. Registrants are also required to file with the Commission monthly, quarterly, and annual reports that include information about, among other things, net capital and cash flow. *See* 15 U.S.C. § 78q(e)(1)(A); 17 C.F.R. §§ 240.15c3-1, 240.15c3-3(e), 240.17a-5(a), (d)(1), (2), (3). Registered dealers are also subject to antifraud provisions (*see* Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c); 17 C.F.R. § 240.15c1-2) and are required to have sufficient liquid resources on hand at all times (17 C.F.R. §§ 240.15c3-1, 240.17a-11(a), (b)).

6

Registration's importance is amplified where the dealer buys and sells "penny stocks"—defined generally to include stocks priced at five dollars or less that are not listed on a national securities exchange and are issued by companies with little to no revenue or assets. *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51-1. Penny stocks have historically raised concerns for the Commission "because they lack transparency." *Bravo Enters. Ltd.*, Exchange Act Release No. 75,775, 112 SEC Docket 1493, 2015 WL 5047983, at *5 (Aug. 27, 2015) (internal quotation omitted). Moreover, because many penny stocks are microcap stocks (*i.e.*, low-priced, thinly traded stocks issued by very small, or shell, companies) that "trade in low volumes ... and are highly volatile[,]" they are "especially attractive targets for manipulative or deceptive trading schemes." *Id.* The Exchange Act authorizes federal courts to bar persons who violate the Act while "participating in ... an offering of penny stock" from engaging in such behavior again. 15 U.S.C. § 78u(d)(6).

## B. Facts

From 2015 to 2018, Keener, a one-time associated person of a broker-dealer who was barred by the Financial Industry Regulatory Authority ("FINRA") for ignoring FINRA's regulatory inquiries, conducted an unregistered dealer business through JMJ. Keener aggressively marketed

7

his services, sponsoring lavish Las Vegas conferences and advertising through press releases, on JMJ's website, and on Twitter. Keener purchased convertible notes from hundreds of penny stock issuers, which granted him the right to obtain discounted shares of the issuers' stock. Keener then sold billions of those shares through a series of brokerage accounts, profiting from the spread between the notes' discounted purchase price and the stocks' sales price. All told, Keener made at least $7.7 million in profits from his unregistered dealer business—profits that came out of the pockets of mostly retail investors, who were ignorant of the newly issued shares' origins and discounted purchase prices.

### 1. FINRA barred Keener after he stonewalled their investigation into his ownership of one broker-dealer and his trading at another.

Three years before engaging in his unregistered dealer business, Keener was barred by FINRA, a registered national securities association that oversees broker-dealers subject to the Commission's oversight (*see* 15 U.S.C. § 78s(d)(2)). Tab 67 at 1; S.A. 70. Keener refused FINRA's repeated requests for information regarding whether he was engaged in underwriting microcap securities offerings through two broker-dealers, including one firm in which Keener was a limited partner and held an

8

ownership interest.[3]  S.A. 70.  As a result, FINRA barred Keener from

associating with any FINRA member in any capacity.  *See id.*

### 2.    While barred by FINRA, Keener conducted a dealer business through JMJ.

Keener did business through JMJ.  Tab 67-4 at 16.  With offices in

Miami, San Diego, and San Juan, JMJ employed as many as 25 employees

(Tab 67 at 2), many of whom were tasked with identifying microcap

companies in need of financing (*id.*).  JMJ also had a chief financial officer,

a general counsel, and an accountant.  *Id.*  The company's payroll was

approximately $2.7 million in 2015, $2.4 million in 2016, and $1.6 million

in 2017.  Tab 118 at 5.

### 3.    Keener held JMJ out to brokers and microcap issuers as willing to buy and sell securities for its own account.

Cognizant of "substantial competition" from other sources of

financing, Keener aggressively advertised his business, and, as a result,

---

[3] Keener and an entity called Cobblestone Trust each purchased 12.5% of
registered broker-dealer Gordon & Company.  Cobblestone's trustee was
Pauline Fife, the spouse of John Fife.  Both Fifes were barred by FINRA and
John is currently a defendant in a Commission enforcement action for
allegedly engaging in his own unregistered dealer business.  *See SEC v. Fife*,
No. 1:20-cv-05227 (N.D. Ill.); https://www.finra.org/sites/default/files/
DisciplinaryAction/p127040.pdf.

obtained a market share exceeding 50%.  Tab 67 at 6, 9.  To do so, Keener utilized proprietary technology (Tab 118 at 6) and "lead generation software" that enabled his employees to track every public company to "identify potential borrowers" (*id.* at 9).

Keener also conducted significant advertising and outreach to find customers.  On JMJ's website and in press releases, JMJ touted its "QuickLoan" convertible-note program as the business's "primary investment vehicle" that "allows small publicly-traded companies ... to access up to $500,000 utilizing a simple two-page promissory note[.]"  *Id.* at 8.  JMJ claimed to have a "portfolio of over 200 companies and many years of operating experience" and also professed to have "placed over $60 million in the last five years, closing transactions with over 70 public companies in 2015 alone."  *Id.* at 8-9.

Keener even held extravagant "all expenses paid" conferences in Las Vegas at which he represented that JMJ had more than $20,000,000 in cash "immediately available" to purchase securities in the form of notes from "small cap emerging companies" and urged the brokers and finders in attendance to refer their leads to JMJ for a commission.  *Id.* at 9-10; Tab 67 at 12-13.  A JMJ press release claimed that JMJ's seminar attendees were "responsible for arranging billions of dollars of investment in hundreds of

10

small and micro-cap companies" and touted JMJ's decision to use an "invitation-only, all expenses paid format" as "underscor[ing] our commitment to providing unsecured investment capital to small cap issuers."  Tab 67 at 13.

> **4.    Keener utilized his QuickLoan program to provide cash-strapped microcap issuers with financing in exchange for discounted shares of the issuers' stocks.**

As noted, JMJ's advertising focused on its QuickLoan program, through which JMJ provided mostly "bankrupt" and "defunct" microcap companies with financing.  Tab 118 at 6-7; S.A. 80.  To administer the program, JMJ purchased hundreds of convertible notes from microcap companies that gave JMJ the option to receive discounted shares of the issuer's stock as repayment.  Tab 118 at 6-8.  Although issuers could prepay the notes in cash, only "10 to 20 percent" did so.  S.A. 80.  This was by design, since "JMJ made ... its money by converting the stock and selling it."  Tab 67-4 at 100.  The convertible notes allowed JMJ to obtain issuer stock at a discount ranging from 10 to 50 percent (Tab 118 at 6); "that's why" JMJ "made money on conversions, because generally speaking, there was that discount" (Tab 67-4 at 109).

Keener thus introduced new issues of securities when he converted the notes and sold the shares on the market.  Tab 118 at 6; S.A. 95 (Keener

Dep. Tr. 121:4-8) ("Q. ... And then you're the person that introduces [the stock] to the market?  A.  Correct.  Q.  And you knew that when you were doing this, right?  A.  Yes.").

Once JMJ received the stock, Keener decided "when and in what volume to sell[.]"  Tab 118 at 7.  "[I]t was important" for Keener to sell "as soon as he could."  Tab 67-4 at 53, 109.  As a "rule of thumb," JMJ would convert a note and sell the stock "[s]ix to nine months" after it entered into the note arrangement.  *Id.* at 52-53; Tab 72-3 at 36.  Keener testified that between 100 to 200 issuers sold JMJ convertible notes as part of the QuickLoan program, and he further estimated that JMJ's profit margin on those notes was between 50 to 100 percent.  Tab 118 at 8.  He also admitted that from January 2015 to January 2018, JMJ converted more than 100 notes from more than 100 different microcap issuers and, as a result, liquidated billions of shares of stock.  *Id.* at 5, 8.  JMJ's net proceeds from the sales of converted stock were at least $7.7 million.  Tab 145 at 23; Tab 147 at 2.

> **5.    Keener's convertible note business drove down the price of issuers' shares, harming the mostly retail investors who purchased the new issues.**

The vast majority (93%) of issuers that entered into convertible note agreements with Keener experienced stock-price declines between Keener's

first and last sales of each issuer's securities. Tab 145 at 16. The median price decline was 92%, and the declines were not temporary given that Keener was converting and selling his new shares in tranches; because latter conversions occurred at decreased prices, the loss of share value was baked in—and harmed the predominantly retail investors who purchased the shares. S.A. 43 ¶¶ 33-34; S.A. 44-46 ¶¶ 39-42.

Keener's transactions in Accelara Innovations, Inc. (ACNV) are illustrative. The day before Keener signed the first note with Accelara, the company's stock price was 30 cents per share. S.A. 41. Keener's conversions and sales of Accelara stock drove the price down to four tenths of a cent per share. *Id.* And Accelara was not an outlier. *See* S.A. 51-55.

To be clear, while typical for Keener, this convertible note arrangement is far from the norm in corporate finance. Often referred to as "'floorless,' 'toxic,' 'death spiral,' and 'ratchet' convertibles," Keener's type of convertible notes included a "conversion ratio" that was "based on fluctuating market prices to determine the number of shares of common stock to be issued on conversion."[4] These instruments are "floorless"

---

[4] *Convertible Securities*, Investor.gov, SEC, https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities?source=uc1401cs0010001 (last visited Aug. 25, 2023).

because they do not convert into a fixed number of shares, but into however many shares are necessary to reach a fixed dollar value. *See id.* Such "market price based convertible security deals" "can lead to dramatic stock price reductions and corresponding negative effects on both the company and its shareholders[.]" *Id.* These types of arrangements inevitably lead to a drop in share price because "the supply of shares available for purchase in the market increases. This, in turn, gives the lender a greater [incentive] to convert more shares, because it can obtain—and then sell—even more shares of the stock[.]" *Crown Bridge Partners, LLC v. Sunstock, Inc.*, No. 18 Civ. 7632 (CM), 2019 WL 2498370, at *1 (S.D.N.Y. June 3, 2019) (internal quotation and citation omitted). As a result, the "stock price can drop to or near a zero-dollar value." *Id.*

### C.    Procedural History

The Commission alleged that, through the above conduct, Keener violated Exchange Act Section 15(a)(1). Tab 1. The parties filed cross-motions for summary judgment, and the district court granted the Commission's motion and denied Keener's motion. Tab 118.

The district court recognized that, under this Court's precedents, "'the centerpiece to [the 'dealer'] definition is the word 'business,' which is defined as 'a commercial enterprise carried on *for profit*, a particular

occupation or employment habitually engaged in for *livelihood or gain*[.]'" *Id.* at 14-15 (alterations in original) (quoting *Big Apple*, 783 F.3d at 809). The court found "that the undisputed material facts demonstrate" that Keener "was 'engaged in the business' of buying and selling securities within the meaning of the term 'dealer' under the Exchange Act." *Id.* at 21. Keener (1) "converted more than 100 [convertible] notes from more than 100 different microcap issuers" and "liquidated billions of shares of common stock"; (2) had three offices; (3) spent at least $1.6 million annually "on employee payroll"; (4) tasked his employees with contacting "hundreds of companies to inquire whether they could sell [him] convertible notes"; (5) "developed proprietary software to find convertible notes"; and (6) "further advertised his interest in buying convertible notes via a website and press releases[.]" *Id.* at 21-22 (first alteration in original). "[F]urther evidence" that Keener acted as a dealer was his acquisition of "newly issued stock directly from microcap issuers at a discount" and his subsequent resale of the stock "into the public market." *Id.* at 24.

The district court entered judgment that:  (1) permanently enjoined Keener from engaging in the regular business of buying and selling securities unless he registered as a dealer and barred him from participating in penny stock offerings for five years; (2) ordered Keener to

disgorge $7,786,639—a figure "representing net profits [Keener] gained as a result of" his actions as an unregistered dealer—plus prejudgment interest; and (3) imposed a civil penalty of $1,030,000.  Tabs 145, 147.[5]

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment in favor of the Commission *de novo*, "view[ing] the evidence and all factual inferences … in the light most favorable to the non-moving party[.]"  *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (internal quotation omitted). The district court's remedies are reviewed for an abuse of discretion.  *See SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (per curiam).

## SUMMARY OF THE ARGUMENT

I.    The district court correctly concluded that Keener acted as an unregistered dealer as a matter of law.  As the court explained, Keener engaged in classic dealer activity by soliciting hundreds of penny stock issuers to, in effect, underwrite the issuance of billions of new shares of stock onto the public markets.  Keener does not contest that he engaged in underwriting activity, nor does he dispute the volume and frequency of his securities transactions or the significance of his extensive advertising

---

[5] Keener does not independently challenge the penny stock bar or the civil penalty.

16

efforts and direct issuer solicitations—all of which cement his status as a dealer.

Rather, Keener argues that the district court's decision should be reversed based on a statutory argument he did not make below:  that the words "own account" in the Exchange Act's dealer definition require a showing that a dealer effectuates customer orders.  That assertion is new—and wrong.  The plain text of the Exchange Act directly refutes Keener's atextual construction.  A "broker" necessarily effects securities transactions "for the account of others"—*i.e.*, customers—while a "dealer" transacts in securities for its "own account."  Moreover, Congress specified that both dealers and non-dealers buy and sell securities for their "own accounts," showing that the phrase is not unique to dealers, and thus cannot silently cabin the dealer definition as Keener asserts.

Keener's constitutional arguments fare no better.  The plain text of the dealer definition was sufficient to put Keener on notice that his conduct required him to register as a dealer, a conclusion that would have been confirmed by even a cursory review of this Court's precedents.  And Keener fails to demonstrate the elements necessary to support the equal protection argument he asserts.

17

II.    The district court acted within its discretion in ordering Keener to disgorge the profits from his violations.  The disgorgement award is consistent with *Liu v. SEC*, 140 S. Ct. 1936 (2020), because the district court explained the direct relationship between Keener's operation of an unregistered business and the profits that business realized and reasonably found that disgorgement would benefit investors who purchased shares from Keener and were victims of his unregistered dealer activity.

The district court also acted within its discretion in enjoining Keener from engaging in dealer activity unless he registers as a dealer.  Keener's argument that the injunction merely commands him to obey the law ignores that the district court expressly tailored the injunction to put Keener on notice that, absent registration, he is not to engage in the regular business of buying and selling securities for his own account.

**ARGUMENT**

## I.    Keener is liable for acting as an unregistered dealer.

The Exchange Act defines a dealer as "any person engaged in the business of buying and selling securities ... for such person's own account through a broker or otherwise[,]" with an express exception for those who buy and sell securities for their own account "but not as a part of a regular business."  15 U.S.C. §§ 78c(a)(5)(A)-(B).  Congress defined "dealer"

18

broadly "to encompass a wide range of activities involving investors and securities markets." *Registration Requirements for Foreign Broker-Dealers*, 54 Fed. Reg. 30,013, 30,015 (July 18, 1989). Assessing whether a person's activities meet that definition depends on "all of the relevant facts and circumstances." *Definition of Terms in and Specific Exemptions for Banks*, 67 Fed. Reg. 67,496, 67,499 (Nov. 5, 2002); S.A. 162.

Keener does not dispute that he engaged in voluminous and recurrent acquisitions and resales of discounted shares of securities from issuers that were located by employees he hired to identify microcap companies amenable to selling securities to JMJ. Nor does he contest that he engaged in an extensive advertising campaign to increase the magnitude of JMJ's convertible note business. Those undisputed facts conclusively demonstrate as a matter of law that he was "in the business of buying and selling securities" for his "own account."

## A. Keener's conduct falls squarely within the "dealer" definition.

### 1. Underwriting activity is "dealer" activity.

The Exchange Act's dealer definition is grounded in the historical understanding that a dealer is one who is engaged in a commercial endeavor to habitually buy a product to resell it for profit from the spread versus capital appreciation. When the product is a new issue of securities,

this underwriting activity falls squarely within the realm of a securities dealer.

This Court has held that the "centerpiece" of the dealer definition "is the word 'business,' which is defined as '[a] commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood* or *gain*[.]" *Big Apple*, 783 F.3d at 809 (first alteration in original) (quoting Black's Law Dictionary 239 (10th ed. 2009)). That definition is virtually unchanged from how the term "business" was understood when the Exchange Act was enacted. *See Hazen v. Nat'l Rifle Ass'n of Am.*, 101 F.2d 432, 437 (D.C. Cir. 1938) ("Webster's Dictionary defines 'business' as 'Any particular occupation or employment habitually engaged in, especially for livelihood or gain.'").

The Act's definition of a "dealer" likewise comports with historical usage. "A dealer, in the popular, and therefore in the statutory, sense of the word, is not one who buys to keep, or makes to sell, but one who buys to sell again." *Norris Bros.*, 27 Pa. at 495; *accord* Black's Law Dictionary 521 (3d ed. 1933); John Bouvier, Bouvier's Law Dictionary and Concise Encyclopedia 775 (7th ed. 1914). It matters not whether the dealer sells cars or securities—a dealer is one who buys the product to sell it for profit and often acts as a conduit for distribution of a company's product-line.

20

In the securities business, the process of bringing a new issue of securities to market, *i.e.*, "acquiring shares" directly from issuers "for the purpose of reselling them" (*Big Apple*, 783 F.3d at 807), is known as underwriting activity. The Commission has consistently identified underwriting as a quintessential dealer activity. *E.g.*, *Gordon Wesley Sodorff, Jr.*, Exchange Act Release No. 31,134, 52 SEC Docket 1246, 1992 WL 224082, at \*5 (Sept. 2, 1992) ("Unlike an investor or trader, Sodorff's profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid."); *Definition of Terms in and Specific Exemptions for Banks*, 68 Fed. Reg. 8686, 8688 (Feb. 24, 2003) ("2003 Release") ("[D]ealers normally … participate in the sale or distribution of new issues …."); *Adoption of Rule 15Ba2-1, Related Form MSD, Rule 15Ba2-2 and Temporary Rule 15Ba2-3(T)*, Exchange Act Release No. 11,742, 8 SEC Docket 82, 1975 WL 163406, at \*5 (Oct. 15, 1975) (listing "underwriting" as an activity that may trigger registration requirements for "municipal securities dealers"); S.A. 429-59 (Brief for the SEC, Amicus Curiae, *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968) (No. 24500)) (underwriting issues of church bonds is dealer activity).

Courts, including the district court in this case, agree. *E.g.*, Tab 118 at 24 ("As further evidence that [Keener] meets the statutory 'dealer' definition, [Keener] acquired newly issued stock directly from microcap issuers at a discount, ranging between 10% to 50% depending on the terms of the convertible notes, and then resold the stock into the public market."); *SEC v. Fierro*, No. 20-02104 (GC), 2023 WL 4249011, at *6 (D.N.J. June 29, 2023) ("Defendants acquired newly issued stock directly from microcap issuers, at significant discounts based on the terms of the convertible notes, and then resold that stock to the public—further evidencing Defendants' status as dealers, not traders."); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853, 859 (N.D. Ill. 2019) ("[T]he Court finds it particularly significant that ... like an underwriter, River North:  (1) purchased stocks at a discounted price directly from numerous issuers ... and (2) turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price.  This arrangement has been recognized by the SEC as characteristic of a 'dealer.'").

And Congress has expressed agreement that bringing new issues to market is a dealer trait.  *E.g.*, S. Rep. No. 99-426, at 19 & n.36 (1986) (defining "government securities dealer" with reference to the "dealer"

definition as including one who "act[s] as an underwriter for issuers of government securities").

### 2.  *Eastside Church* and *Big Apple* control.

This Court's precedents confirm that engaging in the business of acquiring new issues of securities for resale is "dealer" activity.

a.  In *Eastside Church*, this Court voided the defendant's purchase of certain church bonds because the defendant's conduct "demand[ed] a finding that [it]" "engaged in the business of buying and selling securities for [its] own account" without registering under the Exchange Act.  391 F.2d at 360-62.  Specifically, the Court concluded that the defendant was a "dealer within the meaning of the Act" because it "purchased many church bonds ... for its own account as a part of its regular business and sold some of them" after acquiring the bonds "at a discount."  *Id.*  And this was so even though the defendant did not sell *all* of the bonds it had acquired for its own account.  *Id.* at 361.  As this Court emphasized, the defendant's registration violation cut to the core of the Exchange Act's regulation of brokers and dealers:

> The requirement that brokers and dealers register is of the utmost importance in effecting the purposes of the Act.  It is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records.

*Id.* at 362.

Keener erroneously asserts that the Commission is "[f]lout[ing] [p]recedent" (Br. 36, 38) because *Eastside Church* "concerned customer-order facilitation." The Court rejected—as "not applicable under the facts before [it]"—the plaintiff churches' contention that the defendant violated a Commission rule that would have required the defendant to send the churches written confirmations if they were the defendant's customers. 391 F.2d at 363. As the Commission's *amicus* brief in *Eastside Church* (S.A. 429-59) explained, that rule, which required "that a confirmation be sent by a broker or dealer to its 'customer[,]'" was inapplicable because the churches were *not* the defendant's *customers*: "Since [the churches] dealt with [the defendant] through a broker-dealer, … they were *not customers* of [the defendant] …." S.A. 457 (emphasis added).

b.  In *Big Apple*, the Court held that the defendants acted as unregistered dealers and engaged in unregistered securities transactions when they acquired discounted shares of an issuer's stock in exchange for promoting the issuer's business and then sold those shares (and additional discounted shares they purchased from the issuer) on the open market. 783 F.3d at 791, 806-10.

The Court rejected the defendants' argument that their transactions were exempt from Securities Act Section 5 registration because they were

24

not underwriters or dealers.[6]  The Court reasoned that the defendants engaged in underwriting activity because they did not acquire securities with "an investment purpose" but "for the purpose of reselling them … with a view to distribution."  *Id.* at 807-08.  And the Court concluded that engaging in this underwriting activity also rendered the defendants "dealers" as a matter of law.  *Id.* at 809-10.  The Court held that "it [wa]s indisputable" that defendants "were 'in the business of … buying [and] selling'" securities given that "the defendants' *entire* business model was predicated on the purchase and sale of securities."  *Id.* (second and third alterations in original) (quoting 15 U.S.C. § 77b(a)(12)); *id.* at 809 (The defendants "depended on acquiring client stock and selling that stock to support operations and earn a profit.").  The defendants' purchase of "stocks at deep discounts pursuant to [a] contractual agreement" that they then "sold … for profit" thus provided "further evidence of their dealer status[.]"  *Id.* at 810.

Keener and *amici* note (Br. 38-39; MFA Amicus Br. 14-15; AIMA Amicus Br. 17, 19) that *Big Apple* involved the Securities Act's dealer

---

[6] Securities Act Section 4(a)(1) exempts from registration "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).

definition instead of the Exchange Act's definition.  This Court addressed

that precise issue, however, and explained in *Big Apple* that the two

definitions are "very similar" (783 F.3d at 809 & n.11) and that both focus

on whether one is engaged "in the business of" buying and selling securities

for one's own account (*id*. at 809).  For that reason, Keener's argument (Br.

38) that *Big Apple* "interpreted a *different* word ('business')" is wrong.

This Court in *Big Apple* observed that "the centerpiece to" the Securities

Act's dealer definition "is the word 'business[]'" (783 F.3d at 809)—a

conclusion that applies with equal force here.  *See* 15 U.S.C. § 78c(a)(5)(A)

("The term 'dealer' means any person engaged in the business of buying

and selling securities ...."); *Fierro*, 2023 WL 4249011, at *5 & n.6

("Importantly, the definitions of 'dealer' under the Securities Act and under

the Exchange Act both focus on whether the person is 'in the business' of

securities transactions." (citations omitted)).

     The minor differences between the two definitions that Keener and

*amici* identify do not change this conclusion.  In analogous circumstances,

this Court has held that the Securities Act's and the Exchange Act's

respective definitions of "purchase," "sale" and "security" (15 U.S.C. §§

77b(a)(1), (3); 78c(a)(10), (13), (14)) are "functionally equivalent" despite

"slight differences in wording[.]"  *Nat'l Bank of Com. of Dallas v. All Am.*

26

*Assurance Co.*, 583 F.2d 1295, 1298 (5th Cir. 1978); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 & n.1 (1985) (The Supreme Court has "repeatedly ruled" that the definition of "security" under the Securities Act and Exchange Act will be treated the same despite their minor differences.).

Keener refers to *Big Apple*'s holding regarding the Exchange Act's dealer definition (Br. 38) as *dicta* "on an unbriefed, abandoned issue." But this Court held both that the *Big Apple* defendants had failed to contest "their § 15(a) violations of the Exchange Act" *and* that such an argument would "fail[] as a matter of law for the same reasons as it fails under § 5" of the Securities Act—thus making clear that the Court's dealer holding applied to the definitions in both Acts. 783 F.3d at 806, 809 & n.11. Furthermore, in *Big Apple*, "the district court analyzed the definition of dealer as it related to the SEC's § 15(a) claims and generally applied that analysis to the § 5 exception [under the Securities Act]*." Id.* at 809 & n.11. So it was necessary, and not *dicta*, for this Court to first conclude that the two definitions "are very similar" to affirm the district court's holding that the defendants were dealers under the Securities Act. *Id.*

c. Under *Eastside Church* and *Big Apple*, Keener acted as a dealer. He was in the business of buying and selling securities for his own account

27

because he "acquired newly issued stock directly from microcap issuers at a discount ... and then resold the stock into the public market[,]" liquidating "billions of shares of common stock" in the process. Tab 118 at 21-22, 24. This discount was central to JMJ's business; it was "why" JMJ "made money" when it converted notes into shares of stock, and why JMJ preferred that issuers repay loans with stock instead of cash. Tab 67-4 at 100, 109. And Keener was candid that he was not seeking capital appreciation; instead, "it was important" for him to sell "as soon as he could." *Id.* at 53, 109.

The prodigious number of securities Keener bought and sold bolsters that conclusion. *See* Tab 118 at 21-22 ("[Keener] admits that he converted more than 100 [convertible] notes from more than 100 different microcap issuers and liquidated billions of shares of common stock during the Relevant Period." (internal quotations omitted)). Just as in *Big Apple*, Keener's "*entire* business model was predicated on the purchase and sale of securities." *Id.* at 21; *Big Apple*, 783 F.3d at 809; *see Fierro*, 2023 WL 4249011, at *6 ("Defendants ... sold approximately 5.7 billion shares of stock from converted notes. Defendants also admit that those sales resulted in ... approximately $2.3 million in profits. These undisputed share volumes, proceeds, and profits are strong indicators that Defendants

28

engaged in the 'business' of buying and selling securities." (footnote and citations omitted)); *SEC v. Carebourn Cap., L.P.*, No. 21-cv-2114, 2022 WL 1639515, at *4 (D. Minn. May 24, 2022) ("A high volume of buying and selling securities can be indicative of engaging in a regular business ...."); *River N.*, 415 F. Supp. 3d at 858 ("River North bought and sold over 10 billion shares of stock from more than 62 microcap issuers, and then quickly resold them to the investing public ....").

### B. Keener held out JMJ as being in the business of buying and selling securities for its own account.

Additional undisputed facts buttress the conclusion that Keener was a dealer—namely, that Keener "'[held] himself out as being willing to buy and sell a particular security on a continuous basis.'" Tab 118 at 25 (alterations in original) (quoting SEC Staff, Division of Trading and Markets, *Guide to Broker-Dealer Registration* (Apr. 2008) ("Staff Guide") § II.B, https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-dealer-registration); *see also* Louis Loss, SECURITIES REGULATION 722 (1st ed. 1951) ("A dealer ordinarily holds himself out as one engaged in buying and selling securities at a regular place of business."). The *amicus* briefs submitted in support of Keener's position acknowledge that "advertis[ing] and solicit[ing] buyers and sellers, *or issuers*" is indicative of dealer activity. AIMA Amicus Br. 10 (emphasis

29

added).  Indeed, the MFA Amicus Br. (at 19-20) characterizes "Big Apple's efforts to advertise itself as a source of capital to issuers" as a "central feature[] of the *Big Apple* decision."  It was also a central feature here.

JMJ had "a regular place of business" (three, in fact) and spent millions of dollars to compensate "as many as 25 employees[,]" a number of whom were tasked with "contact[ing] ... companies to inquire whether they could sell [Keener] convertible notes[.]"  Tab 118 at 5, 22.  JMJ's extensive outreach efforts were further embodied in the company's website, its Twitter account, the proprietary software Keener developed "to find convertible notes for sale," and the "all expenses paid" Las Vegas industry conferences and seminars Keener sponsored to find "issuers that were looking to sell convertible notes."  Tab 67 at 13; Tab 118 at 5, 8-9, 22.  The website and accompanying press releases were unabashed both in conveying Keener's "interest in purchasing convertible notes[,]" and in highlighting that JMJ had engaged in transactions in a five-year period that totaled $60 million and involved 70 different companies.  Tab 118 at 8; *see also id.* at 8-9 (press release in which Keener claimed that JMJ had a "portfolio of over 200 companies and many years of operating experience").

### C.    Keener was not a "trader."

Keener argues that the "trader exception" created by 15 U.S.C. § 78c(a)(5)(B) "does not exist" and has no "textual basis" because that provision does not include the word "trading."  Br. 41-45 (internal quotation omitted).  He misses the point.  In reading the dealer definition and its adjoining subsection together as part of a "harmonious whole" (Br. 32 (internal quotation omitted)), Congress intended for the dealer inquiry to center on a single question:  whether someone is in the "business" of buying and selling securities for such person's own account (the definition), or whether that person engages in such transactions "but not as a part of a regular business" (the exception).  15 U.S.C. §§ 78c(a)(5)(A), (B).  Courts, scholars, the Commission (and Keener below) refer to this carve-out as the "trader" exception.  *See, e.g.*, *Fierro*, 2023 WL 4249011, at *5, *7; *River N.*, 415 F. Supp. 3d at 858; 2003 Release, 68 Fed. Reg. at 8688.

As Professor Louis Loss explained, Congress included the exception "to be on the safe side," so as not to sweep in the ordinary—albeit frequent —investor:  "One aspect of the [statute's] 'business' concept is the matter of drawing the line between a 'dealer' and a trader—an ordinary investor who buys and sells for his own account with some frequency."  SECURITIES

31

REGULATION 722.[7]  Keener's attempt to recast this well-established understanding of Section 78c(a)(5)(B) as relevant only to a broker who is "compelled" to execute against its "own account" for error correction (Br. 43-44 (internal quotations omitted)) is unsupported by any authority. Moreover, Keener's revisionist interpretation would inexplicably read out of the statute the only limitation that Congress included and the one that he invoked repeatedly below.

The district court was correct to reject Keener's efforts to avail himself of the exception because "[u]nlike an investor or trader," Keener's "profits did not result from appreciation in the value of the securities" (*Sodorff*, 1992 WL 224082, at *5), but rather from the difference between the market prices for those securities and the discounted prices he paid to acquire them—prices that were unavailable to ordinary investors.  So Keener did not, like a trader, take on the risks attendant with vacillations in stock price.

---

[7] Keener curiously describes Professor Loss only as "a former Commission staffer" (Br. 45).  Professor Loss is considered the "father of securities law[,]" (Stephen Labaton, *Profile*:  *Louis Loss*; *For the Father of Securities Law, Yet Another Milestone*, N.Y. Times (Sept. 26, 1993)), and "[h]is volume on *Securities Regulation* is so comprehensive and so thorough that it is virtually impossible for one to write extensively on any portion of this subject without impinging upon some area of his monumental work" (Alexander Hamilton Frey, *Federal Regulation of the Over-the-Counter Securities Market*, 106 U. PA. L. REV. 1, 1 & n.1 (1957)).

Rather, his activities were profoundly "similar to those of a dealer or jobber in merchandise[,]" who "relies for his compensation upon a favorable difference or spread between the price at which he buys and the amount for which he sells." Tab 71-2 at XIV. Moreover, as the Commission has recognized, "dealers normally ... have a regular turnover of inventory (or participate in the sale or distribution of new issues)" while an ordinary investor does not. 2003 Release, 68 Fed. Reg. at 8688. That distinction again places Keener's activities firmly on the dealer side of the equation.

## D. Keener's argument that the words "own account" limit the dealer definition to persons who effectuate customer orders is wrong.

Keener's argument in this Court that the words "own account" in the dealer definition (15 U.S.C. § 78c(a)(5)(A)) "can *only* be referring to the manner of effectuating customer orders" (Br. 24) should be rejected both because it was not raised below and because it has no statutory basis.

### 1. Keener forfeited the argument he presses on appeal, because he failed to raise it below and because his new argument is irreconcilable with positions he did raise.

Keener claims that the district court ruled against him "[w]ithout even mentioning [his] statutory argument[.]" Br. 18; Br. 2 ("The ruling below, which discusses none of this, cannot stand."). There is a good

reason for that.  Not only did Keener fail to raise this argument before the district court, it also flies in the face of his position below.

Keener conceded in his motion to dismiss that "the definition of dealer in the Exchange Act appears to broadly cover anyone in the business of buying and selling securities[.]"  S.A. 15; S.A. 9 (acknowledging "the broad statutory language upon which the SEC relies").  In another pending SEC enforcement case that raises the same legal issue regarding the scope of the dealer definition, *Fife*, the defendant there highlighted his disagreement with Keener's district court argument, arguing that "the defendants in [*Keener*] had wrongly *conceded* that the text of the Exchange Act appears to broadly cover anyone in the business of buying and selling securities."  Defendants' Brief in Support of Their Motion to Dismiss at 19, *Fife*, No. 1:20-cv-05227 (Dec. 7, 2020), Dkt. 23 (internal quotation omitted).  Thus, the district court "had no occasion to decide—and did not decide" the distinct "customer order effectuation" theory that Fife advanced and that Keener proffers for the first time in this appeal.  *Id.*

Then, at the summary judgment stage, Keener made a limited statutory argument that, as the Commission's brief does here, focused on the word "business."  *See* Tab 90 at 7.  Keener argued that the Commission had limited the statutory dealer definition through its (and its staff's)

statements. *See id*. at 9-22; S.A. 157-74, 388-98. This is why the district court concluded that "[t]he crux of the parties' dispute is whether the Court should apply the statutory language of the Exchange Act or the factors set forth in the [Staff] Guide in determining whether [Keener] is a 'dealer' subject to the Exchange Act's provisions." Tab 118 at 18.

On appeal,[8] Keener has abandoned the positions he took in district court in favor of his new, forfeited argument that the dealer definition's reference to "own account" means that statutory dealers are limited to those who effectuate customer orders. Although Keener argued below that dealers must have customers, he did not, as he does on appeal, claim that this limitation springs from the statutory phrase "own account." Thus, when Keener discussed those words, it was to describe his *own activity* while simultaneously maintaining that he was a trader and *not* a dealer. *See* S.A. 150 ("[T]he Exchange Act contains a trader exception that specifically excludes persons who trade for themselves ...."); S.A. 151 ("[N]o currently registered dealers solely trade for their own account ...."); S.A. 157-58 ("The definition contains an important exception. Specifically, traders are excluded from the dealer definition. Traders buy or sell

---

[8] Keener has now retained Fife's counsel on appeal in addition to his district court counsel.

securities for their own account, but not as part of a regular business ...."
(internal quotation omitted)); S.A. 398 ("[Keener] ... trade[s] solely for [his]
own account without providing any services to customers.").  Completing
the reversal of his position, Keener now claims (Br. 41, 45) that the trader
exception he repeatedly invoked in district court "does not exist," and he
bemoans the resulting lack of a limiting principle.  Indeed, Keener's
position on appeal is also at odds with at least one *amicus* brief submitted
in support of his position.  *See* AIMA Amicus Br. 16 ("[E]ntities engaged in
investment or speculation for their own account are not 'dealers' under the
Exchange Act.").

Keener's attempt to escape the consequences of his contrary district
court legal positions and factual averments is unavailing.  By choosing to
advance his "entirely new theory on appeal" without first presenting it to
the district court, Keener has forfeited the argument.  *Reider v. Philip
Morris USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015) (internal quotation
omitted).  Even aside from that procedural defect, Keener's arguments and
concessions below are binding (*see Dos Santos v. U.S. Att'y Gen.*, 982 F.3d
1315, 1319 (11th Cir. 2020)), and conclusively refute the foundation for
Keener's forfeited argument that that the dealer definition's "own account"
language can *only* mean "effectuating transactions for others."

36

### 2. Keener's interpretation is unsupported by the statute.

Even had Keener preserved his statutory argument, it finds no support in the text of the Exchange Act. Keener relies on the *noscitur a sociis* canon in claiming that the terms "broker" and "dealer" have "a related meaning" that includes effectuating customer trades. Br. 28-35. But that particular interpretive tool does not apply, because the Exchange Act defines broker and dealer separately. *See United States v. Caniff*, 955 F.3d 1183, 1191 (11th Cir. 2020) (per curiam). And even assuming that the terms are related (and we are not arguing that brokers and dealers are unrelated), any related meaning cannot contradict the plain words of the statute, which nowhere indicate that a dealer must effectuate customer orders.

Keener's assertion that brokers effectuate customer orders makes sense, as Congress defined a broker as someone who is "engaged in the business of *effecting* transactions in securities for the account of *others*." 15 U.S.C. § 78c(a)(4)(A) (emphases added). But the terms "effecting" and "others" are absent from the dealer definition. "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning …." *Bittner v. United States*, 143 S. Ct. 713, 720 (2023).

37

Congress could have chosen to define a dealer as a person engaged in the business of "effecting transactions in securities for others for such person's own account"; such language would lend credence to Keener's argument that a dealer simply takes the "opposite side" of a transaction across from a broker.  Br. 1.  But Congress did not do so.  *See Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1309 (11th Cir. 2021) ("And we are not allowed to add or subtract words from a statute; we cannot rewrite it." (internal quotation omitted)).

Keener's position likewise cannot be squared with the trader exception that adjoins the statutory dealer definition.  Courts "presume that identical words used in different parts of the same act are intended to have the same meaning" (*United States v. Garcon*, 54 F.4th 1274, 1278 (11th Cir. 2022) (*en banc*) (internal quotation omitted)), and the trader exception provides that the "term 'dealer' does *not* include a person that buys or sells securities ... for such person's *own account ... but not as a part of a regular business*" (15 U.S.C. § 78c(a)(5)(B) (emphases added)).  If, as Keener argues, buying or selling securities "for such person's own account" necessarily denotes someone buying or selling on behalf a "customer," that person, by definition, cannot be the ordinary, non-business investor that

the trader exception was intended to exclude from regulation as a dealer: ordinary investors do not have customers.

The words "own account" as used in the Exchange Act have a different purpose than indicating persons who "effectuate customer orders." "When someone acts on one's own account, he or she acts at one's own risk." *SEC v. Murphy*, 50 F.4th 832, 843 (9th Cir. 2022) (internal quotation omitted); *see also Levine v. SEC*, 407 F.3d 178, 183-84 (3d Cir. 2005) (holding that a floor broker on a national securities exchange trades "for its own account" by sharing in the economic risk of the trade). Acting at one's own risk is the polar opposite of effectuating transactions for others.

*Levine* confirms the error in Keener's new position. Exchange Act Section 11 prohibits an exchange member from "effect[ing] any transaction on such exchange for its *own account*[.]" 15 U.S.C. § 78k(a)(1) (emphasis added). If, as Keener argues, the words "own account" necessarily denotes trading on behalf of customers, Section 11 would prohibit exchange members from engaging in transactions on behalf of their customers even though such trading is exactly what a floor broker (like the petitioner in *Levine*) existed to do. Levine was found to have violated Section 11 not because he had customers, but because he traded in an account in which he

39

shared the economic risk with his customer.  407 F.3d at 183-86.  As the court concluded: "When a broker shares in the profits and losses of an account, it effectively becomes in part his or her account, thus bringing the broker within the ambit of § 11(a)."  *Id.* at 186.  That conclusion—in fact, Section 11 itself—would make no sense under Keener's newly-minted interpretation of the words "own account."

Finally, although a dealer is not required to have customers under the Exchange Act definition, the issuers whose securities Keener introduced to the market were his "customers" under any understanding of that term. Keener provided the issuers with financing in exchange for discounted shares of stock.  *See* S.A. 213 (Oldfield Dep. Tr. 118:2-3 ("In the convertible note business, I believe Mr. Keener had some clients ...."));  Br. 24 ("A dealer ... buys from a client ...." (internal quotation omitted));  AIMA Amicus Br. 10 (acknowledging that "issuers ... may be a dealer's customer[s]").  Keener even had "conversion notice[s]" sent to his "client[s]" to confirm his conversion of the notes to shares of the issuers' stock.  Tab 67-4 at 39.

### 3.    Keener's theory is ahistorical.

Purportedly invoking (Br. 30-31) the "legal backdrop" and the "common law," Keener cobbles together a number of different historical

sources. But none supports the central premise of his argument—that the words "own account" require a dealer to have customers. Keener cites not a single case, treatise, or Commission statement that has interpreted "own account" in the dealer definition in the manner he suggests.

Keener contends (Br. 22-23 (internal quotation omitted)) that the phrase "own account" was "obviously transplanted" from treatises that used the phrase "own account" to refer to effectuation of customer orders. He relies heavily on a 1933 treatise authored by Charles H. Meyer (Br. 22-25) that describes a dealer as a "person ... engaging in the business of buying and selling securities for his own account as principal" (Tab 71-3 at 32-33). But, as shown, this simply confirms that a dealer acts at his or her own risk. Indeed, Meyer's further description of a dealer as someone who buys "securities for his own account with a view of disposing of them elsewhere at a profit" (*id.* at 33) precisely captures Keener's business: Keener acquired securities from issuers with "a view of disposing them" on the public markets "at a profit."

If there were any doubt that Meyer did not use the term "own account" in the manner Keener suggests, Meyer himself extinguished it in discussing the newly enacted Exchange Act in 1934. As if anticipating this very interpretive question, Meyer asks "whether a trader who has no

41

customers but merely trades for his own account through a broker is a 'dealer' under the Act."  Meyer, *supra* pp. 3-4 at 34.  He concluded that such a person would be a dealer if he were in the regular business of trading for his own account:  "A fair interpretation of the Act would seem to indicate that if the operations of a trader are sufficiently extensive to be regarded as a regular business[,] he would be considered a 'dealer.'"  *Id.*

Similarly, the 1936 Commission report Keener relies on (Br. 26) refers to a dealer as someone who "buys securities from his customer with a view to disposing of them elsewhere."  Tab 71-2 at XIV.  But the report also explains that a dealer "is at complete liberty to deal for his own account with persons other than his customers" and describes a dealer's activities as profoundly "similar to those of a dealer or jobber in merchandise[,]" who "relies for his compensation upon a favorable difference or spread between the price at which he buys and the amount for which he sells."  *Id.* at XIV-XV.

Those descriptions of dealer activity do not limit the term "dealer" to one who has "customers."  By invoking the common understanding of a dealer as a "jobber in merchandise" who profits on the "spread between the price at which he buys and the amount for which he sells" (*id.*), the report confirms that, as the dealer definition provides, a dealer is simply one who

42

is in the business of buying to sell.  (And as shown, he does so for his "own account"—*i.e.* at his own risk.).  The dealer may, or may not, have customers—a fact all the more apparent given the text's allowance that a dealer may engage in securities transactions "through a broker or otherwise."  15 U.S.C. § 78c(a)(5)(A).  The 1936 report thus describes Keener to a T.

For the same reasons, Keener's argument is not supported by cases he cites that simply rely on the same Meyer treatise he invokes[9] or arose in a dissimilar tax context involving a dealer definition that, unlike the Exchange Act's definition, expressly provided that dealers are "regularly engaged in the purchase of securities and their resale to customers." *Donander Co. v. Comm'r*, 29 B.T.A. 312, 313-15 (1933); *Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950, 952 (2d Cir. 1930) (same).

### 4.    Keener's other statutory arguments are unpersuasive.

Even without the erroneous premise that the phrase "own account" limits dealers to those who effectuate customer orders, Keener's remaining statutory arguments fail.  For example, Keener argues (Br. 29) that

---

[9] *See Johnson v. Winslow*, 279 N.Y.S. 147, 156 (N.Y. Sup. Ct. 1935); *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (Ill. App. Ct. 1935).

"Congress had a specific business in mind when it" referred to "*the* business of buying and selling securities" in the dealer definition (15 U.S.C. § 78c(a)(5)(A) (emphasis added)).  Keener attaches outsized importance to the word "the."  The business that Congress had "in mind" (Br. 29) is self-evident; it is "the business of buying and selling securities … for [one's] own account[.]"  15 U.S.C. § 78c(a)(5)(A).  Congress abided by the same convention in neighboring subsections.  *See id.* § 78c(a)(22)(A) ("The term 'securities information processor' means any person engaged in the business of (i) collecting, processing, or preparing for distribution or publication … information …."); *id.* § 78c(a)(61)(A) ("The term 'credit rating agency' means any person … engaged in the business of issuing credit ratings ….").

Similarly, Keener claims that the word "and" in the dealer statute ("buying *and* selling securities" (15 U.S.C. § 78c(a)(5)(A) (emphasis added))), "implies a certain temporal proximity" (Br. 53 (internal quotation omitted)).  But he never explains what that proximity is, or why "a six-month gap" (Br. 55) between his note purchases and subsequent conversions and sales is too remote to constitute "buying *and* selling" activity.  15 U.S.C. § 78c(a)(5)(A) (emphasis added).  He treats as authoritative two state court decisions that predated the Exchange Act for

44

the proposition that dealers must buy and sell securities in the "same condition" (Br. 53-54 (emphasis and internal quotation omitted)); but those cases "reviewed their own states' laws applicable to 'dealers' of certain goods[,]" like shrimp and meat, and did not "involve[] an interpretation or application of the 'dealer' definition from the Exchange Act" (*Carebourn*, 2022 WL 1639515, at *6).

### 5. Keener's claim that the Commission is taking an inconsistent position in this case is without merit.

Keener erroneously asserts (Br. 47-53) that the Commission "calls into question decades of regulatory activity" because it has developed what he claims is a new theory of what makes one a dealer. To the contrary, when Keener's "customer effectuation" argument was presented to the Commission, the Commission unequivocally rejected it: "Although commenters have expressed the view that a person that engages in security-based swap activities on an organized market should not be deemed to be a dealer unless it engages in those activities with customers, we do not agree." *Further Definition of "Swap Dealer"*, 77 Fed. Reg. 30,596, 30,619 & n.282 (May 23, 2012) (footnote omitted).

Keener's hyperbolic conjecture (Br. 40) that the Commission's position would require every "hedge fund, family office, and the like" to register as a dealer has no basis in fact. Whether any of those entities

would be required to register would depend on facts relevant to whether

they are in the regular business of buying and selling securities for their

own accounts—the same assessment this Court undertook in *Eastside*

*Church* and *Big Apple*—and Keener furnishes no evidence establishing that

any or all of those entities are dealers under that analysis, let alone that

they are categorically so.

In any event, there is no merit to Keener's argument (Br. 27) that,

although investment companies and advisers buy and sell securities, "it

didn't occur to anybody that these firms might be 'dealers.'" Regarding

investment companies, the source Keener cites only addresses one specific

practice, noting that under Section 15 of the Exchange Act, "brokers and

dealers only" are "proscribed" from manipulating securities. 2 H.R. Doc.

No. 76-279, at 1523 & n.434 (1939). And the fact that investment advisers

might be dealers should be surprising to no one since "[m]any" advisers are

already dually registered. *Certain Broker-Dealers Deemed Not To Be*

*Investment Advisers*, 70 Fed. Reg. 2716, 2716 (proposed Jan. 14, 2005).

Indeed, one of the House of Representatives documents Keener relies on

acknowledges that, when the Investment Advisers Act was enacted, the

dealer registration provision of the Exchange Act covered "some of the

46

activities of investment counselors." H.R. Doc. No. 76-477, at 31 & n.53 (1939).

Keener likewise misses the mark when he asserts (Br. 48-49) that the Commission would never have adopted a rule to require hedge fund registration if it could have "force[d] hedge funds" to register with the Commission as dealers. The rule he identifies focused only on registration of hedge fund advisers "under the Investment Advisers Act[,]" not the Exchange Act. *Goldstein v. SEC*, 451 F.3d 873, 874 (D.C. Cir. 2006). And in any event, in adopting the rule, the Commission acknowledged that some hedge fund advisers were registered broker-dealers. *Registration Under the Advisers Act of Certain Hedge Fund Advisers*, 69 Fed. Reg. 72,054, 72,067 (Dec. 10, 2004).

Keener also relies (Br. 51) on a no-action letter issued by Commission staff. *See Acqua Wellington N. Am. Equities Fund Ltd.*, SEC Staff No-Action Letter, 2001 WL 1230266 (Oct. 11, 2001). No-action letters are "staff positions regarding enforcement action only and do not purport to express any legal conclusions regarding the applicability of the statutory provisions of the federal securities laws." *Davenport Mgmt., Inc.*, SEC Staff No-Action Letter, 1993 WL 120436, at *13 (Apr. 13, 1993). And the views expressed in the *Acqua Wellington* letter actually undermine Keener's argument—the

47

staff letter notes that whether an individual "acts as an underwriter" or "advertises" by, among other things, "hold[ing] conferences," is relevant to "analyzing whether a person meets the definition of a dealer[.]" 2001 WL 1230266, at *3-4.

Keener similarly mischaracterizes the Commission's decision in *Sodorff*, claiming (Br. 36) that in that case "the Commission unanimously held a dealer effectuates customer orders." The word "customer" does not appear in the section of the opinion analyzing whether Sodorff was a dealer. 1992 WL 224082, at *4-5. And just like Sodorff, Keener actively "solicit[ed] customers" (Br. 37), via his website and the conferences he organized. The remaining decisions that Keener cites (Br. 37-38) likewise center their respective dealer analyses on the business inquiry, not the presence of customers. *See SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) ("Ridenour's level of activity during this period made him more than an active investor."); *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("The record clearly reflects that Roth conducted a private securities business ….").

Finally, Keener errs in asserting (Br. 50-52 (internal quotation omitted)) that there is an incongruity in the Commission's position because convertible-note-lending is "not inherently illegal." Keener mistakenly

48

focuses on whether, in isolation, a particular transaction is legal, failing to recognize that, in the aggregate, a number of otherwise legal transactions trigger the dealer registration requirement.  *See, e.g.*, *SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 13 (D.D.C. 1998) (A person who engages in dealer conduct "on a single, isolated basis" is not doing so as part of a "regular" business and is thus not required to register. (internal quotation omitted)).  What *would* be odd is if the "dealer" definition were triggered only by illegal securities transactions.

To be clear, the Commission is not claiming that convertible-note dealing—even the toxic kind—is illegal.  Rather, as the district court correctly concluded, Keener engaged in this activity with sufficient regularity to render him in the business of buying and selling securities for his own account.  For that reason, the Commission staff's awareness of isolated convertible-note transactions that Keener engaged in (*see* Br. 52-53) is irrelevant.

### E.    Keener's constitutional arguments are unfounded.

#### 1.    The district court correctly rejected Keener's "fair notice" and "vagueness" challenges.

Keener has no answer for the district court's conclusion that he "had notice that his conduct could be unlawful based upon the express language of the Exchange Act[] [and] decisions from this circuit[.]"  Tab 118 at 28

(internal quotation omitted).  Because the statute "sets a reasonably clear standard by which a person can determine whether or not his conduct [wa]s lawful" (*Carebourn*, 2022 WL 1639515, at *7), Keener errs in arguing (Br. 45-47, 56-60) that the district court's judgment violates his "due process rights."  *See Fierro*, 2023 WL 4249011, at *8 ("[T]he Court doubts the viability of any argument that ... the dealer definition under Section 3(a)(5) contains no standard of conduct or rule at all for fair notice purposes." (internal quotation omitted)); *SEC v. Fife*, No. 1:20-cv-05227, 2021 WL 5998525, at *7 (N.D. Ill. Dec. 20, 2021) ("The standard against which the SEC seeks to measure Defendants' conduct is the statute itself, the language of which Defendants and all others even arguably involved in securities transactions plainly have had notice.").[10]

Keener claims (Br. 58-60) that numerous experienced securities professionals were "unaware of the Commission's current theory."  But the supporting materials underlying this pronouncement simply show that

---

[10] Although the Staff Guide is not legally authoritative, the Commission's staff has, in the Guide, long warned that "you may need to register as a dealer" if you engage in "underwrit[ing]" activity, or "hold[] [yourself] out as being willing to buy and sell ... securit[ies] on a continuous basis" and advises those who visit the broker-dealer registration page that "you should find out whether you need to register" by "consult[ing] with private counsel, or ask[ing] for advice from the SEC's Division of Trading and Markets[.]"  Staff Guide, §§ II.B, C.

"purchasing a floorless convertible security is not … inherently manipulative." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). Again, whether convertible-note arrangements are illegal is distinct from whether a person engaged in that business for that person's own account is a dealer under the Exchange Act.

Further weakening Keener's fair notice claim is the fact that some of the sources he cites, such as the staff's *Acqua Wellington* no-action letter (*see* Br. 59 & n.11) could have put a reasonable reader on notice that advertising and underwriting can be indicia of dealer status. 2001 WL 1230266, at *3-4. Furthermore, by the time Keener launched JMJ, the Commission had promulgated multiple regulations applying to "a dealer" "who does not carry customer accounts" "or hold funds or securities for … customers[.]" 17 C.F.R. §§ 240.15c3-1(a)(2)(vi), (6)(ii); *see also id.* §§ 240.15b9-1(a), 240.15c3-3(k)(2)(i). Those regulations also put market participants like Keener on notice that the Commission did not subscribe to his customer-effectuation theory.

For similar reasons, Keener's contention that the Commission's position is unconstitutionally "vague" (Br. 45-47) should be rejected. Keener "could have requested clarification … in the form of a 'No-Action Letter.'" *Murphy*, 50 F.4th at 845 & n.6. Because he did not do so (*see* Tab

51

67 at 15) a "less strict vagueness test applies[.]" *Id.* As in *Murphy*, Keener's vagueness argument should be rejected "because the statute was enacted [more than] 80 years ago, and … has been applied countless times by the courts, which provides guidance to regulated parties." *Id.* (internal quotation omitted).

### 2. The district court correctly rejected Keener's equal protection argument.

Keener argues (Br. 61-63) that he is suffering unequal treatment due to a proposed Commission rule that would regulate certain entities as dealers and allow them to register after a post-adoption grace period. The proposed rule would require certain market participants who play a "central role as liquidity providers" in the markets to register with the Commission, become members of an SRO, and comply with federal securities laws and regulatory obligations. *Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, 87 Fed. Reg. 23,054, 23,055 (proposed Apr. 18, 2022). The district court correctly rejected Keener's equal protection argument because Keener "failed to show" that he is "similarly situated to the entities who would benefit from the proposed rule." Tab 145 at 4; *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006) ("Plaintiffs must show … that they were treated differently from other similarly situated

individuals ....").  Keener still makes no effort to show that he is "similarly situated" to the liquidity providers described in the proposed rule; indeed, because of his FINRA bar, Keener is differently situated, and would not be able to take advantage of "the opportunity to register[.]"  Br. 63.

## II.    The district court acted within its discretion in ordering equitable remedies.

### A.    The district court acted within its discretion in ordering Keener to disgorge his unregistered dealer profits.

Keener fails to demonstrate that the district court exceeded its discretion in ordering him to disgorge $7,786,639, representing the amount he obtained from his unlawful dealing of securities plus prejudgment interest.  Tab 145 at 19-20.  As the Supreme Court reaffirmed in *Liu*, courts may order disgorgement as an "equitable, profits-based remedy[.]"  140 S. Ct. at 1942-43, 1948.  Consistent with *Liu*, the district court ensured that the award did not exceed Keener's "net profits from [his] wrongdoing" (*id.* at 1946), and was imposed "for the benefit of investors" (*id.* at 1947-50 (discussing Exchange Act Section 21(d)(5))).

#### 1.    The district court acted within its discretion in concluding that Keener's disgorged profits were causally connected to his violation.

Section 15(a) prohibits unregistered dealers from using "any means or instrumentality of interstate commerce to effect any transactions in ...

any security[.]"  15 U.S.C. § 78o(a)(1).  It follows, then, that Keener was

unjustly enriched by any profits that he obtained from those prohibited

transactions.  Accordingly, the district court reasonably found that "[t]he

profits [Keener] gained" from his "unlawful dealing of securities … directly

stemmed from his misconduct" and are thus "subject to disgorgement."

Tab 145 at 14-15.

The Commission showed that Keener received at least $7,786,639

from his unregistered dealer activity—representing the substantial

discounts Keener received to the then-current stock prices—which

"satisfied its burden" to provide a "reasonable approximation of [Keener's]

ill-gotten gains."  *Calvo*, 378 F.3d at 1217; *see also SEC v. Fowler*, 6 F.4th

255, 267 (2d Cir. 2021); *CFTC v. Tayeh*, 848 F. App'x 827, 829-30 (11th Cir.

2021) (per curiam) (unpublished) (same, post-*Liu*).  The "burden then

shift[ed]" to Keener, who failed to demonstrate that this was not a

"reasonable approximation."  *Calvo*, 378 F.3d at 1217.[11]

---

[11] There is no merit to Keener's suggestion that the district court's inclusion
of profits from "two bridge loans" in the disgorgement figure was
"erroneous[]" (Br. 63) because record evidence submitted by *both* parties
shows that these loans contained convertible features.  *See* Tab 129 at 5;
S.A. 413 ¶ 23.

Keener mistakenly contends (Br. 63) that no amount of disgorgement was warranted because he "would've earned the same profits had he registered" (Br. 64). For one thing, Keener's hypothetical scenario was made impossible by his own recalcitrance; FINRA's bar, entered after Keener stonewalled their routine inquiries into his association with a registered broker-dealer, would have prevented his registration. Tab 145 at 15 & n.1; Tab 143 at 2. In any event, "efforts to hypothesize" the profitability of *lawful* transactions if Keener *had* registered are "impossibly speculative" (*SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231-32 (D.C. Cir. 1989)), and "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty" (*Calvo*, 378 F.3d at 1217 (internal quotation omitted)). Under Keener's theory, "an unregistered dealer of securities could retain all profits from systemic unlawful activity based on the theory that he *could* have obtained those profits had he complied with the law." Tab 145 at 15. No case supports that counterintuitive view.

Keener erroneously argues (Br. 63-64) that this Court's decision in *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999), precludes disgorgement here. *Sidoti* held that disgorgement is unavailable for a registration violation that lacks a sufficient causal connection to the illegal proceeds. *Id.* Sidoti was liable for failing to register as a principal of a

55

commodities broker but could not be ordered to disgorge profits from that broker's fraud because the CFTC did not contend that Sidoti "knew of, much less participated in, any of the fraudulent conduct[,]" and a district court "may not disgorge profits, unless there is record evidence the defendant is liable (either directly or indirectly) for [that] fraud." *Id.* The district court properly distinguished *Sidoti*: "[I]t is undisputed that Keener personally engaged in the unauthorized dealing of securities. Just as Sidoti's failure to register did not render all of the … activity unlawful, Keener's failure to register did not render all of his financial conduct illegal. Rather, his failure to register rendered illegal the transactions he could not lawfully conduct without being a registered dealer." Tab 145 at 14-15; *see Calvo*, 378 F.3d at 1217 (holding that Commission was entitled to disgorge "proceeds" of "illegal sale of unregistered … securities").

Keener's reliance on *CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir. 2018) (*see* Br. 65-67) is equally misplaced, as the district court found, because that case "addressed whether a registration violation proximately caused customers' losses," whereas "the but-for causation standard applicable in this case is less demanding." Tab 145 at 16. *Southern Trust Metals* addressed a Commodities Exchange Act provision that expressly required the CFTC to show that persons "'sustained

losses *proximately caused* by such violation[.]'"  894 F.3d at 1328-30

(emphasis added) (quoting 7 U.S.C. § 13a-1(d)(3)).  In contrast, there is "no

such authority" to impose any proximate causation requirement on SEC

enforcement actions (*SEC v. Teo*, 746 F.3d 90, 101-03 (3d Cir. 2014)),

which makes sense because disgorgement under Securities Exchange Act

Section 21(d) is based on a wrongdoer's "gains and not the investors'

losses."  *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017); *see also SEC v.

Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (per curiam)

(SEC need not show loss causation).  Keener's argument that proximate

cause "necessarily encompasses" but-for causation (Br. 66-67 (internal

quotation omitted)) is a *non-sequitur*; the issue in *Southern Trust Metals*

was not an absence of but-for causation, but instead an inability of the

CFTC to "[e]stablish[] *proximate cause*[,]" which "requires more" (894

F.3d at 1329-30).[12]

---

[12] *Alvarez v. United States*, 862 F.3d 1297 (11th Cir. 2017), which both
Keener (Br. 65-66) and *amicus* ICAN (Amicus Br. 9) cite, is similarly
inapposite because it bears only on a private plaintiff's proof of loss
causation in a tort action for damages, not an SEC enforcement action for
disgorgement.  *Compare with Morgan Keegan*, 678 F.3d at 1244 (loss
causation not an element of a Commission enforcement action).

### 2. The district court acted within its discretion in concluding that disgorgement is for the benefit of investors.

Exchange Act Section 21(d)(5) authorizes the Commission to seek, and courts to award, "equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).  *Liu* explained that while disgorgement is measured by a "wrongdoer's net profits" and not investors' losses, the "equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit."  140 S. Ct. at 1940, 1948.  As *Liu* held, disgorgement that is "awarded for victims" is permissible equitable relief under Section 21(d)(5).  140 S. Ct. at 1940.[13]

The district court did not abuse its discretion in concluding that its disgorgement order benefits investors within the meaning of *Liu* because the Commission demonstrated "that the majority of investors who bought Keener's offerings suffered losses and could be considered victims of his

---

[13] The Court need not consider the 2021 amendments to Exchange Act Section 21 (*see* Tab 145 at 13-14) which, among other things, omitted the "for the benefit of investors" statutory phrase in Section 21(d)(5), which *Liu* construed as a "limitation[]" or "restriction[]" on a court's equitable authority to disburse collected disgorgement amounts to the Treasury.  140 S. Ct. at 1947-49.  Those amendments are not implicated here because the Commission "has committed to distributing disgorgement to" investors, namely "the victims of Keener's activity."  Tab 145 at 16.

unlawful dealing[,]" and because the Commission "committed to distributing disgorgement to the victims of Keener's activity." Tab 145 at 16; *see also* Tab 147 at 3-4 (requiring district court approval for any distribution plan). "The district court's order—requiring disbursements to" Keener's victims "with court supervision to ensure compliance with that edict—easily satisfies *Liu*." *SEC v. Blackburn*, 15 F.4th 676, 682 (5th Cir. 2021); Tab 145 at 16.

Keener claims (Br. 65) that "there are no victims" because his "trading didn't cause another investor to lose money." The district court, however, "reject[ed] Keener's assertion" because "93% of issuers experienced stock price declines between Keener's first and last sales, indicating that the majority of investors who bought Keener's offerings suffered losses and could be considered victims of his unlawful dealing." Tab 145 at 16; S.A. 41-42 ¶ 29. Keener does not engage with this factual finding, let alone show that it is clearly erroneous. *See SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 463, 466 (5th Cir. 2022).

### B. The district court acted within its discretion in ordering injunctive relief.

Keener has not shown that the district court committed a "clear abuse" of its "sound discretion" in enjoining Keener from engaging in the regular business of buying and selling securities unless he registers as a

dealer (15 U.S.C. § 78u(d)(1)).  *SEC v. Hall*, 759 F. App'x 877, 883 (11th Cir. 2019) (per curiam) (unpublished) (internal quotations omitted).  Keener refers to this relief as an obey-the-law injunction that "merely tracks the language of the securities statutes" without telling him what he can and cannot do.  Br. 68 (internal quotation omitted).  But allowing "injunctions of some breadth in the context of civil enforcement actions brought by the SEC is warranted[,]" because the Exchange Act "grants the district court broad discretion to enjoin violations of the Act" to vindicate "the public interest[.]" *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012).  "Therefore, a broad, but properly drafted injunction, which largely uses the statutory or regulatory language" is permissible.  *Id.*

Recognizing this, the district court observed that while the injunction largely tracks the statutory language, "it makes one important substitution" by focusing squarely on "the activity that makes [Keener] a dealer: engagement in the regular business of buying and selling securities."  Tab 145 at 11 (internal quotation omitted).  The district court also excised "unnecessary references to laws and regulations" and concluded that the injunction properly instructed Keener on the conduct covered by the injunction.  *Id.*  Keener does not discuss any aspect of this analysis, which satisfies this Court's precedents.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

DOMINICK V. FREDA
Assistant General Counsel

DAVID D. LISITZA
Senior Appellate Counsel

ARCHITH RAMKUMAR
Appellate Counsel
Securities & Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-4886 (Ramkumar)
RamkumarA@sec.gov

August 30, 2023

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word processing program with which it was prepared (Word 2016), this brief contains 12,970 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because the brief uses a 14-point proportionally spaced typeface.

 */s/ Archith Ramkumar*
Appellate Counsel for Appellee,
Securities and Exchange Commission

August 30, 2023

## CERTIFICATE OF SERVICE

I certify that on August 30, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Archith Ramkumar_
Appellate Counsel for Appellee,
Securities and Exchange Commission

August 30, 2023