No. 22-14237

# United States Court of Appeals for the Eleventh Circuit

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

v.

JUSTIN W. KEENER
D/B/A JMJ FINANCIAL,

*Defendant-Appellant*.

———————————————

On Appeal from the
United States District Court for the Southern District of Florida,
Case No. 1:20-cv-21254-BB

## REPLY BRIEF FOR DEFENDANT-APPELLANT JUSTIN W. KEENER

CHRISTOPHER F. REGAN
ORRICK, HERRINGTON
  &amp; SUTCLIFFE LLP
2001 M Street NW, Suite 500
Washington, D.C. 20036
(202) 349-8000

HELGI C. WALKER
BRIAN A. RICHMAN
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
HWalker@gibsondunn.com

BARRY GOLDSMITH
M. JONATHAN SEIBALD
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y. 10166-0193
(212) 351-4000

*Counsel for Defendant-Appellant Justin W. Keener*

October 20, 2023

*SEC v. Justin W. Keener*, No. 22-14237

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1(b), Defendant-Appellant Justin W. Keener certifies that the CIPs contained in Mr. Keener's first brief and in the other briefs that have been filed are complete.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. C-1

TABLE OF CONTENTS ................................................................ ii

TABLE OF CITATIONS ................................................................ iv

REPLY BRIEF ................................................................................ 1

I.    The Commission's Hyperliteralism Cannot Be Reconciled With Context, Structure, Or History ................................................ 2

    A.    The Commission Ignores Context. ....................................... 2

    B.    The Commission Fails To Reconcile Its Reading With The Broader Statutory Structure. ........................................ 12

    C.    The Commission Cannot Explain A Century Of Regulatory Activity. ................................................................ 16

        1.    The Commission Cannot Explain The Regulation Of Investment Companies, Investment Advisers, Or Hedge Funds. ........................................................ 16

        2.    The Commission Cannot Explain Precedent. ............... 21

        3.    The Commission Cannot Explain The Convertible-Lending Market. ........................................ 25

    D.    The Commission Still Cannot Tell Anyone What A "Dealer" Is Or Isn't. ............................................................ 26

    E.    The Commission's Waiver Argument Fails. ......................... 27

II.   The Commission Fails To Show Mr. Keener Had Fair Notice Of Its New Theory. .......................................................................... 28

III.  The Commission Cannot Defend The Sanctions. .......................... 30

A.  The Commission Cannot Show The Sanctions Are
Consistent With Principles Of Equal Protection. ................30

B.  The Commission Cannot Rationalize The
Disgorgement Award. ...........................................................31

C.  The Commission Cannot Defend The Injunction. ...............35

CONCLUSION ...........................................................................................36

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Ackerberg v. Johnson*,
  892 F.2d 1328 (8th Cir. 1989) .............................................................. 26

*Alvarez v. United States*,
  862 F.3d 1297 (11th Cir. 2017) ........................................................... 34

*ATSI Commc'ns v. Shaar Fund*,
  493 F.3d 87 (2d Cir. 2007) .................................................................. 34

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) ......................................................................... 33

*CFTC v. Sidoti*,
  178 F.3d 1132 (11th Cir. 1999) ..................................................... 32, 33

*Cuozzo Speed Techs. v. Lee*,
  579 U.S. 261 (2016) .............................................................................. 23

*Donander Co. v. Comm'r*,
  29 B.T.A. 312 (1933) ...................................................................... 10, 11

*Eastside Church of Christ v. Nat'l Plan*,
  391 F.2d 357 (5th Cir. 1968) ............................................................... 23

*Equitec Proprietary Mkts.*,
  2009 WL 536632 (SEC Mar. 4, 2009) ................................................. 15

*Food Marketing Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019) ........................................................................... 6

*Garcia v. Vanguard Car Rental USA, Inc.*,
  540 F.3d 1242 (11th Cir. 2008) ............................................................. 7

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ............................................................. 19

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
  545 U.S. 409 (2005) ............................................................ 3

*In re Home Depot Inc.*,
  931 F.3d 1065 (11th Cir. 2019) ......................................... 27

*Illinois v. Lidster*,
  540 U.S. 419 (2004) ........................................................... 22

*Liu v. SEC*,
  140 S. Ct. 1936 (2020) ....................................................... 34

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ..................................................... 11, 12

*Morrison v. National Australia Bank Ltd.*,
  561 U. S. 247 (2010) ....................................................... 9, 26

*Roth v. SEC*,
  22 F.3d 1108 (D.C. Cir. 1994) ........................................... 22

*Sackett v. EPA*,
  598 U.S. 651 (2023) ......................................................... 3, 8

*SEC v. Big Apple Consulting USA, Inc.*,
  783 F.3d 786 (11th Cir. 2015) ............................... 23, 24, 25

*SEC v. Graham*,
  823 F.3d 1357 (11th Cir. 2016) ......................................... 35

*SEC v. Ridenour*,
  913 F.2d 515 (8th Cir. 1990) ............................................. 22

*Skilling v. United States*,
  561 US 358 (2010) ........................................................... 8, 9

*Slack Techs. v. Pirani*,
  143 S. Ct. 1433 (2023) ................................................... 9, 10

*State v. Yearby*,
    82 N.C. 561 (1880)........................................................................... 11, 12

*Trump v. Thompson*,
    142 S. Ct. 680 (2022)............................................................................. 24

*United States v. Burke*,
    504 U.S. 229 (1992)................................................................................. 7

*United States v. Lee*,
    586 F.3d 859 (11th Cir. 2009)............................................................... 27

## Statutes

15 U.S.C.
    § 78c(a)(5)(A) ................................................................................... 8, 9
    § 78c(a)(5)(A) ....................................................................................... 35
    § 78c(a)(5)(B) ....................................................................................... 35
    § 78f(c)(1) .............................................................................................. 14
    § 78fff-4(c).............................................................................................. 13
    § 78o(a)(1) ............................................................................................. 35

Securities Acts Amendments of 1975, Pub. L. No. 94-29,
    89 Stat. 97, 105 .................................................................................... 14

## Regulations

17 C.F.R.
    § 230.144.................................................................... 11, 26, 27, 29
    § 240.10b-10(a)(2)................................................................................. 4
    § 240.13h-1(a)(7)(i) ............................................................................... 7
    § 240.15b9-1(a) .................................................................................... 14
    § 240.15c3-1(a)(2)(vi)........................................................................... 14
    § 240.15c3-1(a)(2)(vi)(A)...................................................................... 14
    § 240.15c3-1(a)(6)(ii) ........................................................................... 14
    § 240.15c3-3(k)(2)(i) ............................................................................ 14

FINRA Rule 9522(b)(1)................................................................................ 31

## SEC Materials

*Acqua Wellington N. Am. Equities Fund*,
 SEC No-Action Letter, 2001 WL 1230266 (Oct. 11, 2001) ..... 26, 28, 29

*Adoption of Uniform Net Capital Rule*,
 40 Fed. Reg. 29,795 (July 16, 1975) .................................................... 14

Exchange Act Release No. 37,882,
 61 Fed. Reg. 56,990 (Nov. 5, 1996) .................................................... 14

Exchange Act Release No. 60,428,
 74 Fed. Reg. 40,273 (Aug. 11, 2009) .................................................. 15

*Further Definition of 'As a Part of a Regular Business,'*
 87 Fed. Reg. 23,054 (Apr. 18, 2022) .................................... 9, 20, 30, 31

*Gordon Sodorff, Jr.*,
 1992 WL 224082 (SEC Sept. 2, 1992) .......................................... 21, 22

H.R. Doc. No. 76-279 (1939) ...................................................................... 17

H.R. Doc. No. 76-477 (1939) ............................................................... 17, 18

*How to Read Confirmation Statements*, SEC (2012),
 https://www.sec.gov/investor/alerts/ib_confirmations.pdf ................... 4

*Large Trader Reporting System*,
 56 Fed. Reg. 42,550 (Aug. 28, 1991) .................................................... 7

*Order Granting Conditional Exemption*,
 72 Fed. Reg. 52,400 (Sept. 13, 2007) .................................................. 13

President's Working Group on Financial Markets, *Hedge*
 *Funds, Leverage, and the Lessons of Long-Term Capital*
 *Management* (1999) .............................................................................. 20

*Registration Under the Advisers Act*,
 69 Fed. 72,054 (Dec. 10, 2004) ...................................................... 18, 19

*Revisions to Rule 144*,
 72 Fed. Reg. 71,546 (Dec. 17, 2007) .................................................. 11

SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker* (1936)....................................................................3, 5

SEC Answering Br., *Roth v. SEC*, 22 F.3d 1108 (D.C. Cir. 1994) (No. 92-1557)......................................23

SEC Br., *XY Planning Network, LLC v. SEC*, No. 19-2886(L) (2d Cir. Mar. 3, 2020) ..................................16

SEC Mot. for Summ. Disposition, *Justin Keener*, No. 3-21270 (SEC Aug. 25, 2023) .......................................31

SEC Opp'n to Mot. to Dismiss, *SEC v. Lyon*, No. 1:06-cv-14338 (S.D.N.Y. Mar. 16, 2007) ......................................25

SEC Response Br., *SEC v. Morningview Fin.*, No. 1:22-cv-8142 (S.D.N.Y. Aug. 3, 2023) .............................................9

## Other Authorities

Appellants Br., *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015) (No. 13-11976) ...................................25

C.H. Meyer, *Law of Stockbrokers and Stock Exchanges* (1933 cum. supp.) ....................................................................6

C.H. Meyer, *Securities Exchange Act of 1934* (1934) ............................6, 7

*Customer Relationship Summary*, Fidelity (2023), www.fidelity.com/bin-public/060_www_fidelity_com /documents/brokerage-account-customer-agreement.pdf ...................4

FINRA By-Laws of Corporation, art. III, § 3(d) ......................................31

H.R. Rep. No. 73-85 (1933)........................................................................24

1 L. Loss et al., *Fundamentals of Securities Regulation* (7th ed. 2021 Cum. Supp.) ..................................................................24

MFA Comments, No. S7-30-04 (Sept. 15, 2004),
   www.sec.gov/files/rules/proposed/s73004
   /jggaine091504.pdf .............................................................................. 20

W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and
   Dealers*, 43 Yale L.J. 46 (1933) ............................................................ 10

## REPLY BRIEF

The Commission's theory would make every hedge fund and investment company an unregistered "dealer."  The Commission insists that, "from its enactment," the Securities Exchange Act of 1934 has required the registration as a "dealer" of any person whose "operations [as] a trader … are sufficiently extensive to be regarded as a regular business," even if that person "has no customers" and "merely trades" for himself. SEC.Br.3 (emphasis removed).  That cannot possibly be right, and the Commission has no explanation for how it could be.  If a "dealer" really includes any person who is in a "regular business of buying and selling securities" for himself (SEC.Br.46), then every hedge fund and investment company has been operating as an unregistered "dealer" for all 89 years between the '34 Act's adoption and today (Keener.Br.39-40; MFA.Amicus.Br.6; AIMA.Amicus.Br.4).

The Commission reaches this illogical result by reading a few words hyperliterally, in isolation, and without regard for their context or history.  The Commission seizes on the phrase "business of buying and selling securities … for [one's] own account."  But the Commission does not—

1

and cannot—dispute those exact words have been used for the past century to distinguish the manner in which a broker (with the "customer's account") or a dealer (as an opposite party with the dealer's "own account") facilitates customer securities orders. That original meaning controls, and is the only reading that makes sense of the broader statutory structure and fits with the long history of regulatory activity.

## I.   The Commission's Hyperliteralism Cannot Be Reconciled With Context, Structure, Or History.

As Mr. Keener's brief demonstrated, Congress, in adopting the '34 Act, defined "broker" and "dealer" in *the exact words* people at the time used (and continue to use) to distinguish the two methods of effecting customer securities orders. Keener.Br.22-26. A "broker" (or agent) is said to trade "for the account of" the customer, whereas a "dealer" (or principal) is said to effectuate the customer's order by taking the opposite side in the dealer's "own account." Keener.Br.22-23. The Commission cannot overcome this context, so instead ignores it.

### A.   The Commission Ignores Context.

**1.**   The Commission argues the phrase "own account" could refer, literally, to trading with one's "own account" (SEC.Br.39), but "[c]onstruing statutory language" isn't "an exercise in ascertaining 'the outer limits

2

of a word's definitional possibilities,'" *Sackett v. EPA*, 598 U.S. 651, 676 (2023). Language "has meaning only in context." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415 (2005). And when used in the context of differentiating "brokers" and "dealers," references to a customer's account and one's own account plainly refer to the two methods of effectuating customer orders. Keener.Br.22-26.

The Commission argues "not a single case, treatise, or Commission statement" has used the phrase "own account" "in th[at] manner." SEC.Br.41. But they have, repeatedly. Mr. Keener cites numerous examples. Keener.Br.22-26. In 1936, for instance, the Commission explained the "great majority" of brokers and dealers have "combine[d] the functions of dealer and broker." SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936) (SEC Report) (Doc.71-2.at.15). They execute customer orders "solely for the account of the customer" (as a "broker"), or they "sell[] securities to," or "buy[] securities from[,] [the] customer" directly, "for [their] own account" (as a "dealer"). *Id.* There is no way to read these words—or any of the words quoted on pages 22 to 26 of Mr. Keener's

3

brief—as referring to anything other than the effectuation of customer orders.

Present-day Commission regulations *themselves* use this terminology. Every broker-dealer must disclose to its customer whether, on a particular trade, it's "acting as agent for such customer," or "*as principal for its own account*." 17 C.F.R. § 240.10b-10(a)(2) (emphasis added). This terminology is commonplace. "[W]e buy from you or sell to you for or from *our own accounts*," or "buy and sell investments *for your account*" is the standard way broker-dealers indicate *how* they effectuate orders. *Customer Relationship Summary*, Fidelity (2023), www.fidelity.com/bin-public/060_www_fidelity_com/documents/brokerage-account-customer-agreement.pdf (emphases added); *see How to Read Confirmation Statements* 2, SEC (2012), https://www.sec.gov/investor/alerts/ib_confirmations.pdf ("[C]apacity … refers to whether your broker-dealer acts as your agent, on your behalf, in the transaction; or whether your broker-dealer acts as a principal, for its own account, in the transaction.").

The Commission responds with selective quotation. It plucks a few words from the historical sources—*e.g.*, a dealer obtains "a favorable … spread"—and declares nothing in those sources "limit the term 'dealer' to

4

one who has 'customers.'" SEC.Br.42. The sources do exactly that. The snippets quoted by the Commission (SEC.Br.41-42) are highlighted and underscored below, and they all arise in the context of facilitating customer orders, either as a "broker" (with the "account of the customer"), or as a dealer (on the opposite side "for [the dealer's] own account"):

> The characteristic activities of a dealer in securities are similar to those of a dealer or jobber in merchandise. The dealer sells securities to his ***customer*** which he has purchased elsewhere or buys securities from his ***customer*** with a view to disposing of them elsewhere. In any such transaction he acts for his own account and not as agent for the ***customer***. He receives no brokerage commission but relies for his compensation upon a favorable difference or spread between the price at which he buys and the amount for which he sells…. On the other hand, a broker employed to execute an order for the purchase or sale of securities is the agent of his ***customer***. He does not undertake to sell to or buy from his ***customer*** but rather to negotiate a contract … between the ***customer*** and a third party. The transaction is solely for the account of the ***customer*** ….

SEC Report, at XIV (Doc.71-2.at.15) (emphases added).

> [T]he broker does not himself sell to or buy from the ***customer***, but acts as the ***customer's*** representative in making a purchase from or sale to a third party. However, there is nothing in the law which prevents a person from engaging in the business of buying and selling securities for his own account as principal. Such a person is a security *dealer* as distinguished from a *broker*…. He sells to his ***customers*** at a price which usually affords him a profit, securities which he has purchased for his own account elsewhere, or buys from his

5

> ***customers*** <u>securities for his own account with a view of dis-</u><u>posing them elsewhere at a profit</u>…. [A] stock *broker* may also become a stock *dealer* towards his ***customer*** in any one transaction ….  Frequently circumstances are such as to render it difficult to determine whether the relationship between the parties is that of stock *broker* and ***customer*** or stock *dealer* and ***customer***.

C.H. Meyer, *Law of Stockbrokers and Stock Exchanges* § 43-a, at 32 (1933 cum. supp.) (Meyer) (Doc.71-3.at.4) (emphases added).  That *these* are the Commission's best examples of "not limit[ing] the term 'dealer' to one who has 'customers'" (SEC.Br.42) says it all.

The Commission retreats to a second Meyer's treatise (SEC.Br.41), but that treatise is irrelevant, at best, or disproves the Commission's theory, at worst.   Unlike Meyer's earlier, 1933 treatise (Doc.71-3.at.4), Meyer's 1934 work doesn't explain how words are used in ordinary language; instead, Meyer speculates how a court *might* ("would seem" to) "interpret[]" the '34 Act.  C.H. Meyer, *Securities Exchange Act of 1934*, at 34 (1934).  But Meyer's speculation is from a "bygone era of statutory construction," *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019); his views on interpretation (as opposed to ordinary usage) are of limited relevance.

6

Regardless, Meyer proves the Commission wrong. "[I]f" the Commission's current "interpretation is correct," Meyer says, then all "professional traders" "will be classed as a 'dealer.'" Meyer, *Securities Exchange Act*, *supra*, at 34. That has never been true. The Commission runs a reporting program for professional traders—"large traders" who trade more than $20 million per day (17 C.F.R. § 240.13h-1(a)(7)(i))—because those traders are *not* broker-dealers required to report their transactions to the Commission. *Large Trader Reporting System*, 56 Fed. Reg. 42,550, 42,550 (Aug. 28, 1991). As Meyer says, "if" *professional traders* are not dealers—and they're undisputedly not dealers—the Commission's current interpretation is wrong.

> **2.** The Commission disregards other contextual clues.

> **a.** The words "broker" and "dealer" are related. Keener.Br.33. The Commission admits this (SEC.Br.37), yet urges the Court to ignore "any related meaning" because the terms are "define[d] … separately" (*id.*). There's no basis for that. When words come in pairs, courts read the words in light of their linked meaning. *United States v. Burke*, 504 U.S. 229, 243-44 (1992) (Scalia, J., concurring); *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1247 (11th Cir. 2008). And when those

7

words are defined terms, their meaning informs "the reach of the[ir] definition[s]." *Sackett*, 598 U.S. at 672.

Here, "broker" and "dealer" refer to two sides of the same coin. Although the Commission claims people could "register[] as a dealer" (SEC.Br.15, 17, 18, 45), that's impossible; people register only as "broker-dealer[s]," Keener.Br.33, because "broker" and "dealer" refer to the two ways of effectuating customer orders. *Supra* pp.2-6. The Commission admits half of this: "broker" refers to one method of "effectuat[ing] customer orders." SEC.Br.37. "Dealer" should similarly be read to refer to the *other* method. It's almost as odd to believe the second part of the phrase "broker-dealer" refers to something *other* than customer-order facilitation, as it would be to believe the second part of the phrase "fork and knife" refers to something *other* than a kitchen utensil.

**b.** The Commission downplays the "word 'the'" (SEC.Br.44)—as used in the statutory phrase, "*the* business of buying and selling securities," § 78c(a)(5)(A) (emphasis added). The definite article "the" is an important determinant of meaning, however, particularly when there's a question as to the breadth of the phrase following it. In *Skilling v. United States*, 561 US 358, 404 (2010), for example, the Court considered the

8

statutory phrase "the intangible right of honest services." Although the government would've read the phrase to reach "*all* intangible rights of honest services whatever they might be thought to be," the Court held the "definite article 'the'" indicated Congress had a "specific" honest-services right in mind. *Id.* "The" plays a similar limiting role here. Keener.Br.29-30.

The Commission reads "the" out of the statute. A "dealer" is in "*the* business of buying and selling securities," § 78c(a)(5)(A) (emphasis added)—"[n]ot just a," "or any," business of buying and selling securities, *Slack Techs. v. Pirani*, 143 S. Ct. 1433, 1440 (2023). Yet the latter is what the Commission argues. It lumps together "*all*" businesses that "might be thought to" buy and sell securities, *Skilling*, 561 U.S. at 404— from actual broker-dealers (*e.g.*, Fidelity) to "convertible-note-lend[ers]" (SEC.Br.48), "investment club[s],"[1] "principal trading firms,"[2] and "hedge funds."[3] No one would say these firms are in a "particular" business (*the*

---

[1] SEC Response Br. 19, *SEC v. Morningview Fin.*, No. 1:22-cv-8142 (S.D.N.Y. Aug. 3, 2023), ECF No. 34.

[2] *Further Definition of 'As a Part of a Regular Business,'* 87 Fed. Reg. 23,054, 23,079 (Apr. 18, 2022).

[3] *Id.*

business).  *Slack*, 143 S. Ct. at 1440; *cf.* SEC.Br.51 (convertible lending its own business ("that business")).

    **c.**    The Commission disregards the legal backdrop against which Congress acted.  Keener.Br.30-31.  It writes off the common law because two cases "rely on the … Meyer [1933] treatise."  SEC.Br.43.  But those cases are reason to *look* to Meyer's 1933 work, not ignore the cases; regardless, numerous cases, documented in W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and Dealers*, 43 Yale L.J. 46, 60-61 & nn.66-70 (1933), presuppose brokers and dealers effectuate customer orders.  The Commission says nothing about that backdrop.

    The Commission calls contemporaneous tax cases "dissimilar" because Internal Revenue regulations "expressly provided" "dealers" effectuate "customer[]" orders.  SEC.Br.43.  The Commission misses the point: "[D]ealer'" was "not defined by the statute."  *Donander Co. v. Comm'r*, 29 B.T.A. 312, 314 (1933).  And in *Donander*, the petitioner argued the government's customer-centric definition was unduly narrow because it had (as the Commission would say) "add[ed]" the word customer.  SEC.Br.38.  The court, however, disagreed.  It recognized if Congress had really intended to expand the conception of "dealer" beyond that of a "merchant

10

who … sell[s] to customers," it would've "used language which would more aptly convey that thought." 29 B.T.A. at 315. Congress "is presumed to be aware of" this "interpretation," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982), but, when it adopted the '34 Act, it did not indicate a clear intent to expand beyond the customer realm.

**c.** The Commission fails to make sense of other statutory language. It doesn't dispute the word "and" in "buying *and* selling" "implies a certain temporal proximity," instead arguing "a six-month gap" is proximate enough. SEC.Br.44. That's wrong. Keener.Br.53-55. The Commission itself requires a six-month gap in order to freely resell stock (under Rule 144 (Keener.Br.15)), because a six-month gap *attenuates* the purchase and sale. *Revisions to Rule 144*, 72 Fed. Reg. 71,546, 71,565 (Dec. 17, 2007).

The Commission fails to grapple with the statute's "coupling the two acts of *buying and selling*" in another way. *State v. Yearby*, 82 N.C. 561, 562 (1880). It writes off "state court decisions" because they involved "states' laws." SEC.Br.44-45. But that's no answer. The cases interpreted the exact statutory phrase ("*buying and selling*") Congress

11

adopted, and concluded the phrase "render[ed] [a] law more explicit," such that it reached only those who "buy and sell *the same article and in the same condition*." *Yearby*, 82 N.C. at 562; *see* Keener.Br.53-54.  When Congress adopts a phrase with a settled construction, Congress presumptively adopts that construction. *Merrill Lynch*, 456 U.S. at 382 n.66.

The Commission itself adopted that construction (Keener.Br.54-55); it just deletes refences to it in the quotes in its brief.  The Commission's website, for example, doesn't say (as the Commission's brief claims) that a dealer "buy[s] and sell[s] … securit[ites]" (SEC.Br.50 n.10 (alterations in original)); it says a dealer "buy[s] and sell[s] *a particular security*." Doc.118.at.16 (emphasis added).  But Mr. Keener does not "buy and sell a particular security."   He buys one kind and sells another.  Keener.Br.55.  Thus, even the Commission's website shows Mr. Keener isn't a "dealer."

## B.    The Commission Fails To Reconcile Its Reading With The Broader Statutory Structure.

**1.**    The Commission cannot explain *why* Congress would've subjected someone who doesn't effectuate customer orders to "dealer registration." SEC.Br.1.  "Dealers" are subject to numerous requirements that

make no sense for customer-less entities.  Keener.Br.33-34; MFA.Amicus.Br.9; AIMA.Amicus.Br.12.  The Commission offers no explanation, for example, why Congress would've wanted a "dealer" to join an insurance fund to insure non-existent "customer[]" accounts.  15 U.S.C. § 78fff-4(c).

The Commission cannot identify a *single* statutory provision governing "dealers" outside the customer-protection context.  Keener.Br.33-34.  It describes certain provisions in passing, but those provisions concern customers; the Commission just omits the word.  It says, for example, "dealers" are required to track their "net capital" and "have sufficient liquid resources on hand" (SEC.Br.6), but leaves out why:  "to promptly satisfy the claims of *customers*."  *Order Granting Conditional Exemption*, 72 Fed. Reg. 52,400, 52,400 n.3 (Sept. 13, 2007) (emphasis added).

The Commission suggests (SEC.Br.51) a broader, no-customers conception of "dealer" can be inferred, not from the statute which controls here, but from the Commission's regulations.  Of course, the statutory text trumps the regulations, but the Commission mischaracterizes them in any event.  The Commission says the dealer regulatory regime is inconsistent with the "customer-effectuation theory" because "multiple

13

[Commission] regulations apply[]" to a "dealer" (SEC.Br.51) who does not "*carr[y]*" customer "accounts" (17 C.F.R. § 240.15c3-3(k)(2)(i) (emphasis added)) or "*hold* funds or securities for … customers'" (*id.* § 240.15c3-1(a)(2)(vi) (emphasis added)).  That's a sleight of hand.  *Holding* customer "funds and securities" and *effectuating* "customer orders" are separate activities.  Exchange Act Release No. 37,882, 61 Fed. Reg. 56,990, 56,990 (Nov. 5, 1996) (explaining difference between "prime" and "executing" brokers).  Even if a dealer does not "*carr[y]*" customer accounts or "*hold*" customer securities, it still "*execut[es]* [its] customer's order[s]" (17 C.F.R. § 240.15c3-1(a)(2)(vi)(A) (emphasis added)), or "*effectuates* … transactions" with "its customers" (§ 240.15c3-3(k)(2)(i) (emphasis added)).

The Commission turns (SEC.Br.51) to two regulations concerning stock-exchange members—specialists and market makers, 17 C.F.R. §§ 240.15c3-1(a)(6)(ii), 240.15b9-1(a)—but those regulations don't help the Commission.  Stock-exchange members are "unique," *Adoption of Uniform Net Capital Rule*, 40 Fed. Reg. 29,795, 29,796 (July 16, 1975): they must register as broker-dealers *irrespective* of the statutory definitions.  Securities Acts Amendments of 1975, Pub. L. No. 94-29, sec. 4, § 6(c)(1), 89 Stat. 97, 105 (codified at 15 U.S.C. § 78f(c)(1)).  Regardless,

14

specialists and market makers effectuate customer orders: they have a legal obligation to other exchange members to execute transactions to maintain "continuous" markets, Exchange Act Release No. 60,428, 74 Fed. Reg. 40,273, 40,274 (Aug. 11, 2009), including by effectuating other members' customer orders, *Equitec Proprietary Mkts.*, 2009 WL 536632, at *2 ¶ 6 (SEC Mar. 4, 2009).

  **2.** The Commission not only fails to situate its theory *within* the statutory structure; it cannot deny its theory would *destroy* part of that structure. The Commission doesn't dispute that every investor—from Mr. Keener to the largest hedge fund—is *itself* a *customer* of a broker-dealer (Doc.72¶¶40-41, 70; Doc.88¶¶40-41, 70; MFA.Amicus.Br.10), and that scores of regulations protect customers of broker-dealers (Keener.Br.36). But as Mr. Keener and *amici* explain, if the Commission deems *them*—customers of broker-dealers—"dealers" too, they'd be "deprive[d]" of these "customer protections" (MFA.Amicus.Br.10; *see* Keener. Br.35-36), "without a corresponding benefit" (as they have no customers of their own who need protection (TMP.Amicus.Br.13 in No. 21-13755)). The Commission still has "no answer." Keener.Br.36.

The Commission suggests Mr. Keener's borrowers could be considered "customers" (SEC.Br.40), but even if that were true, the borrowers were not customers in the broker-dealer sense. A broker-dealer "effect[s] transactions for customers," SEC Br. 7, *XY Planning Network, LLC v. SEC*, No. 19-2886(L) (2d Cir. Mar. 3, 2020), ECF No. 170; Mr. Keener didn't do *that* for anyone.

### C. The Commission Cannot Explain A Century Of Regulatory Activity.

If any person in a "regular business of buying and selling securities" is really a "dealer" (SEC.Br.46), a century of regulatory activity makes no sense.

#### 1. The Commission Cannot Explain The Regulation Of Investment Companies, Investment Advisers, Or Hedge Funds.

**a.** The Commission cannot explain the Investment Company or Investment Advisers Acts of 1940. It admits investment companies and investment advisers regularly "buy and sell securities" (SEC.Br.46), but cannot explain why it occurred to nobody in 1940 (or since, until the Commission launched its new theory) that these firms might be "dealers" (Keener.Br.27). The '40 Acts were premised on the understanding that

investment companies and investment advisers were *not* broker-dealers. Keener.Br.28.

The Commission now suggests these entities *might* have been considered broker-dealers after all (SEC.Br.46), but cites no support. Instead, it quibbles with "documents Keener relies on" (SEC.Br.46)—the Commission's contemporaneous reports—but says nothing about the reports' conclusions:  investment companies and investment advisers were not broker-dealers. The Commission, for example, complains a report addressed "one" issue. *Id.* But the agency found the issue wasn't resolved by the '34 Act *because investment companies were not broker-dealers*. 2 H.R. Doc. No. 76-279, at 1523 n.434 (1939).

The Commission misconstrues a footnote in another report. The report doesn't say the "dealer registration provision of the ['34 Act] covered 'some of the activities of investment counselors.'" SEC.Br.46-47. On the contrary, the Commission said federal regulation of investment advisers did "not exist" yet. H.R. Doc. No. 76-477, at 31 (1939). The report states the '34 Act "may *interdict*" some of the activities of investment ad-

17

visers, *id.* at 31 n.53 (emphasis added), not because advisers are *themselves* regulated by the '34 Act, but because they are *customers* of regulated broker-dealers who "execute [their] orders," *id.* at 15.

If today's Commission is right, everyone who supported the '40 Acts is wrong.

**b.**    The Commission fails to explain the regulation of hedge funds, which are not registered as broker-dealers (MFA.Amicus.Br.5-6; AIMA.Amicus.Br.1).  The Commission argues there's "no evidence" hedge funds are in a "regular business of buying and selling securities" (SEC.Br.46), but they are, MFA.Amicus.Br.3 (hedge funds "have a business model based almost entirely on the buying and selling of securities").  That's why the Commission has tried to regulate hedge funds in other ways for decades.  In the 2004 hedge fund rule, for example, the Commission complained one fund was singlehandedly responsible for "five percent" of the "daily trading volume of the New York Stock Exchange." *Registration Under the Advisers Act*, 69 Fed. 72,054, 72,056 (Dec. 10, 2004).  But, tellingly, it didn't occur to the Commission this or any fund might be a dealer.  Keener.Br.48-49.

18

The Commission tries to wave this away by claiming that in 2004 it wasn't focused on the '34 Act, only the "Advisers Act" (SEC.Br.47), but that's inaccurate. The Commission searched for "a hook on which" to regulate hedge funds, *Goldstein v. SEC*, 451 F.3d 873, 882 (D.C. Cir. 2006), and considered numerous options, including under the '34 Act. Notably, however, the '34-Act option was to monitor "broker-dealers" that "clear, settle, and finance trades *for hedge funds*." 69 Fed. Reg. at 72,091 n.17 (emphasis added). It occurred to nobody hedge funds might *themselves* be broker-dealers.

The Commission quibbles with this conclusion, stating the Commission "acknowledged" at the time "some hedge fund advisers were registered-broker-dealers." SEC.Br.47 (citing 69 Fed. Reg. at 72,067). They weren't. The Commission cites a typo. In the 2004 release, the Commission discusses "reports emphasized by … commenters," which the Commission summarizes as containing "information about hedge funds advisers that are registered as broker-dealers." 69 Fed. Reg. at 72,067. The Commission meant to say "hedge funds advisers *whose affiliates* are registered as broker-dealers." That's what the cited comment (*id.* at 72,067

n.155)—by one of the *amici* here—actually says,[4] and that's consistent with reality: hedge funds "are not registered … broker-dealers." President's Working Group on Financial Markets, *Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management*, at B-1 (1999). The Commission cannot explain the regulatory treatment of hedge funds.

The pending rulemaking on the "further definition" of "dealer" makes that regulatory treatment even more inexplicable. Keener.Br.12-13. In the pending rule, the Commission insists many "prominent" hedge funds need to promptly "apply for dealer registration," because (according to the Commission) they are in a "'business' of buying and selling securities." 87 Fed. Reg. at 23,062, 23,081. But if that's true today, it's been true for decades because the statutory text has not changed. The Commission cannot explain how, if "dealer" really includes any person who "regular[ly]" "operat[es] [as] a trader" (SEC.Br.3), nobody noticed, until now, that hedge funds trading *$25 billion per month* might be dealers, 87

---

[4] MFA Comments, at A-5, No. S7-30-04 (Sept. 15, 2004), www.sec.gov /files/rules/proposed/s73004/jggaine091504.pdf ("[s]ome Hedge Fund Managers are affiliated with registered broker-dealers").

Fed. Reg. at 23,071.  The regulatory history makes no sense under the Commission's theory.

### 2.    The Commission Cannot Explain Precedent.

If "dealer" really swept beyond the context of customer-order facilitation, one would think there'd be some adjudicated Commission or appellate decision in the last nine decades arising from that situation.  The Commission cannot find any, because *every* adjudicated Commission or appellate decision under the '34 Act arises in the context of customer-order facilitation.

In trying to downplay this precedent, the Commission misreads it.  For example, the Commission argues the "word 'customer' does not appear in the section of … [*Sodorff*] analyzing whether Sodorff was a dealer."  SEC.Br.48.  That's more than a little silly.  The Commission, in the opinion, uses "investor" and "customer" interchangeably.  The "investors" were Sodorff's "customers," *Gordon Sodorff, Jr.*, 1992 WL 224082, at *2 (SEC Sept. 2, 1992), and "investor" is front and center in the Commission's analysis.  According to the Commission, Sodorff facilitated customer transactions:  "Sodorff solicited investors and handled their money

21

and securities, rendered investment advice, and sent subscription agree-ments to investors for their review and signature." *Id.* at 5. "These fac-tors," the Commission held—all concerning customer-order facilitation—made Sodorff "a dealer." *Id.* at *5 n.27.

The Commission misreads judicial precedent, too. It quotes two sentences about "business," and asserts the cases didn't "center … [on] the presence of customers." SEC.Br.48. The Commission is doubly wrong. Whatever the cases "center[ed]" on (*id.*), "language in judicial opinions" is read "as referring in context to circumstances similar to the circumstances then before the court," *Illinois v. Lidster*, 540 U.S. 419, 424 (2004), and the context in those cases unquestionably concerned cus-tomer-order facilitation (Keener.Br.37-38). Regardless, the cases cen-tered on customers. Immediately after the language the Commission quotes (SEC.Br.48), the courts explained the defendants "solicit[ed] cli-ents" to "consummate [their] transactions." *Roth v. SEC*, 22 F.3d 1108, 1110 (D.C. Cir. 1994); *accord SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (sought "a regular clientele"). To borrow from one of the Com-mission's briefs, these cases are about "assist[ing] … clients to buy and

22

sell securities."  SEC Answering Br. 7, *Roth* (No. 92-1557), 1993 WL 13650741.

The Commission retreats to *Eastside Church* and *Big Apple*, (SEC.Br.23-29), but neither helps.  Contrary to the Commission's assertion, *Eastside Church of Christ v. National Plan*, 391 F.2d 357 (5th Cir. 1968), *also* concerned customer-order facilitation (Keener.Br.38).  The Commission's argument is a red herring.  It says the churches from whom National Plan (the putative "dealer") bought bonds were "*not* the [National Plan's] *customers*" (SEC.Br.24), but no one claims they were.  Once National Plan received the bonds, it "directed the bond sales programs," traveling "throughout the country" selling bonds over-the-counter to customers.  391 F.2d at 361; *see* Appellants' Supp. Br. 12, *Eastside Church* (No. 24500) (5th Cir. Dec. 1, 1967) (purchasers are "customers").  *That* was National Plan's "principal business."  391 F.2d at 361.

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015), doesn't help the Commission.  The Commission admits *Big Apple* "involved the ['33] Act's dealer definition instead of the ['34] Act's." SEC.Br.25-26.  An interpretation of one statute doesn't "magically" dictate the meaning of another.  *Cuozzo Speed Techs. v. Lee*, 579 U.S. 261,

277 (2016).  The Commission says the statutes have "minor differences" (SEC.Br.26), but Congress and the alleged "father of securities law" (SEC.Br.32n.7) disagree:  H.R. Rep. No. 73-85, at 14 (1933) ('33 Act extends beyond "merely the ordinary dealer"); 1 L. Loss et al., *Fundamentals of Securities Regulation* § 3.A.4 (7th ed. 2021 Cum. Supp.) ('34 Act returned "dealer" to "English Language").

The Commission clings to a footnote, which says the definitions "are very similar" (SEC.Br.27), but that's dicta and plainly erroneous (AIMA.Amicus.Br.18).  As the Court held, "any claims" related to the '34 Act's dealer definition were "abandoned."  783 F.3d at 806.  The Court thus "had no occasion" to construe that Act, because it would've "made no difference to the court's decision"; any discussion was "dicta."  *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022).

The Commission points (SEC.Br.27) to the Court's statement that "any argument that can be discerned from the defendant's briefs as to [the '34 Act's dealer-registration requirement] fails as a matter of law," 783 F.3d at 806, but that's dicta for the same reasons.  Even if it were not, the argument *here*—that, in context, the phrase "own account" in the '34 Act's "dealer" definition refers to a method of effectuating customer

24

orders—cannot be "discerned from the defendant's brief," 783 F.3d at 806;

the defendant didn't cite or even mention that provision, Appellants Br.,

*Big Apple* (No. 13-11976), 2013 WL 4401076.

### 3. The Commission Cannot Explain The Convertible-Lending Market.

As Mr. Keener demonstrated, the Commission has reviewed conduct identical to Mr. Keener's for decades and never asserted the right to regulate it.  Keener.Br.48-53.  The Commission's response cannot withstand even the slightest scrutiny.  It says individual "arrangements" are "[]legal," but claims not to have known entities were "engaged in" this activity as a "business."  SEC.Br.51.  That's nonsensical.  In the cases cited in Mr. Keener's brief, the Commission alleged the defendants were engaged in a *business* of acquiring "securities at large discounts" directly from issuers and "selling" those securities into the market—*exactly* what the Commission alleges here.  SEC Opp'n to Mot. to Dismiss 1-2, *SEC v. Lyon*, No. 1:06-cv-14338 (S.D.N.Y. Mar. 16, 2007), ECF No. 11.  The Commission explicitly said this was "not unlawful," so long as the securities were exempt (as all of Mr. Keener's were).  *Id.* at 7; *see* Keener.Br.49-50.  The Commission cannot explain this.

### D.    The Commission Still Cannot Tell Anyone What A "Dealer" Is Or Isn't.

The Commission cannot articulate a comprehensible standard for identifying whether a person is a "dealer" or not.  The Commission, in its brief, cites numerous characteristics that "may" be indicia of "dealer" status—*e.g.*, underwriting, earning a spread—but they have no plausible grounding in the statutory text.  They are not a proper test anyway.  The Commission, for example, mentions "underwriting" (SEC.Br.19-23), but many underwriters are not dealers.  *Acqua Wellington N. Am. Equities Fund*, SEC No-Action Letter, 2001 WL 1230266, at \*1 (Oct. 11, 2001); *see Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989) (potential "underwriter" "[c]learly" not "dealer").  There's no telling what factor matters.  *Morrison v. National Australia Bank Ltd.*, 561 U. S. 247, 258-59 (2010) (there's "no more damning indictment" of the "'conduct' and 'effects' tests than" the "declaration that 'the presence or absence of any single factor which was considered significant in other cases … is not necessarily dispositive in future cases'").

The Commission's assertion that Mr. Keener is an "underwriter" is particularly flawed.  Mr. Keener undisputedly complied with Rule 144

(Keener.Br.15); he is "therefore not an underwriter" (17 C.F.R. § 230.144 prelim. note).

### E.    The Commission's Waiver Argument Fails.

Unable to respond to Mr. Keener's arguments on their own terms, the Commission insists he has waived those arguments by "not rais[ing] [them] below." SEC.Br.33. That's incorrect. A party cannot waive the proper interpretation of law. *United States v. Lee*, 586 F.3d 859, 866 (11th Cir. 2009). Regardless, Mr. Keener didn't waive anything. In his summary judgment motion, he argued that, "in 1934," dealer "was well understood by courts, scholars, and the SEC itself to mean the business of providing financial services to customers and facilitating customer trading." S.A.158. Mr. Keener cited the same "[c]ontemporaneous SEC statement," "[c]ontemporaneous cases," and "[c]ontemporaneous treatise" he cites here. *Id.*; *see* Doc.90.at.13-14.

The Commission tries to identify inconsistencies in Mr. Keener's "argument[s]" (SEC.Br.35), but confuses "issue[s]" and "arguments," *In re Home Depot Inc.*, 931 F.3d 1065, 1086 (11th Cir. 2019). "If an *issue* is 'properly presented,' a party can make any *argument* in support of that issue," even if it's "inconsistent with [an] old argument." *Id.* (emphasis

added).  Here, the "Issue[] Presented" is "[w]hether the district court correctly concluded that Keener was a dealer."  SEC.Br.4.  That issue isn't waived, and Mr. Keener's arguments are properly before the Court.  His arguments are consistent anyway.  For example, the Commission claims that, below, Mr. Keener argued Commission guidance "had limited the statutory dealer definition."  SEC.Br.34.  That isn't true.  Mr. Keener argued Commission "guidance" had "reinforced" the "contemporaneous understanding" of the "dealer definition":  broker-dealers serve "customers."  Doc.71.at.16-17.

## II.    The Commission Fails To Show Mr. Keener Had Fair Notice Of Its New Theory.

The Commission argues "some" sources Mr. Keener cited "could" have put him "on notice" he supposedly needed to register as a "dealer."  SEC.Br.51.  But the one "source[]" the Commission cites—"the staff's *Acqua Wellington* no-action letter"—says the opposite.  *Id.*  That source explains that people like Mr. Keener (who "frequently buy convertible debt securities") operate "*without* being broker-dealers."  2001 WL 1230266, at *5 n.10 (emphasis added).

28

To be sure, *Acqua Wellington* indicates underwriting "*can* be indicia of dealer status" (SEC.Br.51 (emphasis added)), but Mr. Keener "satisf[ied] the ... conditions" of Rule 144, which establishes he's "not an underwriter." 17 C.F.R. § 230.144 prelim. note; *see supra* pp.26-27. Regardless, *Acqua Wellington* held the "underwriter" was *not* a broker-dealer. 2001 WL 1230266, at *1, *4. *Acqua Wellington* would've put a reasonable reader "on notice" (SEC.Br.51) Mr. Keener could operate "*without* registering ... as a broker-dealer," 2001 WL 1230266, at *1 (emphasis added).

The Commission denies "experienced securities professionals were 'unaware'" of its current theory (SEC.Br.50), but that isn't credible. The Commission cannot explain the views of its own dissenting commissioners, the chairman of the Commission's congressional oversight subcommittee, and the former director of the Commission's Division of Market Regulation, all of whom did not share the Commission's current view. Keener.Br.17, 59-60. The Commission, moreover, has no explanation for the scores of agency officials who reviewed, and in many cases approved, transactions identical to Mr. Keener's for years, and never once noticed every convertible lender was supposedly an unregistered "dealer."

29

Keener.Br.48-53, 58-60.  The Commission cannot identify *anyone* who saw its theory coming.

## III.  The Commission Cannot Defend The Sanctions.

### A.  The Commission Cannot Show The Sanctions Are Consistent With Principles Of Equal Protection.

The Commission denies Mr. Keener is "suffering unequal treatment," because (it says) he hasn't shown "he is 'similarly situated'" to the large hedge funds the Commission offered a one-year "grace period." SEC.Br.52.  This doesn't compute.  The Commission alleges Mr. Keener and the hedge funds are doing the same thing.  The hedge funds (the Commission says) are "'in the business' of buying and selling securities for their own account," 87 Fed. Reg. at 23,062, and (according to the Commission) so is Mr. Keener, SEC.Br.19 ("he was 'in the business of buying and selling securities' for his 'own account'").  On the Commission's theory, they are *identically* situated.  And the Commission cannot argue they are receiving "[]equal treatment" (SEC.Br.52); one (the hedge funds) can keep their money; the other (Mr. Keener) must disgorge it and pay millions in fines.  Keener.Br.62-63.

30

The Commission argues Mr. Keener "is differently situated," because he would supposedly "be [un]able to take advantage of '[an] opportunity to register.'" SEC.Br.53. That argument is forfeited, untrue, and irrelevant. As the district court held, the Commission failed to develop the point. Doc.145.at.15.n.1. For good reason: FINRA suspended Mr. Keener for declining to assist an investigation, S.A.70 (Tr. 18:5-19:11). That's not a capital offense; he could still register, *see* FINRA By-Laws of Corporation, art. III, § 3(d); FINRA Rule 9522(b)(1), which is presumably why the Commission has tried to preemptively stop him from doing so, Mot. for Summ. Disposition 7, *Justin Keener*, No. 3-21270 (Aug. 25, 2023), https://tinyurl.com/2rxb4r62. The "grace period" has nothing to do with future registration anyway. SEC.Br.52. Before it ends, many hedge funds will "exit" the market "to avoid registration." 87 Fed. Reg. at 23,091. The "unequal treatment" (SEC.Br.52) is *they* can keep the money they already made, whereas Mr. Keener must disgorge it and pay massive fines.

## B. The Commission Cannot Rationalize The Disgorgement Award.

1.    The Commission admits "disgorgement is unavailable for a registration violation that lacks a sufficient causal connection to the"

31

property disgorged (Mr. Keener's profits).  SEC.Br.55 (citing *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999)).  That principle resolves this case, because there's no causal link between the alleged registration violation and Mr. Keener's earnings (Keener.Br.63-64; AIMA.Amicus.Br.32); the Commission admits Mr. Keener "could have engaged" in the exact same transactions had he registered (Doc.129.at.6.n.4).  (The lack of causation is particularly pronounced for two bridge loans, which not even the Commission alleges were part of the convertible-note business (Keener.Br.63).[5]

The Commission argues it'd be "impossibl[e]" to estimate Mr. Keener's earnings "*had* [he] registered" (SEC.Br.55), but that's not so. Mr. Keener would've made the exact same trades in the exact same way. The Commission admits Mr. Keener's transactions were lawful (SEC.Br.49), and cannot identify any regulation that would've altered his trading (or profits) in any way.

---

[5] The Commission now says the loans "contained convertible features" (SEC.Br.54 n.11); there's nothing dealer-like about "convertible features."

The Commission argues (again) Mr. Keener would've been unable to register (SEC.Br.55), but (again) that isn't true (*supra* p.31). Even if it were, that has nothing to do with the causal relationship between a registration violation and profits. To assess causation, the Court must "change one thing at a time and see if the outcome changes." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020). Here, if the Court changes Mr. Keener's registration status, the outcome would be the same; he'd earn the same profits, because registration has nothing to do with it. Keener.Br.63-64; AIMA.Amicus.Br.32.

*Sidoti* compels this conclusion. Keener.Br.64. The Commission says *Sidoti* is "distinguish[able]," because Mr. Keener was "personally engaged" in unregistered activity (SEC.Br.56). So was Sidoti: he was the "principal" of a broker (he "exercised a controlling influence over [the broker's] activities"), 178 F.3d at 1137, but wasn't "register[ed] as a principal," *id.* at 1138  This Court nevertheless held there was no causal "nexus" between the "failure to register" and "profits." *Id.* The same reasoning applies here.

33

**2.**    The Commission stumbles over *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).  The Commission cannot show the "equitable" relief of disgorgement is needed to make "victims" whole (SEC.Br.58); there are no victims.    Keener.Br.65-67;  AIMA.Amicus.Br.33;  ICAN.Amicus.Br.9-10. The Commission points to the district court's "finding" that investors who purchased stock of Mr. Keener's borrowers "*could* be considered victims," "because 93% of [borrowers] experienced stock price declines.'" SEC.Br.58-59 (emphasis added).  But that "finding" is "clearly erroneous." SEC.Br.59.  The Commission "does not engage" (*id.*) with the fact *every* expert—including the Commission's—testified either there's no causal connection or it's "impossible" to identify one between Mr. Keener's trading and price declines, Keener.Br.65, let one between his *registration status* and declines.  Mr. Keener invests in risky companies (Doc.72¶¶27, 30); it's "unsurprising[]" some experienced declines, *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 106 (2d Cir. 2007).  He didn't "wrong[]" (SEC.Br.58) anyone.

The Commission all buts concedes the point.  Confronted with the holding in *Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017), that a lack of registration doesn't harm investors, the Commission argues

"loss causation" isn't required.  SEC.Br.57 n.12.  But while that may be true for *liability*, it's not for disgorgement; if the Commission cannot show Mr. Keener's registration status caused investor harm, there's nothing to disgorge.  Keener.Br.65-66.

### C.    The Commission Cannot Defend The Injunction.

The Commission cannot deny the injunction "merely tracks the language of the" statute.  *SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016).  The Commission calls this "focusing" on the "activity that [allegedly] ma[de] Keener a dealer" (SEC.Br.60 (cleaned up)), but that's a euphemism for "the district court copied and pasted the statutory text."  *Compare* Doc.147.at.1-2 ("effect transactions" in "any security" while engaged in "regular business" of "buying and selling securities"), *with* 15 U.S.C. §§ 78o(a)(1), 78c(a)(5)(A)-(B) (same).  The result is an "unenforceable" "obey-the-law" injunction.  *Graham*, 823 F.3d at 1362 n.2; *see* Keener.Br.68-69.

Although invalid, the injunction is nevertheless revealing, because the Commission cannot explain how anyone could know what activity is covered by it (and, in turn, the statue).  As Mr. Keener asked in his brief, what if he buys and sells some Microsoft stock, "more than a few isolated"

35

times, Doc.89.at.23, and does so as part of a business (say, a hedge fund)? Keener.Br.69. Isn't that "buying and selling" "any security" as part of a "regular business"? If it is, wouldn't that make every hedge fund an unregistered "dealer"? And if it's not, how could anyone know from the text? The Commission offers no answer, because there isn't one. In the Commission's world, the "dealer" definition is either absurdly broad, and everyone is a dealer, or it's entirely indeterminate, and no one knows who is or isn't.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

Dated:  October 20, 2023

/s/ *Helgi C. Walker*

BARRY GOLDSMITH
M. JONATHAN SEIBALD
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y. 10166-0193
(212) 351-4000

CHRISTOPHER F. REGAN
ORRICK, HERRINGTON
    & SUTCLIFFE LLP
2001 M Street NW, Suite 500
Washington, D.C. 20036
(202) 349-8000

HELGI C. WALKER
BRIAN A. RICHMAN
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
HWalker@gibsondunn.com

*Counsel for Defendant-Appellant Justin W. Keener*

37

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

**1.      Type Volume**

_  X  _      This document complies with the type-volume limit of Federal Rules of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 6,499 words.

**2.      Type face and Type-Style**

_  X  _      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point New Century Schoolbook font.

Dated:  October 20, 2023          /s/ *Helgi C. Walker*
                                   _____

                                   Helgi C. Walker
                                   *Attorney for Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2023, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

Dated:  October 20, 2023                    /s/ *Helgi C. Walker*
                                            _____
                                            Helgi C. Walker
                                            *Attorney for Appellant*