# RAIL

U.S. COURT OF APPEALS
RECEIVED
CLERK
AUG 2 7 2024
ATLANTA, GA

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
### CASE NO. 22-14237 – JJ

---

U.S. SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee,*

v.

JUSTIN W. KEENER
D/B/A JMJ FINANCIAL,
*Defendant-Appellant.*

---

## PETITION FOR REHEARING EN BANC AND
## PETITION FOR PANEL REHEARING OF APPELLANT,
## JUSTIN W. KEENER D/B/A JMJ FINANCIAL



To be
scanned
yes

1

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26.1-1, I, Justin W. Keener, state that the following individuals, law firms, and

entities have an interest in the outcome of this appeal:



1.  Augustini, Hope Hall

2.  Barbero, Megan

3.  Bloom, Beth F., U.S. District Judge

4.  Braunstein, Joshua E.

5.  Buckley LLP

6.  Conley, Michael A.

7.  Dwyer, Jared E.

8.  Folena, Jan

9.  Freda, Dominick V.

10. Gibson, Dunn & Crutcher LLP

11. Goldsmith, Barry

12. Greenberg, Benjamin G.

13. Greenberg Traurig, P.A.

14. Keener, Justin W.

15. Lisitza, David D.

16. Louis, Lauren Fleischer, U.S. Magistrate Judge

17. Miller, Adam

18. Orrick, Herrington & Sutcliffe LLP

19. Petrilla, Antony R.

20. Quinn, Brian O.

21. Ramkumar, Archith

22. Raskin, Jane S.

23. Raskin & Raskin

24. Regan, Christopher F.

25. Richman, Brian A.

26. Seibald, Jonathan M.

27. U.S. Securities and Exchange Commission

28. Viswanatha, Veena

29. Walker, Helgi C.

30. Welshhans, Carolyn M.

Pursuant to the district court's order, I have surrendered my remaining shares of stock and my remaining conversion rights. Accordingly, I certify that, pursuant to Eleventh Circuit Rule 26.1-3(b), there is no publicly traded company or corporation that has an interest in the outcome of this case or appeal.

[Signature on next page]

Dated: August 27, 2024          Respectfully submitted,

**JUSTIN KEENER D/B/A JMJ FINANCIAL**

/s/

Justin Keener
(619) 508-9916
750 N. State Street, 7th Floor
Chicago, IL 60654
info@jmjfn.com

# TABLE OF CONTENTS

Cover page.................................................................................................. 1

Certificate of Interested Parties and Corporate Disclosure Statement................... 2

Table of Contents ........................................................................................ 5

Table of Citations ........................................................................................ 5

Certificate of Service

Certificate of Compliance

Exhibits

Copy of the Opinion Sought to be Reheard ............................................Exhibit A

Trade Confirmation ....................................................................Exhibit B

Section 3 of the Exchange Act ................................................................Exhibit C

Broker Dealer Registration Form 2024 ....................................................Exhibit D

Mr. Keener Statement on Dealer Definition ............................................Exhibit E

Mr. Keener Statement on Section 15 Violation ....................................... Exhibit F

SEC Website Statement on Trade Execution...........................................Exhibit G

Statement of Commissioner Uyeda.........................................................Exhibit H

# TABLE OF CITATIONS

Not applicable

## **APPELLANT'S PETITION FOR REHEARING EN BANC**

## **AND PETITION FOR PANEL REHEARING**

I, Justin W. Keener, pursuant to Federal Rule of Appellate Procedures 35 and 40, file this Petition for Rehearing En Banc and this Petition for Panel Rehearing, and state:

On May 29, 2024, the Court issued its opinion in this appeal. Pursuant to 11th Cir. R. 40-1, a copy of the opinion is attached hereto as an addendum. Pursuant to 11th Cir. R. 40-3 this petition for rehearing en banc and petition for panel rehearing can be filed within 45 days of the opinion, as this is a civil appeal in which an agency of the United States, here the Securities and Exchange Commission, is a party. On July 15, 2024, I filed an emergency motion for an extension of time until August 27, 2024 to file this petition for rehearing en banc and petition for panel rehearing, which motion was approved by the Court on July 22, 2024.

As I explained in my motion for an extension of time to file this petition, in review of questions raised by the Court's opinion, we were lead to discover information in historical documents never before found after our six year search. It is believed that not even the SEC is aware of this information as it relates to "dealer" and the Securities Exchange Act of 1934's (the "Exchange Act") registration requirements. Had this information been known to the parties, this suit may never have been filed, or at the very least it would have been defended in a completely

different manner. This "undiscovered" or "previously unknown" information is central to this case and is in direct conflict with information that was presented and used to decide this case.

## INTRODUCTION

It has been said that the word "business" is central to the Exchange Act's dealer definition. The courts have erred in that application because the true centerpiece of the definition is the technical securities business phrase "engaged in the business of buying and selling securities." The word business alone is not significant in this case.

In "Big Apple" the Judge erred by using the business definition from Black's Law Dictionary. Even after all of these years of confusion over the word and topic, most don't realize that if one flips from "b" to "d" in that same dictionary, there is a very fine definition of dealer as follows.

> **Black's Law Dictionary, 10th ed., 2009**
>
> **Dealer - "a person or firm that buys and sells securities for its own account as a principal, and then sells to a customer."**

There is a reason that the court used the business definition rather than dealer, but it's not relevant here so I can address it at another time for fun. Moreover, the Big Apple case had nothing to do with any of this or my lawful and

genuine investing activity. It's unfortunate for me and for the courts that the dealer theory was pulled into the Big Apple case.

Personally, I found the word business so troubling from day one, and I spent months researching it and contemplating it for over six years. While I do work and make money on my good investments, and lose money on my bad investments, I don't have a business. Yes, I have offices and employees who help me manage my money, I did not have JMJ Financial as an operating business in a service, trade, or any type of commerce. If you had walked into my office, you would not have found me in there flipping burgers to sell to customers at $4.99.

Further, I didn't manufacture widgets, nor did I have a business that was buying goods to resell them at a profit to customers. That business would be referred to as merchandising in goods as a merchant, or dealing in goods as a dealer. As an FYI, securities dealers were often called securities merchants in the 1800s, and even still today though that phrase is more rare than it used to be.

The phrase "investment banking and securities business" is a defined phrase and it has the same meaning as "securities dealing." Similarly, to be "engaged in the business of dealing" is, in fact, to be "engaged in the business of buying and selling securities" as derived from the Exchange Act dealer definition and exception. These phrases are not plain English, instead they are precise and

technical industry phrases that are regularly used today in the securities business and their use is well documented back to the 1800s.

FINRA defines broker-dealer firms as "being engaged in the business of buying and selling securities" (such as stocks and bonds) on behalf of their customers as broker, for its own account as principal, or both as dealer. The "Big Apple" judge erred in attempting to force a plain English meaning on that phrase, which simply can't be done.

Another way to describe the phrase "to be engaged in the business of buying and selling securities" is that a broker-dealer creates an entire business out of providing the service of buying and selling securities for customers and charging customers fees to do so. This meaningful phrase is well documented back to the 1800s and the securities business was a critical segment of President's Roosevelt's New Deal.

Indeed, these words and phrases are in fact technical industry jargon that needed not to be defined in the Exchange Act. They are used in all things related to the New Deal including the Exchange Act, the New Deal's revenue code, and more. Today, FINRA's documentation is filled with meaningful industry phrases such as these.

As a retail investor and customer of a brokerage firm, I am not able to "effect transactions" in securities myself. Only broker-dealers can do that. Like

any other investor I can place an order, which may or may not be executed, but I can't effect (execute) transactions. As the investor I simply place an order with my broker-dealer to "buy 100 shares of AAPL" for example, and my broker-dealer then provides me the service of executing and effecting that order in exchange for a fee.

Effecting securities transactions is a complex, specialized, and highly-regulated "lock and key" process controlled by the SEC and FINRA. Only registered broker-dealers are able to do it, and they can only do so when they have access to the systems known as "exchange facilities" along with the training that goes with that. Their customers, who are investors like me, pay broker-dealers to provide this service of effecting securities transactions and fees are usually in the form of commissions.

### INCREDIBLY SIMPLE TO DISPROVE THE SEC'S NONSENSE

Now that I am very quickly and easily going to prove to the Court, with 100% certainty, that I did not violate Section 15(a) of the Exchange Act. Any thought that I, Justin Keener, have violated 15a or that I meet the definition of a dealer must be fully dismissed. Herein I will quickly and easily demonstrate that I did not violate 15a by analyzing the language in the U.S. code, and I will also show that I did not meet the definition of a dealer in several ways from several sources:

-34 Act - nope

10

-Blacks - nope

-USA - nope

Please see the full analysis in Exhibit E

## THE SEC AND ITS STAFF TRICKED US ALL

*The SEC created, devised, and carried on a well-rehearsed scheme of deceit, manipulation, and omission. After all, malicious and __intentional omission__, especially when conducted by a supposedly "trustworthy" government agency, is one of the most powerful, deceptive, and manipulative tools that can be used to prosecute completely innocent people like me.* In short, *the SEC and its staff tricked us,* and I mean they tricked us all: me, the courts, the Judges, the American people, journalists, politicians, and others.

## UNDERSTANDING THE SITUATION IN 1934 – TRANSITION INTO FEDERAL REGULATION

There seems to be a misunderstanding of events from the 1930s. Some people are under the impression that the Exchange Act suddenly created new opportunity in the securities business for people to become dealers and brokers. Allow me to clarify: it is not as if suddenly dealers and brokers came into existence, here's how we define them, here's their functions, and "poof!" just like magic the entire concept is created, and those who wish to participate may apply to register. That's not the case.

Registered brokers and dealers existed long before 1934 and as described below, the only reason they were defined in detail was because they were segregated by the Exchange Act. The public, investors, regulators, and market participants knew who and what brokers and dealers were, and brokers and dealers themselves knew that they were brokers and dealers. Of course, they also knew their functions:

Dealer Functions –

(1) Handle customer funds and securities, and other services such as underwriting, advice, stock picks, stock loans, etc.

*(2)* Trade for their own account with customer accounts. For example, a dealer may trade for its own account with a customer account by selling a security it owns to that customer, or a dealer may trade for its own account with a customer account by buying a security from that customer. Recall that "trading for own account" is a technical industry phrase from the 1800s that means a dealer makes a trade with a customer account and they act as the customer's counter-party to the trade. *If a dealer buys or sells a security in its own account for speculation or a day trade, that is not trading for its own account.*

It's important to understand that when written, brokers and dealers already existed. They knew they were brokers and dealers and they were in fact registered. They were not registered with the SEC because the SEC did not exist before 1934, but they were registered as brokers, dealers, traders, etc., with the securities exchanges such as the New York Stock Exchange and/or they were registered with States under the "blue sky laws."

Note that the dealer definition 3(a)(5) states "the term dealer *means*…" while 15a states "It *shall be* unlawful…" Dealer already *means* because dealers already existed, but it *shall be* unlawful because no such Federal law existed, such that, from that point forward, it shall be unlawful. Also note that the dealer definition from the Securities Act of 1933 only defines dealer… it does not define broker.

## SEGREGATION OF DEALER AND BROKER FUNCTIONS

If dealers already existed and they knew they were dealers, why define dealer? And why define broker? The answer is not commonly known, but it is very simple: the Exchange Act segregated the two functions from dealer (dealer and broker) into separate roles of dealer and broker.

Please note that a dealer can function as both a dealer and a broker. However, a broker can only function as a broker and can't also function as a dealer. Congress found, in the tremendously thorough "Report on the Feasibility

and Advisability of the Complete Segregation of the Functions of Dealer and Broker" from June 20, 1936, that if a dealer functioned in a transaction as both a dealer and a broker, there was an inherent conflict of interest for its customer's best interest and potential fiduciary duty issues.

The conclusion of the report was that the initial segregation in the Exchange Act, which defined dealer and broker differently and the functions of each, was adequate and that the SEC could develop an adequate program without having Congressional legislation on the matter.

### FACT: DEALERS "TRADE FOR OWN ACCOUNT"

### *WITH CUSTOMERS*

As I have maintained throughout this case, dealers "trade for their own account" with customers, and that is a fact. The words of that phrase may be familiar, but in the securities industry those words tougher in that phrase have a specific meaning. That phrase can't be forced into plain English and maintain its proper meaning.

*The phrase "trading for own account" is a technical industry phrase that means a dealer executes transactions for its own account with customers for the customer's account.* For example, when "trading for own account" a dealer <u>buys</u> a security for its own account <u>from</u> a customer, or a dealer <u>sells</u> a security from its own account <u>to</u> a customer.

14

Congress learned from the report that an inherent conflict may exist on each dealer-customer transaction that is effected, and therefore addressed it by segregating the two functions of broker and dealer. Also enacted was the requirement to obtain pre-approval and written disclosure by the dealer, such that when effecting transactions for customers the dealer must notify and document in writing whether the customer's transaction was effected by the dealer as "principal" or as "agent." When the dealer effects a transaction for its account with a customer account, it is a "principal trade" or "principal transaction" because the dealer is acting as "principal" for its "principal account." When a dealer effects a trade for a customer account and solely for the customer without trading its own account, then the dealer is acting only as a broker (or agent) in what is called an "agency trade."

This disclosure by the dealer to the customer is intended to notify the customer that they are buying from or selling to the dealer in a "principal transaction," or if the dealer is acting solely as a broker it is an "agency transaction." This disclosure by the dealer to the customer notifies the customer of the nature of the dealer's role in the transaction, and by knowing whether the trade was "principal" or "agency," that may indicate whether there could be a conflict of interest or fiduciary duty concern.

15

Please see a trade confirmation provided to me by my broker (EXHIBIT B where the trade effected was as a broker trade, or an "agency" trade (Etrade effected the transaction as an agent with some third party unknown to me). You'll also note how poor the disclosure is, it would be nearly impossible for the average person to figure this out. I encourage the reader to ask their broker-dealer for a full understanding, and even to review their own trade confirmations online. Recall that "trading for its own account" is a very technical phrase used in the securities business and it has a precise meaning dating to the 1800s.

### INDISPUTABLE FACT

A dealer can buy or sell a security for its own account as they choose. <u>BUT,</u> that action of the dealer simply buying a security for its own account or selling a security for its own account without effecting the transaction with a customer account *is not* "trading for own account." That is an indisputable fact.

Protecting the customer is one of the main factors that the Exchange Act is designed to address. Further, there is absolutely no reason for an investor like me, who has no customers and does not effect transactions, to be regulated. Any thought otherwise is nonsensical. When I invest or trade with my account held by Etrade or another broker-dealer,

### PLEASE FORGIVE ME, BUT THIS MUST BE STATED

### UNEQUIVOCALLY

16

Please forgive me for being so forthright but it must be done:  I do not have customers.  I do not sell to customers, and I do not buy from customers.  There is no conflict with customers in my investing activity.  I am an investor and I am not a broker-dealer.  There is no customer to be protected, and I do not need to be registered or regulated for me to invest my own personal funds.  *It is ME, the investor*, who needs to be protected from (1) the broker-dealers that effect my transactions, and it's me the investor, who needs to be protected from (2) the Issuers who sell and issue the securities that I invest in.

Accordingly, I ask that the Court rehear these arguments en banc or, in the absence of the Court agreeing to a rehearing en banc, I ask that the Court panel rehear these arguments.

WHEREFORE, I, Justin W. Keener, pray that the court grant this Petition for Rehearing En Banc or, in the alternative, grant this Petition for Panel Rehearing.

Dated:  August 27, 2024          Respectfully submitted,

JUSTIN KEENER D/B/A JMJ FINANCIAL

/s/

Justin Keener
(619) 508-9916
750 N. State Street, 7th Floor
Chicago, IL  60654
info@jmjfn.com

# CERTIFICATE OF SERVICE

I hereby certify that I have this day mailed, postage prepaid, a true and correct copy of the foregoing document to the following:

Megan Barbero
Michael A. Conley
Dominick V. Freda
David D. Lisitza
Archith Ramkumar
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549-9040
Telephone: (202) 551-4886 (Ramkumar)
RamkumarA@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*

Dated:  August 27, 2024

Respectfully submitted,

**JUSTIN KEENER D/B/A JMJ FINANCIAL**

/s/

Justin Keener
(619) 508-9916
750 N. State Street, 7th Floor
Chicago, IL  60654
info@jmjfn.com

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitation set forth in

Federal Rules of Appellate Procedure 32.  This motion is submitted in Times New

Roman 14-point font.


Dated:  August 27, 2024                    Respectfully submitted,

**JUSTIN KEENER D/B/A JMJ FINANCIAL**

/s/

Justin Keener
(619) 508-9916
750 N. State Street, 7th Floor
Chicago, IL  60654
info@jmjfn.com

[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

---

No. 22-14237

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

*versus*

JUSTIN W. KEENER,
d.b.a. JMJ Financial,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-21254-BB

---

Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether Justin Keener violated the Securities Exchange Act of 1934 by buying and selling securities as an unregistered "dealer." 15 U.S.C. § 78o(a). Keener made more than $7.7 million by purchasing convertible debt notes from microcap issuers, converting those notes into common stock, and selling the stock in high volumes in the public market. The Securities and Exchange Commission filed this civil enforcement action against Keener, and the district court granted summary judgment for the Commission. It enjoined Keener from future securities transactions as an unregistered dealer and ordered him to disgorge the profits from his convertible-note business. We affirm.

## I. BACKGROUND

Justin Keener was a sole proprietor doing business as JMJ Financial, a fictitious name that he registered in Florida in 2008. Keener's business model involved purchasing convertible notes from microcap issuers, converting those notes into new issues of common stock, and selling that stock into the public market at a profit. The convertible notes that Keener purchased obligated issuers to pay sums of principal and interest within a designated time. The notes also guaranteed Keener the option of receiving repayment in the form of the issuer's stock. Keener demanded and received "highly favorable" terms for these conversion options—

typically, the notes allowed Keener to covert debt to common stock at a discount of 30 to 40 percent from the market price.

Keener's lending behavior—converting debt to stock at a significant discount and selling the resultant shares in high volumes—is known as "toxic" or "death spiral" financing. *See SEC v. Almagarby*, 92 F.4th 1306, 1312 (11th Cir. 2024) (citation and internal quotation marks omitted); *Crown Bridge Partners, LLC v. Sunstock, Inc.*, No. 18 Civ. 7632 (CM), 2019 WL 2498370, at *1 (S.D.N.Y. June 3, 2019). The arrangements can harm microcap companies and existing investors by causing the stock price to "drop to or near a zero-dollar value." *Crown Bridge*, 2019 WL 2498370, at *1.

Keener or his employees identified viable issuers, "negotiated the terms of the convertible notes" directly with those issuers, and "signed contracts to memorialize" those notes. Although the notes allowed issuers to prepay in cash and avoid the dilutive effects of conversion, prepayment occurred only "10 to 20 percent" of the time. This practice was by design because when an issuer "prepaid a note, [Keener] would make less money." Keener "made money on conversions"—at profit margins of 50 to 100 percent—because of the conversion discount. Keener decided when to covert an issuer's outstanding debt, and he did so by placing requests with the issuer's transfer agent and with his own brokerage firm. Keener's conversion request would trigger the creation of new shares that "w[ere not] in the market before." When the new shares were deposited into Keener's brokerage accounts, "it was important for

him to sell the stock . . . as soon as he could," within six to nine months as "the rule of thumb."

From January 2015 through January 2018, Keener's business operations were extensive. He made at least $7.7 million in profits from the sales of converted stock, purchased debt notes from at least 100 microcap issuers, and liquidated "billions" of microcap shares. Keener operated out of a 7,400-square-foot office in San Diego and had additional offices in Miami and San Juan, Puerto Rico. He employed as many as 25 individuals, including a chief financial officer, a general counsel, a marketer, accountants, and multiple employees tasked with identifying microcap companies in need of financing. He had an employee payroll of $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017.

Keener advertised aggressively and held himself out to microcap issuers as willing to buy convertible debt. He maintained a public website and issued press releases touting his "QuickLoan" convertible-note program: Keener asserted that QuickLoan could provide companies with "up to $500,000 in working capital utilizing a simple, two-page promissory note," and that with "over 200 Nasdaq, OTC Markets, NYSE, and OTCBB companies in its portfolio and a long and highly successful track record, JMJ Financial is one of the most active and reliable investors in the [microcap] space."

Keener invested more than $3 million to develop proprietary "lead generation" and other software, which allowed him to screen public filings with the Securities and Exchange Commission to

identify potential issuers. His employees contacted hundreds of the companies identified by the software. Keener also sponsored, attended, and spoke at lavish microcap industry conferences, where he solicited issuers selling convertible notes. For example, he hosted a dinner at Nobu in Las Vegas for brokers and finders, and he sponsored an all-expenses paid "Broker and Finder Seminar" at the Wynn Hotel, where he covered airfare and accommodations for the attendees.

Keener never registered as a dealer with the Commission. He was once an "associated" person who held an ownership interest in a registered broker-dealer. But the Financial Industry Regulatory Authority, or FINRA—a national self-regulatory organization that oversees registered securities dealers—disbarred Keener in 2012 for refusing to cooperate with its investigation of whether he illegally underwrote microcap stock offerings. *See* 15 U.S.C. § 78s(d) (procedure for disciplinary actions by a self-regulatory organization). FINRA forbade Keener from future association with any member in any capacity.

The Commission filed this enforcement action against Keener, charging that he operated as an unregistered dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a). The Commission submitted expert reports attesting that 93 percent of the microcap issuers who borrowed from Keener experienced price declines in their shares, and that those price declines primarily harmed retail investors. Even as this suit was pending, Keener sold stock holdings acquired through his convertible-note

business but made "materially false" statements to the district court by asserting that the stock was unrelated to the ongoing litigation.

The district court granted summary judgment for the Commission. It then partially adopted the magistrate judge's report and recommendation, which relied on the Commission's expert. The district court calculated that Keener had made net profits, subject to disgorgement, of over $7.7 million. The district court also credited the Commission's assertion that it intended to "distribute any disgorgement it collect[ed] . . . to harmed investors." It enjoined Keener from future violations of section 15(a)(1) of the Exchange Act and imposed a five-year penny-stock bar, ordered disgorgement of $7,786,639 in profits plus prejudgment interest, and imposed a civil penalty of $1,030,000.

## II. STANDARDS OF REVIEW

We review *de novo* a summary judgment. *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023). We review for an abuse of discretion the district court's choice of equitable remedies. *See SEC v. Calvo*, 378 F.3d 1211, 1216–17 (11th Cir. 2004).

## III. DISCUSSION

We divide our discussion into four parts. First, we explain that Keener operated as an unregistered dealer in violation of section 15(a) the Exchange Act. Second, we explain that Keener's arguments that the district court violated his rights to due process and equal protection are meritless. Third, we explain that the district court did not abuse its discretion by imposing an injunction.

Fourth, we explain that the district court did not abuse its discretion by ordering disgorgement.

### A. Keener Operated as an Unregistered Exchange Act "Dealer."

Section 15(a) of the Exchange Act makes it unlawful for a "dealer" to use interstate commerce to "effect any transactions in . . . any security" unless he registers with the Commission. *See* 15 U.S.C. § 78*o*(a)(1). A dealer is "any person engaged in the business of buying and selling securities . . . for such person's own account." *Id.* § 78c(a)(5)(A). A dealer is "a professional market-maker" who "matches the buyers and sellers of securities" and whose business model depends on "his *volume* of buying and selling because he profits from executing trades." *Almagarby*, 92 F.4th at 1315. The word "business" is the "centerpiece" of the Exchange Act's dealer definition: a dealer is one whose "*entire* business model [i]s predicated on the purchase and sale of securities." *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015); *see Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 361–62 (5th Cir. 1968) ("National purchased many church bonds prior to the ones in question for its own account as a part of its *regular business* and sold some of them. Thus National was a broker and a dealer within the meaning of the [Securities Exchange] Act." (emphasis added)). An unregistered dealer may not buy or sell securities in interstate commerce. *See* 15 U.S.C. § 78*o*(a)(1).

In *Almagarby*, which arose out of the series of Commission actions against toxic lenders, we held that Almagarby's lending activities rendered him a "dealer" under the Exchange Act. 92 F.4th

at 1316–18. Almagarby purchased existing microcap debt held by third parties and negotiated with the issuers to obtain conversion options carrying a significant discount. *Id.* at 1313. He then converted his debt holdings and sold the resultant new shares "as fast as possible." *Id.* (internal quotation marks omitted). Almagarby's operations were smaller and less professional than Keener's—Almagarby netted $885,000 in profits, never had any employees, never advertised or publicly held himself out as a buyer or seller of securities, and never attended any industry conferences or meetings. *Id.* at 1313–14 (citing *Guide to Broker-Dealer Registration*, U.S. SEC. & EXCH. COMM'N (last modified Dec. 12, 2016), https://perma.cc/YN2X-TZED)). Still, we found that the "regularity" of Almagarby's transactions; that his "*entire* business was predicated on flipping penny stocks"; that he "relied on high volumes of trade execution to profit"; and that he "brought *new* [microcap] shares to the market" were enough to render him an Exchange Act dealer. *Id.* at 1316–17.

Keener's business model was materially similar to Almagarby's. Most of Keener's profits were made from converting microcap debt into stock at a discount and selling the resultant shares in high volumes. Like Almagarby, Keener's conversions and sales brought new microcap shares to the public market. If anything, Keener's business operations were more extensive: he purchased more debt, sold a higher volume of shares in the public market, made significantly more profit, and directly employed others in his scheme. And unlike Almagarby's activity, Keener's activity *did* directly implicate the Commission's public guidance for defining

broker-dealers. *See Guide to Broker-Dealer Registration, supra* (an individual who "holds himself out as being willing to buy and sell a particular security on a continuous basis" or "advertise[s] or otherwise let[s] others know that [he is] in the business of buying and selling securities" might need to register as a dealer). Keener maintained a public website; developed proprietary software and issued press releases to solicit borrowers; and sponsored and attended lavish industry conferences for microcap issuers. The nature, volume, regularity, and frequency of Keener's transactions render him a dealer.

Keener contends that because he never effectuated securities orders for *customers*, he could not have been an Exchange Act dealer. He argues that market participants and Congress historically "presumed" that dealers handled orders for customers; that the statutory phrase, acting as a dealer for his "own *account*," is a term of art presupposing that trades executed through a dealer's account are for customers, *see* 15 U.S.C. § 78c(a)(5)(A) (emphasis added); and that the "legal backdrop" and the Exchange Act's structure imply that dealers must have customers.

*Almagarby* forecloses Keener's customer-requirement argument. We explained there that "a customer requirement has no grounding in the statutory text" of the Exchange Act. 92 F.4th at 1318. Although many dealers execute trades on behalf of customers, the Exchange Act makes no mention of a customer-facing role in its statutory definition. Instead, the Act defines dealers by their function, as being "*in the business* of buying and selling securities,"

15 U.S.C. § 78c(a)(5)(A) (emphasis added); *see also Almagarby*, 92 F.4th at 1315 (a dealer is a market participant whose "business model depends on his *volume* of buying and selling because he profits from executing trades" and who "provide[s] market liquidity"); *Eastside Church*, 391 F.2d at 361–62. Since the enactment of section 15(a), the "dealer" definition has been understood to cover a trader "who *has no customers* but merely trades for his own account through a broker," so long his operations "are sufficiently extensive to be regarded as a regular business." Charles H. Meyer, The Securities Exchange Act Of 1934 Analyzed And Explained 34 (1934) (emphasis added). Indeed, several Exchange Act provisions apply to a dealer "who does *not* carry customer accounts" "or hold funds or securities for customers." *Almagarby*, 92 F.4th at 1318 (alterations adopted) (quoting 17 C.F.R. § 240.15c3–1(a)(2)(vi), (6)(ii)). Keener operated as an unregistered Exchange Act "dealer."

### B. *The Commission Did Not Violate Keener's Rights to Due Process or Equal Protection.*

Keener argues that the Commission violated his due-process right to "fair notice," *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), by pressing an enforcement theory that "[n]o one could've seen . . . coming." He asserts that he "acted in accord with longstanding industry practice" and points to the Commission's tolerance of penny-stock flipping—i.e., the discounted acquisition and resale of *existing* microcap shares—and convertible debt lending.

The fair-notice principle "has been recognized in only a 'very limited' set of cases," and we have declined to apply it in this context. *See Almagarby*, 92 F.4th at 1319 (quoting *Suburban Air Freight, Inc. v. Transp. Sec. Admin.*, 716 F.3d 679, 684 (D.C. Cir. 2013)). We explained in *Almagarby* that the Commission's "dealer" definition fairly accords with our precedents interpreting the Exchange Act. *Id.* Although the Commission might have tolerated stock-flipping of existing shares and convertible lending in general, it has never issued guidance condoning the *combination* of transactions for which Keener has been sued. So the Commission's enforcement theory does not deprive Keener of fair notice and is not a due-process violation.

Keener also argues that his equal-protection right was violated because the Commission sought sanctions against him while offering other "prominent [market] participants" a yearlong grace period to register as dealers without penalty. *See Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, 87 Fed. Reg. 23,054, 23,062 (Apr. 18, 2022). This argument is meritless. Keener points to a proposed Commission rule that would require market participants who play a "central role as liquidity providers" in the U.S. Treasury market—that is, high-frequency and algorithmic traders who buy and sell government bonds—to register as dealers. *See id.* at 23,055. The proposed rule asserts that liquidity providers already act as dealers because they buy and sell securities "as part of a regular business," but the rule offers a post-adoption grace period for the providers to register without penalties. *Id.* at 23,058, 23,062.

To prove that he suffered unequal treatment under the proposed rule, Keener must show that he is "similarly situated" to the liquidity providers who would benefit from the rule's grace period. *See Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Keener cannot make that showing. For one thing, he is not one of the market participants who play a "central role as liquidity providing intermediaries in the U.S. Treasury market." 87 Fed. Reg. at 23,056. For another, in the light of his FINRA bar, it is doubtful that Keener would be permitted to register with the Commission to avail himself of the grace period. Because Keener cannot prove that he is similarly situated to the liquidity providers, his equal-protection argument fails.

### C. The District Court Did Not Abuse its Discretion by Imposing a Permanent Injunction.

Keener argues that the district court imposed an impermissibly vague "obey-the-law" injunction that failed to "clearly and specifically describe permissible and impermissible conduct." *See SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016) (citation and internal quotation marks omitted). He proposes instead a narrower injunction that would prohibit him only from "engaging in the convertible note transactions, note conversions, acts, practices or courses of business *described in the Complaint*."

The grant of injunctive relief "rests within the sound discretion of the trial court and will not be disturbed unless there has been a clear abuse of it." *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir.

1978) (citation and internal quotation marks omitted). An injunction prohibiting violations of securities regulations must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012) (quoting FED. R. CIV. P. 65(d)(1)) (internal quotation marks omitted). Yet "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language," is permissible "so long as it clearly lets the defendant know what he is ordered to do or not." *Id.* at 952. And a broader injunction might be "necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)) (internal quotation marks omitted).

The district court permanently enjoined Keener from future securities transactions as an unregistered dealer using language that largely tracks section 15(a)(1):

> Keener is . . . enjoined from directly or indirectly making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . while *engaged in and pursuant to the regular business of buying and selling securities* . . . for his own account through a broker or otherwise unless Keener is registered as a dealer with the Securities and Exchange Commission, or unless he is associated with a broker-dealer that is so registered.

(Emphasis added). But the injunction also makes an important substitution to the statutory language. Although section 15(a)(1) generally prohibits "any broker or dealer" from engaging in unregistered dealing, *see* 15 U.S.C. § 78*o*(a)(1), the injunction specifically describes the activity that rendered Keener a dealer: "the regular business of buying and selling securities."

The district court provided *more* detail than the Exchange Act language to describe proscribed dealer activity. *See Goble*, 682 F.3d at 952 (an injunction may "largely" track "statutory or regulatory language" so long as it specifically describes proscribed conduct). It also took care to excise "unnecessary references to law and regulations," instead using plain language to describe the acts addressed by the injunction. And it recognized Keener's "decade-long history of noncompliance and nondisclosure"; his "firm position in the financial industry"; and his "misrepresentation and obfuscation" of his securities transactions while this very litigation was ongoing, to determine that a broader injunction was necessary to prevent future misconduct. *See Askins & Miller*, 924 at 1362. Indeed, it is Keener's proposed language, which cross-references the complaint, that would violate the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 65(d)(1)(C) (injunction may not "refer[] to the complaint or other document" to explain the acts enjoined). We cannot say that the district court abused its discretion.

*D. The District Court Did Not Abuse its Discretion by*
*Ordering Disgorgement.*

The district court ordered Keener to disgorge $7,786,639 of profits from his convertible-note business. Keener argues that the district court abused its discretion in two ways: first, there is no causal connection between Keener's profits and his failure to register; and second, the disgorged profits would not "be awarded for victims," *see Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).

Keener's arguments are both foreclosed by *Almagarby*, 92 F.4th at 1319–20. First, Keener's profits were causally linked to his failure to register because section 15(a) prohibits unregistered dealers from effecting "*any* transactions in . . . any security" in interstate commerce. 15 U.S.C. § 78*o*(a)(1) (emphasis added). Because Keener was altogether prohibited from making securities transactions, "*any* profits generated from his prohibited transactions were causally linked to his failure to register." *See Almagarby*, 92 F.4th at 1321. Second, disgorgement did not violate *Liu*'s victim-benefit requirement. The Commission offered evidence that Keener's conduct harmed investors: his sales caused price declines for 93 percent of microcap issuers who borrowed from him, and the price declines primarily affected retail investors who held those issuers' shares. The Commission also promised to distribute the disgorged profits to investor-victims who suffered from Keener's activity. These proffers satisfy the victim-benefit requirement. *See id.* at 1320–21.

16                    Opinion of the Court                    22-14237

## IV. CONCLUSION

We **AFFIRM** the judgment for the Commission.



**U.S. Securities and Exchange Commission**

INVESTOR PUBLICATIONS

# Trade Execution:

Jan. 15, 2013

## *What Every Investor Should Know*

When you place an order to buy or sell stock, you might not think about where or how your broker will execute the trade. But where and how your order is executed can impact the overall costs of the transaction, including the price you pay for the stock. Here's what you should know about trade execution:

## Trade Execution Isn't Instantaneous

Many investors who trade through online brokerage accounts assume they have a direct connection to the securities markets. But they don't. When you push that enter key, your order is sent over the Internet to your broker — who in turn decides which market to send it to for execution. A similar process occurs when you call your broker to place a trade.

While trade execution is usually seamless and quick, it does take time. And prices can change quickly, especially in fast-moving markets (/investor/pubs/onlinetips.htm). Because price quotes are only for a specific number of shares, investors may not always receive the price they saw on their screen or the price their broker quoted over the phone. By the time your order reaches the market, the price of the stock could be slightly – or very – different.

No SEC regulations require a trade to be executed within a set period of time. But if firms advertise their speed of execution, they must not exaggerate or fail to tell investors about the possibility of significant delays.

## Your Broker Has Options for Executing Your Trade

Just as you have a choice of brokers, your broker generally has a choice of markets to execute your trade:

- For a stock that is listed on an exchange, such as the New York Stock Exchange (NYSE), your broker may direct the order to that exchange, to another exchange (such as a regional exchange), or to a firm called a "third market maker." A "third market maker" is a firm that stands ready to buy or sell a stock listed on an exchange at publicly quoted prices. As a way to attract orders from brokers, some regional exchanges or third market makers will pay your broker for routing your order to that exchange or market maker — perhaps a penny or more per share for your order. This is called "payment for order flow." (/answers/payordf.htm)

- For a stock that trades in an over-the-counter (OTC) market, such as the Nasdaq, your broker may send the order to a "Nasdaq market maker (/answers/mktmaker.htm)" in the stock. Many Nasdaq market makers also pay brokers for order flow.

- Your broker may route your order – especially a "limit order" (/answers/limit.htm) – to an electronic communications network (ECN) that automatically matches buy and sell orders at specified prices. A "limit order" is an order to buy or sell a stock at a specific price.

- Your broker may decide to send your order to another division of your broker's firm to be filled out of the firm's own inventory. This is called "internalization." (/answers/internalization.htm) In this way, your broker's firm may make money on the "spread" – which is the difference between the purchase price and the sale price.

The graphic below shows your broker's options for executing your trade:



**Your Broker's Choices**

## Your Broker Has a Duty of "Best Execution"

Many firms use automated systems to handle the orders they receive from their customers. In deciding how to execute orders, your broker has a duty to seek the best execution that is reasonably available for its customers' orders. That means your broker must evaluate the orders it receives from *all* customers in the aggregate and periodically assess which competing markets, market makers, or ECNs offer the most favorable terms of execution.

The opportunity for "price improvement" – which is the opportunity, but not the guarantee, for an order to be executed at a better price than what is currently quoted publicly – is an important factor a broker should consider in executing its customers' orders. Other factors include the speed and the likelihood of execution.

Here's an example of how price improvement can work: Let's say you enter a market order to sell 500 shares of a stock. The current quote is $20. Your broker may be able to send your order to a market or a market maker where your order would have the possibility of getting a price better than $20. If your order is executed at $20.05, you would receive $10,025.00 for the sale of your stock – $25.00 more than if your broker had only been able to get the current quote for you.

Of course, the additional time it takes some markets to execute orders may result in your getting a worse price than the current quote – especially in a fast-moving market. So, your broker is required to consider whether there is a trade-off between providing its customers' orders with the possibility – but not the guarantee – of better prices and the extra time it may take to do so.

## You Have Options for Directing Trades

If for any reason you want to direct your trade to a particular exchange, market maker, or ECN, you may be able to call your broker and ask him or her to do this. But some brokers may charge for that service. Some brokers offer active traders the ability to direct orders in Nasdaq stocks to the market maker or ECN of their choice.

SEC rules (/rules/final/34-43590.htm) aimed at improving public disclosure of order execution and routing practices require all market centers that trade national market system securities to make monthly, electronic disclosures of basic information concerning their quality of executions on a stock-by-stock basis, including how market orders of various sizes are executed relative to the public quotes. These reports must also disclose information about *effective* spreads – the spreads actually paid by investors whose orders are routed to a particular market center. In addition, market centers must disclose the extent to which they provide executions at prices better than the public quotes to investors using limit orders.

These rules also require brokers that route orders on behalf of customers to disclose, on a quarterly basis, the identity of the market centers to which they route a significant percentage of their orders. In addition, brokers must respond to the requests of customers interested in learning where their individual orders were routed for execution during the previous six months.

With this information readily available, you can learn where and how your firm executes its customers' orders and what steps it takes to assure best execution. Ask your broker about the firm's policies on payment for order flow, internalization, or other routing practices – or look for that information in your new account agreement. You can also write to your broker to find out the nature and source of any payment for order flow it may have received for a particular order.

If you're comparing firms, ask each how often it gets price improvement on customers' orders. And then consider that information in deciding with which firm you will do business.

We have provided this information as a service to investors. It is neither a legal interpretation nor a statement of SEC policy. If you have questions concerning the meaning or application of a particular law or rule, please consult with an attorney who specializes in securities law.

Last Reviewed or Updated: Jan. 16, 2013



**U.S. Securities and Exchange Commission**

STATEMENT

# Statement Regarding GHS Investments, LLC

## Commissioner Mark T. Uyeda (/about/sec-commissioners/mark-t-uyeda)

Aug. 19, 2024

From 2017 through 2022, GHS Investments, LLC (GHS) acquired convertible, variable rate notes from penny stock securities issuers, converted the notes into stock at a substantial discount from the prevailing market price, and sold the resulting shares into the public market to obtain profits. The Commission has issued an order that finds that such activities made GHS a dealer[1] under Securities Exchange Act of 1934 (Exchange Act) and GHS's failure to register as a dealer violated Section 15(a)(1) of that Act.[2] I dissent from this order because it appears that

the Commission is attempting to achieve policy objectives through enforcement, instead of rulemaking, while also arbitrarily deciding which activities necessitate enforcement action.

**<u>Regulation by Enforcement</u>**

Since at least the 1990s, companies have issued convertible, variable rate notes to finance their operations.[3] When investors, like GHS, convert the notes into the company's common stock and resell the stock, there can a "death spiral" of the price of the stock.[4] However, companies generally issue these notes understanding this risk because they have no other sources of financing.[5]

Although the Commission has not publicly expressed it, its enforcement actions suggest policy concerns with investors' actions relating to convertible, variable rate notes and such actions' impact on the share prices of companies that issue them. However, the appropriate course of action to address these concerns is through rulemaking, not enforcement.

The Commission began a rulemaking process in 2020 when it proposed changes to Rule 144 under the Securities Act to eliminate tacking of holding periods[6] for certain types of convertible, variable rate notes, including those at issue in this case. Without tacking, investors, like GHS, may be required to hold the converted shares for at least six months before selling them.[7] If that were the case, investors may be discouraged from purchasing notes at the outset because they would be subject to investment risk while holding the underlying common stock after conversion. Thus, if tacking were prohibited, the

Commission may achieve its unspoken policy objective regarding convertible, variable rate notes. However, the Commission has yet to take final action on the proposal.[8]

Since 2017, the Commission has brought a series of enforcement actions against investors engaged in activities similar to GHS with respect to convertible, variable rate notes. These cases introduced a novel interpretation that such activities meant that investors were "dealers" and needed to register under the Exchange Act. While the Commission has been successful in some of these actions,[9] the facts of this case demonstrate why regulation by enforcement is extremely problematic.

Prior to 2017,[10] investors in convertible, variable rate notes had no reason to believe that their activity could trigger dealer registration obligations. One might claim that market participants should have been on notice about the Commission's previously undisclosed interpretation of "dealer" when it filed the first complaint in 2017. However, it is unreasonable to expect market participants to be continuously scanning court dockets in pending litigation across the country for new legal theories from the Commission, and on which a court has never ruled.[11]

District courts began issuing opinions analyzing the Commission's interpretation of "dealer" in late 2019 and in 2020. [12] However, a court of appeal would not rule on the issue until 2024.[13] The Supreme Court has recognized "[t]he fundamental principle that laws regulating persons or entities must give fair notice of what conduct is required or proscribed."[14] The Commission's action against GHS did not satisfy this principle. As the Commission acknowledges in its order, GHS ceased purchases of new convertible, variable rate notes in 2020, and

converted and sold only small amounts of stock from existing inventory after 2020.[15] In other words, GHS stopped the conduct in question around the time that the first judicial opinions stating that such conduct triggered dealer registration requirements was issued. In light of this, holding GHS to a standard not articulated until after its conduct occurred is fundamentally unfair.

The Commission should not be implementing policy objectives for convertible, variable rate notes through enforcement of novel theories under the "dealer" definition. Instead, the Commission should achieve its objectives through the rulemaking process, such as its proposal to change Rule 144's tacking requirements.

### Arbitrary Enforcement

Under the Commission's broad definition of "dealer," nearly any activity that involves buying and selling securities outside of the trader exception could require registration under the Exchange Act. Yet the action against GHS is solely focused on its transactions involving convertible, variable rate notes.

In addition to notes, GHS also acquired shares of common stock at a discounted price pursuant to equity lines of credit and then sought to resell them at prevailing market prices pursuant to registration statements under the Securities Act.[16]

However, the Commission's order makes no mention of the common stock obtained through these equity lines of credit. Instead, the Commission appears to make an arbitrary decision that transactions involving convertible, variable rate notes should be subject to different – and harsher – regulatory treatment.

Why does the acquisition and resale of stock from convertible, variable-rate notes require GHS to register as a dealer while the acquisition and resale of discounted stock from equity lines of credit raise no such registration requirements? Is it because issuances of such notes, which are often made as last-ditch financing by near-bankrupt companies, implicate the Commission's unspoken policy concerns but issuances of common stock may not? Unfortunately, the order is silent on this question.

Singling out of notes transactions as requiring dealer registration appears to be an arbitrary application of the "dealer" definition. This type of arbitrary implementation was a concern to the Supreme Court when it overturned the *Chevron* doctrine in *Loper Bright Enterprises v. Raimondo*.[17] As Justice Gorsuch explained in his concurring opinion, "because the reasonable bureaucrat may change his mind year-to-year and election-to-election, the people can never know with certainty what new 'interpretations' might be used against them."[18] Actions like the one the Commission takes today invite heightened judicial scrutiny of the Commission's interpretation of the term "dealer."

The Commission's actions also further raise questions as to whether its implementation of the "dealer" definition under the Exchange Act should be analyzed under the Supreme Court's "void for vagueness" doctrine, which "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."[19] Under the Commission's

current interpretation of the "dealer" definition, parties cannot know what is required of them, and the Commission's lack of precision enables enforcement actions to be undertaken in an arbitrary and discriminatory manner.

## Conclusion

In enforcing the federal securities laws, the Commission has an obligation to express its views prospectively, *ex ante*, to provide fair notice to persons of the conduct that will run afoul of the law. The Commission has failed to do so in this action against GHS.

---

[1] Section 3(a)(5) of the Exchange Act defines the term "dealer" to mean "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). The definition excludes "a person that buys or sells securities...for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business," which is commonly referred to as the "trader exception." *See* 15 U.S.C. § 78c(a)(5)(B).

Earlier this year the Commission adopted a definition of the term "as a part of a regular business" as used within the Exchange Act's definition of "dealer." *See* Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers,

Release No. 34-99477 (Feb. 6, 2024) [89 FR 14938 (Feb. 29, 2024)] ("Dealer Definition Release"), available at https://www.govinfo.gov/content/pkg/FR-2024-02-29/pdf/2024-02837.pdf (https://www.govinfo.gov/content/pkg/FR-2024-02-29/pdf/2024-02837.pdf). For my views on this rulemaking, see Statement on Further Definition of "As a Part of a Regular Business" in the Definition of Dealer, Mark T. Uyeda (Feb. 6, 2024), available at https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-dealer-trader-020624 (https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-dealer-trader-020624).

[2] *See* In the Matter of GHS Investments, LLC, Mark S. Grober, Sarfraz S. Hajee, and Matthew L. Schissler, Release No. 34-100769 (Aug. 19, 2024) (the "OIP"), available at https://www.sec.gov/files/litigation/admin/2024/34-100769.pdf (/files/litigation/admin/2024/34-100769.pdf).

[3] *See* Rule 144 Holding Period and Form 144 Filings, Release No. 33-10911 (Dec. 22, 2020) [86 Fed. Reg. 5063, 5072 (Jan. 19, 2021)] (the "Rule 144 Release"), available at https://www.govinfo.gov/content/pkg/FR-2021-01-19/pdf/2020-28790.pdf (https://www.govinfo.gov/content/pkg/FR-2021-01-19/pdf/2020-28790.pdf).

[4] *Id.*

[5] *Id.*

[6] Tacking refers to combining the holding period of the underlying common stock with the holding period of the convertible notes, to satisfy Rule 144's holding period requirement. Tacking is generally permitted under Rule 144 when notes are convertible for the underlying common stock because

the holder of the notes is subject to investment risk in the underlying common stock during the pre-conversion period. However, when the conversion rate is at a substantial discount to the market price of the common stock, it is questionable whether this investment risk exists during the pre-conversion period. Typically, when investors such as GHS rely on Rule 144 to sell converted common stock, they satisfy the rule's holding period requirement solely through their holding period of the notes, and accordingly, they can sell the underlying common stock immediately upon conversion. *See*, generally, the Rule 144 Release *supra* note 3.

[7] In lieu of holding the converted shares for the period required by Rule 144, an investor may resell the converted shares immediately upon conversion pursuant to a resale registration statement filed by the issuer.

[8] *See* Agency Rule List – Spring 2024, Securities and Exchange Commission, available at https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&ε (https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&agencyCode&showStage=active&agencyCd=3235).

[9] *See*, e.g., *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1269, 1271-73 (S.D. Fla. 2020), *affirmed by SEC v. Almagarby*, 92 F.4th 1306 (11th Cir. 2024), and *SEC v. Keener*, 580 F. Supp. 3d 1272, 1282 (S.D. Fla. 2022), *affirmed by SEC v. Keener*, 2024 WL 2745055 (11th Cir. May 29, 2024).

[10] The Commission's first complaint alleging failure to register as a dealer in the context of convertible, variable rate notes was in *SEC v. Ibrahim Almagarby, et al.*, No. 0:17-cv-62255-MGC (S.D. FL filed Nov. 17, 2017), available at https://www.sec.gov/files/litigation/complaints/2017/comp23992.pdf (https://www.sec.gov/files/litigation/complaints/2017/comp23992.pdf).

[11] The same can be said for market participants affected by some of the Commission's recent enforcement actions related to crypto asset securities.

[12] *See*, e.g., *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019) and *SEC v. Almagarby,* 479 F. Supp. 3d 1266 (S.D. Fla. 2020). The district court in *Almagarby* denied the defendant's motion to dismiss in 2018. However, it did not issue an opinion and published only an order.

[13] *See SEC v. Almagarby*, 92 F.4th 1306 (11th Cir. 2024).

[14] *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), available at https://docs.fcc.gov/public/attachments/DOC-314768A1.pdf (https://docs.fcc.gov/public/attachments/DOC-314768A1.pdf).

[15] The OIP at paragraph 15.

[16] *See, e.g.,* Form S-1 of Guided Therapeutics, Inc. (filed June 5, 2018), available at https://www.sec.gov/Archives/edgar/data/924515/000165495418006 (https://www.sec.gov/Archives/edgar/data/924515/00016549541800664 6/gthp_s1.htm); Form S-1 of Rocky Mountain High Brands, Inc. (filed May 15, 2019), available at https://www.sec.gov/Archives/edgar/data/1670869/000166357719000

(https://www.sec.gov/Archives/edgar/data/1670869/00016635771900021
3/mainbody.htm); Form S-1 of Singlepoint, Inc. (filed June 12, 2020),
available at
https://www.sec.gov/Archives/edgar/data/1443611/000147793220003
(https://www.sec.gov/Archives/edgar/data/1443611/00014779322000334
6/sing_s1.htm).

[17] *See Loper Bright Enterprises v. Raimondo,* 603 U.S. _ _ _ (2024),
available at https://www.supremecourt.gov/opinions/23pdf/22-
451_7m58.pdf   (https://www.supremecourt.gov/opinions/23pdf/22-451
_7m58.pdf).

[18] *Id.* at 19.

[19] *See* FCC v. Fox Television Stations, Inc., *supra* note 14, at 12.

Last Reviewed or Updated: Aug. 19, 2024

| Applicant Name: _____ | **Official Use** | Official Use Only |
| Date: _____ Firm CRD No.: _____ | | |

**12.** Check types of business engaged in (or to be engaged in, if not yet active) by the *applicant*. Do not check any category that accounts for (or is expected to account for) less than 1% of annual revenue from the securities or investment advisory business.

A. Exchange member engaged in exchange commission business other than floor activities   [ ] EMC

B. Exchange member engaged in floor activities   [ ] EMF

C. Broker or dealer making inter-dealer markets in corporate securities over-the-counter   [ ] IDM

D. Broker or dealer retailing corporate equity securities over-the-counter   [ ] BDR

E. Broker or dealer selling corporate debt securities   [ ] BDD

F. Underwriter or selling group participant (corporate securities other than mutual funds)   [ ] USG

G. Mutual fund underwriter or sponsor   [ ] MFU

H. Mutual fund retailer   [ ] MFR

I. 1. U.S. government securities dealer   [ ] GSD

   2. U.S. government securities broker

J. Municipal securities dealer

K. Municipal securities broker

L. Broker or dealer selling variable life insurance or annuities

M. Solicitor of time deposits in a financial institution

N. Real estate syndicator

O. Broker or dealer selling oil and gas interests   [ ] OGI

P. Put and call broker or dealer or option writer   [ ] PCB

Q. Broker or dealer selling securities of only one issuer or associate issuers (other than mutual funds)   [ ] BIA

R. Broker or dealer selling securities of non-profit organizations (e.g., churches, hospitals)   [ ] NPB

S. Investment advisory services   [ ] IAD

T. 1. Broker or dealer selling tax shelters or limited partnerships in primary distributions   [ ] TAP

   2. Broker or dealer selling tax shelters or limited partnerships in the secondary market   [ ] TAS

U. Non-exchange member arranging for transactions in listed securities by exchange member   [ ]

V. Trading securities for own account   [ ]

W. Private placements of securities   [ ] PLA

X. Broker or dealer selling interests in mortgages or other receivables   [ ] MRI

Y. Broker or dealer involved in a networking, kiosk or similar arrangement with a:

   1. bank, savings bank or association, or credit union   [ ] BNA

   2. insurance company or agency   [ ] INA

Z. Other (give details on Schedule D, Page 1, Section II)   [ ] OTH

**13.** A. Does *applicant* effect transactions in commodity futures, commodities or commodity options as a broker for others or as a dealer for its own account?   YES [ ] NO [ ]

   B. Does *applicant* engage in any other non-securities business?   [ ] [ ]

   *If 'yes,' describe each other business briefly on Schedule D, Page 1, Section II.*

---

## Broker-Dealer Registration Form 2024

*The many types of services that broker-dealers can provide to their customers and types of business they can be engaged in.*

**\*No box to check for INVESTING**

## Trading for own account

*means effecting transactions for own account with a customer account.*

*That type of transaction is a "principal trade," not an agency trade.*

*Example:*

*Buy 100 shares of AAPL for own account from a customer,*

*or,*

*Sell 100 shares of AAPL from own account to a customer.*


E✳TRADE®
from Morgan Stanley


JUSTIN KEENER

**Your Account**
Account Type

**E*TRADE from Morgan Stanley**
P.O. BOX 484
JERSEY CITY, NJ 07303-0484
(800)-387-2331

*This transaction is confirmed in accordance with the information provided on the Conditions and Disclosures page.*

| Trade Date | Settlement Date | Quantity | Price | | Settlement Amount |
|---|---|---|---|---|---|
| 03/20/2024 | 03/22/2024 | | 148.68 | Principal | |
| | | | | FINRA TAF | $0.17 |
| | | | | Supplemental Transaction Fee | $1.25 |
| | | | | Net Amount | |

**Transaction Type: Sold**

**Description: ALPHABET INC CL A**
Symbol / CUSIP / ISIN: GOOGL / 02079K305 / US02079K3059
Unsolicited trade
Morgan Stanley Smith Barney LLC acted as agent.



(5) DEALER.—

   (A) IN GENERAL.—The term "dealer" means any person engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise.

   (B) EXCEPTION FOR PERSON NOT ENGAGED IN THE BUSINESS OF DEALING.—The term "dealer" does not include a person that buys or sells securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.

These two phrases obviously have two different meanings

# I DID NOT AND HAVE NEVER VIOLATED 15 – 78o

I, Justin Keener, did not and have never violated 15-78o to the best of my knowledge and understanding at the present time.

Justin W. Keener, Investor

## CODE

15 U.S. Code § 78o - Registration and regulation of brokers and dealers

**(a)Registration of all persons utilizing exchange facilities to effect transactions; exemptions**

(1) It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

## ANALYSIS

**Registration of all persons utilizing exchange facilities to effect transactions**

+I have never in my life "utilized exchange facilities to effect transactions," therefore I have never violated 15-78o.

+The words "exchange" and facilities" are defined terms, please review.

+Please recall that the SEC and its staff have manipulated and brainwashed everyone by forcing this phrase into plain English. That is not correct.

+The defined term "exchange" means any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange.

+ The defined term "facility" when used with respect to an exchange includes its premises, tangible or intangible property whether on the premises or not, any right to the use of such premises or property or any service thereof for the purpose of effecting or reporting a transaction on an exchange (including, among other things, any system of communication to or from the exchange, by ticker or otherwise, maintained by or with the consent of the exchange), and any right of the exchange to the use of any property or service.

+**To Effect Transactions** means the execution or effectuation of a customer order by a broker-dealer or other market participant in the chain of execution when a securities transaction is effected.

**Information on Effecting Transactions and Trade Execution can be found on the SEC website at SEC.gov**

https://www.sec.gov/about/reports-publications/investorpubstradexec

Customers can only place orders, for example, to buy a stock or to sell a stock.

Customers can't effect transactions for their accounts or anyone else's account.

## <u>CONCLUSION</u>

**Keener <u>did not</u> violate U.S. 15-78o**

# I DID NOT AND HAVE NEVER MET THE DEFINITION OF DEALER FROM THE SECURITIES EXCHANGE ACT OF 1934

I, Justin Keener, did not and have never met the definition of a dealer (as set forth below) to the best of my knowledge and understanding at the present time.

_____
Justin W. Keener, Investor

## DEFINITION

(5) DEALER.—

(A) IN GENERAL.—The term ''dealer'' means any person engaged in the business of buying and selling securities (not including security-based swaps, other than security based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise.

(B) EXCEPTION FOR PERSON NOT ENGAGED IN THE BUSINESS OF DEALING.—The term ''dealer'' does not include a person that buys or sells securities (not including security based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.

## ANALYSIS

**I am not a person and have never been engaged in the business of buying and selling securities**

+To be "engaged in the business of buying and selling securities" is a technical industry term dating to the 1800s and it means that someone has created a business (a brokerage firm, brokerage house, dealer firm, etc.) out of providing the service of buying and selling securities and effecting those transactions on their behalf. Dealers charge a fee for this service, such as a commission.

As an investor I may, as I see fit, short sell securities or buy securities, or sell securities, or buy to cover, or invest in and so on. But I only do that as my personal investment activity. I do not provide services or engage in the business of buying and selling securities on behalf of any customer in order to earn fees or commissions. I do not have any customers. As an investor, I endeavor to make money from capital gains, interest, dividends, etc.

## CONCLUSION

**Keener has <u>never met the definition of a dealer</u>**

# <u>I DID NOT AND HAVE NEVER MET THE DEFINITION OF DEALER</u>
# <u>FROM VARIOUS SOURCES LISTED BELOW</u>

I, Justin Keener, did not and have never met the definition of a dealer (as set forth below) to the best of my knowledge and understanding at the present time.

Justin W. Keener, Investor

## <u>ANALYSIS</u>

**I am not a person and have never been engaged in the business of buying and selling securities**

+To be "engaged in the business of buying and selling securities" is a technical industry term dating to the 1800s and it means that someone has created a business (a brokerage firm, brokerage house, dealer firm, etc.) out of providing the service of buying and selling securities and effecting those transactions on their behalf. Dealers charge a fee for this service, such as a commission.

As an investor I may, as I see fit, short sell securities or buy securities, or sell securities, or buy to cover, or invest in and so on. But I only do that as my personal investment activity. I do not provide services or engage in the business of buying and selling securities on behalf of any customer in order to earn fees or

commissions.  I do not have any customers.  As an investor, I endeavor to make

money from capital gains, interest, dividends, etc.


## CONCLUSION

**Keener has <u>never met the definition of a dealer</u>**


## DEFINITIONS


### <u>Blacks Law Dictionary (2009)</u>

Dealer, n. (17c) 1. Someone who purchases goods or property for sale to others; a retailer. 2. A person or firm that buys and sells securities for its own account as a principal, and then sells to a customer. See Deal, n. & vb.


### <u>New York State dealer definition</u>

https://www.nysenate.gov/legislation/laws/GBS/359-E


SECTION 359-E
Definitions
General Business (GBS) CHAPTER 20, ARTICLE 23-A
§ 359-e. Definitions. Registration requirements.

1. The following terms, whenever used or referred to in this article, shall have the following meaning unless a different meaning clearly appears from the context:

(a) A "dealer" shall mean and include any person, firm, association or corporation engaged in the business of buying and selling securities

from or to the public within or from this state for his or its own account, through a broker or otherwise, except a bank unless such bank is considered a dealer under the federal securities exchange act of 1934, but does not include any person, firm, association or corporation in so far as he or it buys or sells securities for his or its bona fide investment account, either individually or in some fiduciary capacity. The term "dealer" shall, except as otherwise provided in this article, also include a person, firm, association or corporation selling or offering for sale securities within or from this state securities issued by it. No person shall be deemed to be a "dealer", as defined in this subdivision, or a broker, as defined in subdivision (b) of this section, solely by reason of the fact that he is engaged in the business of (i) selling, offering for sale, purchasing or offering to purchase any security or securities to, from or through any bank, dealer or broker, or to or from any syndicate, corporation or group formed for the specific purpose of acquiring such securities for resale to the public directly or through other syndicates or groups, or (ii) any offer, sale or distribution by an issuer of stock dividends, nontransferable warrants or transferable warrants exercisable within ninety days of their issuance to existing stockholders, securities issued upon conversion of convertible securities and exercise of warrants and securities issued as part of a recapitalization or reclassification to existing stockholders of the same issuer, or (iii) selling, offering for sale, purchasing or offering to purchase any security or securities on the floor of any securities exchange registered as a national securities exchange under the securities exchange act of nineteen hundred thirty-four. No person, firm, association or corporation shall be deemed to be a "dealer", as defined in this subdivision, solely by reason of selling or offering for sale any security or securities to any bank, corporation, savings institution, trust company, insurance company, investment company, as defined in the federal investment company act of nineteen hundred forty, pension or profit-sharing trust, or other financial institution or institutional buyer, whether the purchaser is acting for himself or itself or in some fiduciary capacity, as part of a private placement of securities.

(emphasis added)

## State of Florida dealer definition

http://www.leg.state.fl.us/Statutes/index.cfm?App_mode=Display_Statute&URL=0500-0599/0517/Sections/0517.021.html#:~:text=%2810%29%20%28a%29%20E2%80%9CDealer%E2%80%9D%20includes%2C%20unless%20otherwise%20specified%2C%20a,or%20trading%20in%20securities%20issued%20by%20another%20person.

**The 2024 Florida Statutes**

**517.021    Definitions.**—When used in this chapter, unless the context otherwise indicates, the following terms have the following respective meanings:

(10)(a)    "Dealer" includes, unless otherwise specified, a person, other than an associated person of a dealer, that engages, for all or part of the person's time, directly or indirectly, as agent or principal in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person.

(b)    The term "dealer" does not include any of the following:

1.    A licensed practicing attorney who renders or performs any such services in connection with the regular practice of the attorney's profession.

2.    A bank authorized to do business in this state, except nonbank subsidiaries of a bank.

3.    A trust company having trust powers that it is authorized to exercise in this state, which renders or performs services in a fiduciary capacity incidental to the exercise of its trust powers.

4.    A wholesaler selling exclusively to dealers.

5.    A person buying and selling for the person's own account exclusively through a registered dealer or stock exchange.

6.    An issuer.

7.    A natural person representing an issuer in the purchase, sale, or distribution of the issuer's own securities if such person:

a.    Is an officer, a director, a limited liability company manager or managing member, or a bona fide employee of the issuer;

b.    Has not participated in the distribution or sale of securities for any issuer for which such person was, within the preceding 12 months, an officer, a director, a limited liability company manager or managing member, or a bona fide employee;

c. Primarily performs, or is intended to perform at the end of the distribution, substantial duties for, or on behalf of, the issuer other than in connection with transactions in securities; and

d. Does not receive a commission, compensation, or other consideration for the completed sale of the issuer's securities apart from the compensation received for regular duties to the issuer.

## Uniform Securities Act dealer definition

https://www.nasaa.org/wp-content/uploads/2021/09/2002-Uniform-Securities-Act.pdf

SECTION 101. SHORT TITLE. This [Act] may be cited as the Uniform Securities Act (2002).

SECTION 102. DEFINITIONS. In this [Act], unless the context otherwise requires:

(4) "Broker-dealer" means a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account. The term does not include:

(A) an agent;

(B) an issuer;

(C) a bank or savings institution if its activities as a broker-dealer are limited to those specified in subsections 3(a)(4)(B)(i) through (vi), (viii) through (x), and (xi) if limited to unsolicited transactions; 3(a)(5)(B); and 3(a)(5)(C) of the Securities Exchange Act of 1934 (15 U.S.C. Sections 78c(a)(4) and (5)) or a bank that satisfies the conditions described in subsection 3(a)(4)(E) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(4));

(D) an international banking institution; or

(E) a person excluded by rule adopted or order issued under this [Act].

(emphasis added)

## 1932-1933 US Tax Guide

https://babel.hathitrust.org/cgi/pt?id=hvd.hntf7q&seq=5

142. Dealers in Securities. The Commissioner defines a dealer in securities as a "merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale <u>to customers.</u>" The Commissioner and the Board have both held that <u>persons engaged in the trade or business of buying and selling securities on their own account are not dealers.</u> (Emphasis added. Remainder of definition omitted.)


## 1939 Tax Code dealer definition

(Part of the New Deal legislative enactments that coincided with the Maloney Amendment to the Exchange Act requiring registration of dealers who are not members of a stock exchange).

https://www.law.cornell.edu/cfr/text/26/1.864-2

## 26 CFR § 1.864-2 - Trade or business within the United States.

## § 1.864-2  Trade or business within the  United States.

### (iv) *Definition of dealer in stocks or securities—*

(*a*) *In general.* For purposes of this subparagraph, a dealer in stocks or securities is a merchant of stocks or securities, with an established place of business, regularly engaged as a merchant in purchasing stocks or securities and selling them <u>to customers</u> with a view to the gains and profits that may be derived therefrom. <u>Persons who buy and sell, or hold, stocks or securities for investment or speculation, irrespective of whether such buying or selling constitutes the carrying on of a trade or business, and officers of corporations, members of partnerships, or fiduciaries, who in their individual capacities buy and sell, or hold, stocks or securities for investment or speculation are not dealers in stocks or securities within the meaning of this subparagraph solely by reason of that activity.</u> In determining under this subdivision whether a person is a dealer in stocks or securities such person's transactions in stocks or securities effected both in and outside the United States shall be taken into account.